Michael A. AUSTIN, Richard Elliot, Ogie Lee Hayes, Charles Orlander Guess, Warren Leatherwood, and Kervin Goodwin, Plaintiffs,

v.

Joe HOPPER, Commissioner of the Alabama Department of Corrections, Defendant.

No. CIV.A. 95–T–637–N.

United States District Court, M.D. Alabama, Northern Division.

Aug. 10, 1998.

J. Richard Cohen, Morris S. Dees, Jr., Rhonda Brownstein, Marcia Bull Stadeker, Ellen M. Bowden, Montgomery, AL, Roy S. Haber, Roy S. Haber, P.C., Eugene, OR, for Michael A. Austin, Richard Elliot, Ogie Lee Hayes, Charles Orlander Guess, Warren Leatherwood, Kervin Goodwin, plaintiffs.

Robin Garrett Laurie, Balch & Bingham, Montgomery, AL, Edward S. Allen, N. DeWayne Pope, Balch & Bingham, Birmingham, AL, Andrew W. Redd, Albert S. Butler, Alabama Department of Corrections, Legal Div., Montgomery, AL, William P. Gray, Jr., Gray & Jauregui, Montgomery, AL, for Fob James, defendant.

Andrew W. Redd, Albert S. Butler, Kim T. Thomas, Alabama Dept. of Corrections, Legal Div., Montgomery, AL, for Joe Hopper, defendant.

## MEMORANDUM OPINION

MYRON H. THOMPSON, District Judge.

In this class-action lawsuit, the plaintiffs, who are inmates in the Alabama prison sys-

tem, challenged the following four policies and practices employed by the prison system: (1) the use of "chain gangs"; (2) the use of "hitching posts"; (3) the denial of visitation rights to certain inmates; and (4) the failure to provide adequate toilet facilities to inmates on work squads. The plaintiffs claim that these policies and practices violated the first, fifth, eighth, and fourteenth amendments to the United States Constitution, as enforced through 42 U.S.C.A. § 1983. The plaintiffs named the Commissioner of the Department of Corrections (hereinafter "DOC") as defendant. The subject-matter jurisdiction of the court has been properly invoked pursuant to 28 U.S.C.A. §§ 1331, 1343(a)(4).

This lawsuit is now before the court on the recommendation of the United States Magistrate Judge.[1] In it, she recommends the following: (1) the approval of the parties' settlement of the plaintiffs' challenge to the use of chain gangs, including certification of a plaintiff class as to this claim; (2) the approval of the parties' settlement of the plaintiffs' claim that inmates on work release are not provided adequate toilet facilities; (3) the certification of a plaintiff class as to the plaintiffs' remaining two claims, the visitation-privileges claim and the hitching-post claim; (4) a holding that the denial of visitation privileges to certain inmates is constitutionally impermissible; and (5) a holding that the use of the hitching post is constitutionally impermissible.

For the reasons that follow, the court accepts the Magistrate Judge's recommendation to the following extent: (1) the chain-gang settlement is approved and a plaintiff-class certified; (2) plaintiff classes are certified as to the plaintiffs' visitation-privileges claim and their hitching-post claim; and (3) the DOC's use of the hitching post is held to be unconstitutional, albeit only as to the *manner* in which the hitching post is generally used. The court rejects the Magistrate Judge's recommendation as to following matters: (4) the DOC's visitation-privileges policy is not unconstitutional; and (5), at this time, the toilet-facilities settlement is not be approved. The court will, however, enter a supplemental order setting forth the procedures necessary for the court to approve the toilet-facilities agreement.

## I. STANDARD OF REVIEW

The court makes a "de novo determination upon the record, or after additional evidence, of any portion of the magistrate judge's disposition to which specific written objection has been made." Fed.R.Civ.P. 72(b); 28 U.S.C.A. § 636(b)(1). The court "may accept, reject, or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate judge with instructions." *Id.; see also United States v. Raddatz*, 447 U.S. 667, 673–84, 100 S.Ct. 2406, 2411–16, 65 L.Ed.2d 424 (1980).

## II. SETTLEMENT OF CHAIN-GANG CLAIM

On May 3, 1995, the DOC Commissioner implemented a "chain gang" prison labor policy.[2] Pursuant to this policy, inmates assigned to a chain gang were shackled by leg irons in groups of five; they were separated with eight feet of chain between them. The inmates, who were required to wear white uniforms with "CHAIN GANG" printed in black, were then taken to public highways or work sites on DOC property where they performed manual labor in ten-hour shifts.[3] One to two corrections officers supervised 25 to 40 inmates, who remained shackled to each other throughout the day, including during mealtime.[4] The type of work the

---

1. Recommendation of United States Magistrate Judge Vanzetta Penn McPherson, entered January 28, 1997 (Doc. no. 372) (hereinafter "recommendation of the Magistrate Judge").

2. Areas of agreement and disagreement between plaintiffs and defendant regarding class certification, filed March 22, 1996 (Doc. no. 80), at 1. The Commissioner at the time of the implementation of the chain gangs was Ronald E. Jones.

3. Complaint, filed May 15, 1996 (Doc. no. 1), ¶ 14; plaintiffs' exhibit 16 ("Chain Gang" Schedule).

4. *Id.* Inmates were not removed from the chain gang when they were ill, unless the correction officer determined they needed to return to the institution, nor were inmates removed when the use of force was necessary. *Id.; see also* recommendation of the Magistrate Judge, at 57 n. 66.

inmates performed included cutting grass, picking up litter, and breaking apart rocks.

Although unused for the past 30 years, chain gangs have a long, sordid history in the State of Alabama. During the Reconstruction era, chain gangs provided an alternative to rebuilding the penal institutions that were destroyed during the Civil War; they also served as a cheap form of labor. The majority of these chain-gang inmates, who died at enormously high rates due to the brutal conditions, were African–Americans. *See* Lynn M. Burley, *History Repeats Itself in the Resurrection of Prisoner Chain Gangs,* 15 Law & Ineq. 127, 129–130 (1997) (discussing history of the use of chain gangs). Chain gangs were later incorporated into the convict-lease system, whose atrocities have been well-documented. *See, e.g.,* C. Vann Woodward, *Origins of the New South: 1877–1913* 214–215 (1951) ("For the Southern convict-lease system a modern scholar can 'find parallel only in the persecutions of the Middle Ages or in the prison camps of Nazi Germany.' ") (citations omitted); Benno Schmidt, *Principle and Prejudice: The Supreme Court and Race in the Progressive Era. Part 2: The Peonage Cases,* 82 Colum. L.Rev. 646, 651 (1982) ("Alabama Governor Thomas E. Kilby in 1919 declared his state's convict-lease system 'a relic of barbarism ... a form of human slavery.' ") (citations omitted). Although the DOC's modern version of the chain gang differs in many respects from these earlier models, the return of chain gangs to Alabama's roadsides has provoked much concern from commentators, as well as jurists, about reviving a practice with such heinous roots. *See, e.g., Alabama v. Engler,* 85 F.3d 1205, 1210 (6th Cir.1996) (Jones, J., concurring) (noting that a fugitive from Alabama, whom the Sixth Circuit held should be extradited by the State of Michigan, "will be tossed into a prison system that has adopted the barbaric 'discipline' of the chain gang. This perpetuation of injustice cloaked in the tattered cloth of the Alabama justice system is deplorable.").

The purpose behind the reinstatement of the chain gang was, as stated in a form distributed to the inmates assigned to the chain gang, to send the inmates a message: "If you are worried about the Chain Gang, then don't violate parole, commit crimes, or come to prison in ALABAMA." [5] However, no uniform policy in the Alabama prison system was used to determine prisoner eligibility for chain-gang placement. Some prisons assigned only repeat offenders and parole violators to the chain gang. Other institutions used the chain gang as a means of punishing inmates who committed disciplinary violations.[6] In addition, Alabama trial judges were permitted to sentence inmates to placement on a chain gang as a part of a split-sentence. These sentences could range from 30 to 180 days.[7] The length of an inmate's assignment to the chain gang, whether it was imposed through sentencing or a DOC classification, could be extended depending on the inmate's behavior during the assignment. The "orientation" form for the Holman Correctional Facility explains the reassignment system as follows:

"You are now assigned to the Holman Correctional Facility 'Chain Gang.' The institution is a limited privileges work camp. You are expected to work while assigned to this institution. The length of your stay will be no less than 30 days. The average stay is 180 days. Many factors determine how long you stay. The number one factor is attitude and behavior. The number two factor is work performance and following the institution's rules on the job and on all three (3) shifts. Bottom line, a clear record, no negative reports. Depending on the severity of your infractions or breaking rules you can be extended. For instance, you could be extended for: late for work, failure to shave, disrespect to a staff member, arguing with a staff member, not keeping your bed area clean and neat, etc. A disciplinary results in an automatic extension usually. Behave, if you want another job and more privileges and

---

5. Plaintiffs' exhibit 15.

6. Defendant's memorandum in support of motion for summary judgment, filed November 15, 1995 (Doc. no. 48), exhibit 9 (affidavit of J.D. White (Deputy Commissioner, Alabama DOC)).

7. *Id.,* exhibit 10 (affidavit of John Jacobs (Administrative Analyst, Alabama DOC)).

the opportunity for programs. If you don't behave, you could stay here indefinitely."[8]

The plaintiffs' chief claim in their original complaint was that Alabama's use of chain gangs violated the eighth and fourteenth amendments of the United States Constitution. The claim encompassed two distinct sets of allegations: the first set related specifically to the increased risk of exposure to physical harm associated with accidents and inmate violence; the second included more general allegations concerning the physical and psychological harm inflicted by the use of chains that render the practice barbarous and inhumane. As part of the first set of claims, the plaintiffs alleged the following: (1) that the location of the gangs—alongside the highway—placed inmates at risk of being hit by a car, and further, that if an automobile accident did occur, the inmates were more likely to be hit or dragged by virtue of being chained together; (2) that the chains increased the likelihood of inmate-on-inmate violence because of the frustration inmates experienced while on the chain gang, and the chains rendered them unable to protect themselves should such violence occur; and (3) that the chains decreased the inmates' ability to protect themselves from workplace accidents, especially at locations such as rock piles. In their second set of allegations, the plaintiffs complained that the shackles inflicted physical pain, by chafing their legs and causing swelling, as well as severe psychological pain.[9] According to the plaintiffs, this psychological pain emanated from the inherent indignity of being chained together, as well as the humiliation of being publicly exposed while working in such chains.[10] In their amended complaint, the plaintiffs raised a claim concerning the lack of adequate toilet facilities for chain gang inmates while they were placed on work sites.[11]

The settlement agreement reached by the parties with regard to the chain-gang claim includes the following terms: that the DOC Commissioner, his agents and his successors, had ceased and would not resume the practice of chaining inmates together, but would use individual chains to shackle inmates; that Governor Fob James should be dismissed from the case;[12] that the plaintiffs would waive their right to seek fees and costs incurred in pursuing their claim related to the practice of chaining inmates together; that the plaintiffs' challenge to the practice of chaining inmates together should be dismissed with prejudice; and that in the event the Commissioner or his successors breached the settlement agreement, the plaintiffs may reinstate their challenge to the practice of chaining inmates together, or enforce the agreement as a contract between the parties in State court.[13] During a pretrial conference with the Magistrate Judge, the DOC Commissioner agreed to withdraw his opposition to the plaintiffs' motion for class certification only as it applied to the chain-gang claim in order to implement the settlement agreement.[14] One notable aspect of the settlement agreement, immediately seized upon by the inmates who objected to it, as discussed *infra*, is that the agreement only curtails the DOC's ability to chain inmates to-

---

**8.** Plaintiffs' exhibit 15. The Fountain Correctional Center Orientation form listed a third factor in determining an inmate's assignment to a chain gang: "The number three factor is bed space availability at other institutions." Plaintiffs' exhibit 14.

**9.** Complaint, filed May 15, 1995 (Doc. no. 1); amended complaint, filed May 17, 1995 (Doc. no. 7); plaintiffs' opposition to defendant's motion for summary judgment, filed June 13, 1996 (Doc. no. 134), at 16–19 (discussing psychological pain claim).

**10.** Plaintiffs' opposition to defendant's motion for summary judgment, at 18–19.

**11.** Proposed second amended complaint, filed on September 9, 1995 (Doc. no. 37). This additional claim relating to the inadequate toilet facilities at the work sites resulted in a second settlement agreement between the parties, which is discussed *infra*.

**12.** The court dismissed Governor Fob James in an order entered January 6, 1998 (Doc. no. 397).

**13.** Stipulation, filed June 19, 1996 (Doc. no. 140).

**14.** Order of the Magistrate Judge, entered June 25, 1996 (Doc. no. 145), at 2 (granting defendant's oral motion to withdraw, in part, his opposition to class certification). Class certification for the purposes of the settlement agreement will be discussed *infra*.

gether; it does not prevent the DOC from continuing the practice of placing inmates on public highways to perform manual labor in individual chains.

Rule 23(e) of the Federal Rules of Civil Procedure provides, in part, that "[a] class action shall not be dismissed or compromised without the approval of the court." Not only must this court approve of the settlement agreement, it must also determine whether the agreement meets the requirements of the Prison Litigation Reform Act, 18 U.S.C.A. § 3626 ("PLRA"), as well as whether the putative class to which the agreement applies meets the criteria for class certification under Rule 23. These issues will be addressed by the court below.

### A. The Prison Litigation Reform Act

■ Before approving the settlement agreement, the court must determine whether it complies with the PLRA. The PLRA limits the prospective relief a federal court may provide in cases concerning prison conditions. Prospective relief may "extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs," must be "narrowly drawn," and "is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C.A. § 3626(a)(1)(A). Further, the court may not "order any prospective relief that requires or permits a government official to exceed his or her authority under State or local law or otherwise violates State or local law" unless the following conditions are met: (1) Federal law permits such relief to be ordered in violation of State or local law; (2) the relief is necessary to correct the violation of a Federal right; and (3) no other relief will correct the violation of the Federal right. § 3626(a)(1)(B). In addition to limiting the type of relief a federal court may grant, the PLRA also curtails the longevity of such relief to two years after the court approves or grants the relief, or one year after the court has entered an order denying termination of relief. § 3626(b)(1).[15]

However, private settlement agreements are not subject to the above restrictions if the terms of such an agreement are not subject to court enforcement other than the reinstatement of the civil proceeding. § 3626(c)(2)(A). A "private settlement agreement" is defined in the PLRA as "an agreement entered into among the parties that is not subject to judicial enforcement other than the reinstatement of the civil proceeding that the agreement settled." § 3626(g)(6). In addition, the PLRA provides that a party to a private settlement agreement claiming that the agreement has been breached is not precluded "from seeking in State court any remedy available under State law." § 3626(c)(2)(B).

By choosing to resolve their chain-gang claim through a private settlement, rather than through a judicially enforceable consent decree, the plaintiffs have attempted to avoid the PLRA's stringent limitations with respect to the type and duration of the relief. The expense of their trade-off is the relinquishment of their right to challenge the constitutionality of the DOC's practice of shackling inmates together. The agreement does not require judicial enforcement of its terms, but rather contemplates enforcement through mechanisms permitted by the PLRA: reinstatement of the action and state-court relief. Thus, the court does not need to decide whether the relief provided in the settlement agreement—complete and permanent cessation of the chain gang practice—comports with the PLRA's prospective relief limitations.

### B. Court Approval of the Settlement Agreement

■ Judicial policy favors voluntary settlement as the means of resolving class-action cases. *Cotton v. Hinton,* 559 F.2d 1326, 1331 (5th Cir.1977).[16] However, "the settlement process is more susceptible than the adversarial process to certain types of abuse and, as a result, a court has a heavy, independent duty to ensure that the settlement is 'fair, adequate, and reasonable.'" *Paradise*

---

**15.** For prospective relief awarded on or before the enactment of the PLRA, the relief is terminated two years after the date of enactment. § 3626(b)(1)(iii).

**16.** In *Bonner v. Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

*v. Wells,* 686 F.Supp. 1442, 1444 (M.D.Ala. 1988) (Thompson, J.) (quoting *Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157, 1214 (5th Cir.1978)). This abuse can occur when, for example, "the interests of the class lawyer and the class may diverge, or a majority of the class may wrongfully compromise, betray or 'sell-out' the interests of the minority.'" *Id.* Besides evaluating the fairness of the settlement agreement, the court also has the duty to make sure that the settlement is not illegal or against public policy. *Piambino v. Bailey,* 757 F.2d 1112, 1119 (11th Cir.1985).

■ Before resolving these concerns, the court must ensure that all interested parties were informed of the settlement and had the opportunity to voice their objections. As required by Rule 23(e) of the Federal Rules of Civil Procedure, the Magistrate Judge ordered the parties to provide notice of the settlement of the chain-gang issue to the putative class of plaintiffs. This court-approved notice was posted on community bulletin boards in every dormitory in every prison, as well as in the law libraries and dining areas of each facility; it was also sent to county jails so as to facilitate notice to state inmates who were potential class members.[17] The notice informed inmates about the nature of the settlement, the advantages and disadvantages of the terms of the agreement, the right to file an objection to the settlement, as well as forms for filing such objections.[18] A fairness hearing was held on August 2, 1996, and a total 154 objections to the agreement were filed by members of the putative class of plaintiffs.

The notice was adequate to inform all the interested parties about the provisions of the settlement of the chain-gang claim. The fairness hearings and opportunity for written objections were adequate to solicit and determine the views of the class members. In

sum, the notice and fairness hearings were sufficient under Rule 23(e).

### 1. Whether the Settlement Is Fair, Adequate, and Reasonable

■ The factors the court may examine in deciding whether a settlement is fair, adequate, and reasonable are as follows: (1) the views of the class members; (2) the views of the class counsel; (3) the substance and amount of opposition to the settlement; (4) the possible existence of collusion behind the settlement; (5) the stage of the proceedings; (6) the likelihood of success at trial; (7) the complexity, expense, and likely duration of the lawsuit; and (8) the range of possible recovery. *Shuford v. Alabama State Bd. of Educ.,* 897 F.Supp. 1535, 1548 (M.D.Ala.1995) (Thompson, J.) (citing *Leverso v. SouthTrust Bank of Al., Nat. Assoc.,* 18 F.3d 1527, 1530 n. 6 (11th Cir.1994); *Bennett v. Behring Corp.,* 737 F.2d 982, 986 (11th Cir.1984)).

#### a. *Views of the Class Members*

■ In determining whether a settlement agreement is fair, adequate, and reasonable, the obvious first place a court should look is to the views of the class itself. *Shuford,* 897 F.Supp. at 1548. As stated above, notice was given to the class and 154 objections were filed in opposition to the settlement agreement. The Magistrate Judge categorized these objections in the following manner: the responses of 56 inmates did not constitute objections;[19] 50 inmates objected on the basis that they were still being chained individually and the lawsuit should have covered that circumstance; three wanted a declaration that the chain gangs were unconstitutional; 14 wanted money damages; eleven wanted further relief not included in the complaint and beyond the court's power (*e.g.,* early release, parole, etc.); 17 inmates thought the settlement should have included other claims, such as the hitching-post and

17. Order of the Magistrate Judge, entered July 5, 1996 (Doc. no. 160) (copy of approved notice attached).

18. *Id.*

19. The Magistrate Judge found that 28 inmates did not articulate objections, and that an additional 28 inmate responses did not constitute objections. *See* recommendation of the Magistrate Judge, at 60. To clarify this distinction,

responses in the first category simply did not state any objection on the form. Responses in the latter category did not state an objection to the settlement agreement, but rather to the chain gang practice itself (*e.g.,* "[The use of the chain gangs] should be banned immediately!" (Doc. no. 300), to "I think that [the] chain-gangs should be abolished because they [are] unfit and unsafe for Alabama's Department of Corrections Inmates." (Doc. no. 309)).

the toilet-facilities claims; and three objections discussed gender and other classification issues.[20]

The Magistrate Judge also conducted a fairness hearing on August 2, 1996, in which named plaintiffs Michael Austin and Ogie Hayes, and putative class members Douglas Crouch, Domineke Taylor, Terrance Roberts, Curtis Boggs, and Lorenzo Johnson, all five of whom had filed objections to the settlement agreement, testified for the plaintiffs. Austin and Hayes both testified that they approved the terms of the settlement agreement, and that they had not received any benefit, reward, or promise of reward in exchange for their approval of the agreement.

Based on a review of the objections and the testimony given at the fairness hearing, it appears that the majority of inmates who objected to the settlement agreement did so based on a misunderstanding of the terms of the agreement, rather than based on unfairness. Hayes testified that although he agreed with the terms of the settlement, many inmates with whom he discussed the lawsuit thought the agreement was a "sell-out" because it failed to encompass the DOC's practice of shackling inmates individually while on work detail. Indeed, 50 inmates based their objections specifically on this perceived deficiency of the settlement. It is entirely understandable that some inmates would object to the settlement agreement or view it as a "sell-out" because of the agreement's failure to cover the DOC's practice of individually shackling inmates while on work detail. After all, under the terms of the agreement the DOC may send inmates to work detail on public highways, and may use chains, albeit on an individual basis, to prevent the inmates from escaping. Assuming the objecting inmates believed this class-action litigation was designed to end the entire practice of chaining inmates while on work detail, whether the chains be used for individual or group purposes, the terms of the settlement might strike them as a somewhat of a disappointment, or a "sell-out." However, as both Hayes and Austin acknowledged in the fairness hearing, the plaintiffs did not challenge the DOC's use of individual chains for inmates, but rather the specific practice of shackling five men together. Three of the inmates who testified at the fairness hearing and who objected on this basis (Taylor, Roberts, and Buggs) approved the terms of the settlement after the plaintiffs' attorney and the Magistrate Judge informed them that the settlement agreement did not state that the plaintiffs agreed that the DOC could shackle inmates individually, and that the inmates were free to challenge this practice in the future.[21]

Although the court has characterized this objection as a "misunderstanding" of the terms of the settlement agreement and of the underlying claim of the lawsuit, the objecting inmates do raise an important issue regarding the adequacy of the settlement agreement: whether the agreement is adequate with regard to the psychological injury claim raised in the second part of the plaintiffs' eighth- and fourteenth-amendment challenge to the use of chain gangs. Prior to reaching a settlement with the DOC Commissioner, the plaintiffs submitted to this court dozens of affidavits of inmates who had served time on chain gangs in various Alabama penal institutions. These affidavits reported the nature of the physical and psychological pain suffered by inmates placed on the DOC chain gangs. The psychological injuries, particularly those caused by being forced to wear the chains in public, were described as follows:

> "People photographed and waved and honked at me and the other inmates. This was humiliating. Looking down at my feet and seeing the chains around them, I felt like a slave. Wearing the chains publicly was still more humiliating." [22]

---

**20.** Recommendation of the Magistrate Judge, at 60–61 (referencing the objections by docket number).

**21.** The settlement agreement states that "Without being ordered to do so by the Court, the Department of Corrections has ceased the practice of chaining inmates together. It has adopted the practice of individual chains for inmates. It believes that the latter practice allows more productive and efficient management of inmates, with increased safety and security." Stipulation, filed June 19, 1996 (Doc. no. 140).

**22.** Exhibits in support of plaintiffs' opposition to defendant's motion for summary judgment, exhibit 65 (affidavit of Marvin Hudson, inmate at

"The chain gang tore me apart mentally. I was chained up in public view. My family, friends and potential employers could all see me in chains—a fact which hurt and embarrassed me deeply." [23]

"The chain gangs have caused me extreme mental anguish. Wearing chains made me feel like an animal. Being paraded along the Alabama highways, moreover, made me feel like I was for sale—for public consumption." [24]

"My chain gang sentence has caused me extreme mental anguish. Being forced to wear chains was humiliating. The experience also reminded me of the slavery that my ancestors had to endure.... Although I have been out of chains for months, I cannot stop their image from running through my mind. I dream about the chains frequently. I often wake up two or three times in the night screaming and in a cold sweat. Every time I see my ankles, I picture the chains around them." [25]

Based on these statements, it is arguable that the inmates' alleged psychological injuries were not solely derived from the DOC's practice of chaining inmates together, but from the mere fact of being chained throughout the day and placed in public view. The settlement agreement, which states that the DOC will adopt the practice of individually shackling inmates, leaves the DOC with plenty of room to continue practices that have allegedly inflicted psychological harm on the inmates. This drawback, however, must be balanced with the substantial benefits the plaintiff class derives from the settlement agreement, along with the fact that the agreement does not preclude future challenges to the DOC's use of chains on individual inmates on work detail.

The second area involving a misunderstanding of the terms of the settlement agreement concerned the lack of award of monetary damages. Crouch's testimony at the fairness hearing typified this objection: Crouch stated that he wanted a clarification on the monetary and punitive damages, and wanted to know why the putative class of plaintiffs had not received these damages in the lawsuit. However, after the plaintiffs' attorney and the Magistrate Judge explained to Crouch that the plaintiffs did not seek damages in their lawsuit and individual inmates would be able to pursue claims for monetary damages in addition to the settlement, Crouch stated that he approved the terms of the settlement. Again, this set of objections must be balanced against the substantial benefits the plaintiffs will derive from the settlement agreement, as well as with the fact that inmates such as Crouch and the other 13 objectors are permitted to file or maintain their actions for monetary damages stemming from injuries while serving time on the chain gangs.

These two sets of objections together constitute 64 of the 98 objections filed with the court that actually stated an objection to the settlement agreement, or 65% of such objections. Of the remaining objections, only those concerning the constitutionality of the chain gangs warrant this court's attention in an examination of the fairness and adequacy of the settlement agreement.[26] One of the trade-offs the plaintiffs have made in settling their chain-gang claim is to forgo the possibility that this court would find the practice of shackling inmates together cruel and unusual punishment in violation of the eighth and fourteenth amendments. Although such a holding would arguably have limited duration, given the relevant provisions of the PLRA discussed above, such a decision would also have precedential value if future challenges to the practice were brought. On the other hand, by settling the chain-gang claim, the plaintiffs have avoided the significant risk of losing their constitutional chal-

Donaldson and Staton Correctional Facilities), at 1.

**23.** *Id.*, exhibit 56 (affidavit of Dickie Garner, inmate at Easterling and Staton Correctional Facilities), at 1.

**24.** *Id.*, exhibit 66 (affidavit of Victor Vintson, inmate at Ventress and Limestone Correctional Facilities), at 1.

**25.** *Id.*, exhibit 63 (affidavit of Rosevelt Simmons, inmate at Elmore and Limestone Correctional Facilities), at 1.

**26.** The Magistrate Judge correctly noted that the remaining objections requested relief outside the scope of the court's authority. *See* Recommendation of the Magistrate Judge, at 61.

lenge to the chain-gang practice. These considerations all must be included in the court's appraisal of the agreement.

### b. Views of Class Counsel

The judgment of class counsel is also important in addressing the fairness, adequacy, and reasonableness of a settlement agreement. *Pettway,* 576 F.2d at 1215. Class counsel for the plaintiffs are experienced civil rights lawyers who have shown to the court, through their participation and continued monitoring in this case, an enduring commitment to protecting the rights of the plaintiff class. Further, class counsel have agreed to waive attorneys' fees with regard to the chain-gang claim, thus alleviating any doubts about their dedication to the plaintiff class. *Id.* (court should be sensitive to potential conflict between class and its attorneys, particularly where large attorneys' fees may also be at stake). Class counsel have argued that the proposed settlement is fair, adequate and reasonable, and have thoroughly explained the benefits the settlement agreement provides, specifically in terms of the longevity of the agreement, and the court gives considerable weight to their views.

### c. Substance and Amount of Opposition to the Settlement Agreement

It is difficult for the court to gauge the size of the putative class of plaintiffs involved in this litigation. The Magistrate Judge has estimated the class size at different times as numbering 2,000 or 4,000.[27] The Magistrate Judge also noted that because "the population of state inmates is ever-changing, and the function of the institutions involved suggest[s] a perpetual life," the class of plaintiffs involved in the chain-gang claim is potentially infinite.[28] In their amended motion for class certification, the plaintiffs sought to certify two classes for purposes of the litigation, the first consisting of "all present and future

Alabama inmates who have been or may be assigned to work in chain gangs."[29] According to the plaintiffs, at the time of the filing of their motion, there were 700 inmates on Alabama chain gangs, and approximately 2,000 inmates had completed sentences on the chain gang. The DOC Commissioner has not contested the plaintiffs' allegations concerning the number of inmates who have been, are, or will be assigned to the chain gang.[30]

Even with these difficulties in estimation, the court can say with reasonable certainty that the 154 objections filed by the members of the putative class represent a small percentage of the class as a whole.[31] In resolving objections within the class to a settlement agreement, this court has previously noted that "where the settlement provides for structural changes with each class member's interest in the adequacy of the change being substantially the same, and where there are no conflicts of interests among class members or among definable groups within the class, then the decision to approve the settlement 'may appropriately be described as an intrinsically "class" decision in which majority sentiments should be given great weight.'" *Paradise v. Wells,* 686 F.Supp. at 1445 (quoting *Pettway,* 576 F.2d at 1217). Here, where the number of objections to the settlement agreement is relatively small, and where the concerns voiced in those objections, particularly the concerns related to monetary damages and challenges to the DOC's practice of individually shackling inmates on work detail, are capable of being remedied outside or in addition to the settlement agreement, the court is confident in giving credence to the class majority's approval of the agreement.

This conclusion does not imply, however, that the court has interpreted the silence of the remaining class members to represent

---

27. Recommendation of the Magistrate Judge, at 60, 66.

28. *Id.* at 55 n. 63.

29. Plaintiffs' amended motion for class certification, filed March 11, 1996 (Doc. no. 74), at 1.

30. *See* areas of agreement and disagreement between plaintiffs and defendant regarding class

certification, filed March 22, 1996 (Doc. no. 80), at 2.

31. Based on the parties' representations of the number of inmates who have served or were serving time on chain gangs when the lawsuit was filed, a conservative estimate would place the class size at 2,700 inmates. The 154 filed objections therefore represent only 5.7% of the class.

agreement with the settlement. As the court previously noted in *Reynolds v. King,* "the court must look beyond the numbers to the total reality of the circumstances presented and from those circumstances attempt to extrapolate some picture of the true support for the proposed decree." 790 F.Supp. 1101, 1109 (M.D.Ala.1990) (Thompson, J.) (declining to approve consent decree despite the overwhelming majority of class members who did not file objections to the decree). The court is especially wary of such silence in the context of prison litigation where the members of the class are likely to have lower literacy levels, as well as limited access to materials to enable them to file an objections. *See generally Johnson v. Avery,* 393 U.S. 483, 487, 89 S.Ct. 747, 750, 21 L.Ed.2d 718 (1969) ("Jails and penitentiaries include among their inmates a high percentage of persons who are totally or functionally illiterate, whose educational attainments are slight, and whose intelligence is limited."). The court has therefore taken pains to examine the objections that were raised to determine whether the agreement is fair, adequate, and reasonable.

#### d. Existence of Collusion

There has been no charge that the agreement was the product of collusion between the parties. There is no evidence that counsel or the named plaintiffs will benefit from the agreement at the expense of members of the class or sub-class: the settlement agreement specifically states that the plaintiffs have waived their right to fees and costs related to their chain-gang claim, and Austin and Hayes both testified that they had received no reward or promise of reward in exchange for agreeing to settle their claim. Further, there is no evidence that the parties' negotiations were anything other than at arms length.

#### e. Other Factors

The four remaining factors are interrelated: the stage of the proceedings; the likelihood of success at trial; the complexity, expense, and likely duration of the lawsuit; and the range of possible recovery. The issues presented in these two claims are particularly complex and would have required a contentious trial with considerable expense. Indeed, the parties and the Magistrate Judge estimated that trial on the chain-gang and toilet-facilities claims would have doubled the length of the trial, as well as created a much more voluminous record requiring the court to expend an even greater time considering the claims.

In light of the above considerations, the court has independently evaluated the fairness, adequacy, and reasonableness of the proposed settlement. Here, the plaintiffs have traded the risk of losing a protracted litigation, combined with the limited duration of any success under the PLRA, with the assurance that the DOC will cease the practice the plaintiffs contested in their original complaint. A major drawback to the agreement, as recognized by the court and the objecting inmates, is that the DOC will be able to maintain a "chain gang" policy by shackling inmates on an individual basis. However, there is no evidence provided to the court that the named plaintiffs and their counsel have failed to pursue their claim as consideration for the DOC's agreement to cease the practice of shackling inmates together. Indeed, the named plaintiffs did not even include the individual-chain practice in their complaint or any of their amended complaints. Further, the court is satisfied that should an inmate wish to challenge the DOC's practice with regard to the use of individual chains at work sites, the settlement agreement does not preclude such an inmate from doing so. A settlement implicitly means settling for less than all that is sought; it is "a reasoned choice of a certainty over a gamble, the certainty being the settlement and the gamble being the risk that comes with going to trial." *Paradise,* 686 F.Supp. at 1446. Here, the settlement agreement gives the plaintiffs more relief than they could have obtained by pursuing their claims in court in terms of longevity, and leaves open the possibility for future challenges to the DOC's use of individual chains. With one exception, discussed below, the court approves the terms of the settlement agreement.

■ The settlement agreement provides that the plaintiffs' eighth-amendment challenge will be dismissed with prejudice. As

the Magistrate Judge correctly noted, this provision substantially curtails one of the agreement's stated remedies for breach: that the plaintiffs may reinstate their challenge in federal court. "[A] stipulation of dismissal with prejudice ... at any stage of a judicial proceeding, normally constitutes a final judgment on the merits which bars a later suit on the same cause of action." *Citibank, N.A. v. Data Lease Fin. Corp.,* 904 F.2d 1498, 1501–02 (11th Cir.1990) (citation omitted). So as to fully protect the rights of members of the putative class to enforce this agreement, the court will approve the settlement with the modification that the chain-gang claim be dismissed *without* prejudice.[32]

### 2. Whether the Agreement Is Legal and Good Public Policy

The court has already discussed whether the settlement agreement complies with the PLRA, and has concluded that it does. None of the interested parties has contested the legality of the settlement agreement and, with the exception of the provision dismissing the case with prejudice, the court does not find any cause to contest the agreement's legality.

The court also finds that the agreement is good public policy. The putative class of plaintiffs articulated legitimate safety concerns relating to the DOC's practice of chaining inmates together, and the agreement, if enforced, will obviate the vast majority of those concerns. What the agreement does not eliminate, particularly the risk of psychological injury, it also does not preclude from resolution. Thus, the court is satisfied that any deficiencies contained in the settlement agreement can be remedied in the future, if necessary, through future challenges. With the modification discussed above, the court therefore approves the settlement agreement between the parties.

### 3. Class Certification

 In settling the chain-gang claim, the DOC Commissioner agreed to withdraw his opposition to the plaintiffs' motion for class certification only as it pertained to the chain-gang claim. Accordingly, this court has continually referred to the plaintiffs as a putative class when discussing the fairness of the settlement agreement. However, the Supreme Court has indicated, in somewhat different circumstances, that in approving a settlement agreement in a class-action litigation, a federal court must also ensure that the settling class meets the class-certification criteria of Rule 23 of the Federal Rules of Civil Procedure. *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, ——, 117 S.Ct. 2231, 2248, 138 L.Ed.2d 689 (1997). As the Court noted in *Amchem,* the "proposed settlement classes sometimes warrant more, not less caution on the question of certification." —— U.S. at —— n. 16, 117 S.Ct. at 2249 n. 16. Although the Supreme Court in *Amchem* was dealing with a settlement class "opting-out" of litigation, the Court's statement, that "Federal courts ... lack authority to substitute for Rule 23's certification criteria a standard never adopted—that if a settlement is 'fair,' then certification is proper," applies to the facts at hand with equal force. Thus, the fairness of the agreement is irrelevant if the court finds the plaintiffs fail to meet the criteria for class certification.

 In their complaint, the plaintiffs requested certification of a class of "all present and future Alabama inmates who have been or may be assigned to work in chain gangs." Rule 23(a) of the Federal Rules of Civil Procedure sets forth the following prerequisites for class certification:

"One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

---

32. In her recommendation, the Magistrate Judge stated "should the court approve the parties' settlement of the chain gang claims, dismissal should be without prejudice. The parties have already stipulated that the plaintiffs' claims regarding toilet facilities should be dismissed without prejudiced." Recommendation of the Magistrate Judge, at 69. Neither the Commissioner nor the plaintiffs objected to the Magistrate Judge's conclusion.

As stated above, the exact size of the class is difficult to estimate given the fluctuations of the prison population, as well as the number of inmates who may be assigned to chain-gang labor in the future. However, having previously estimated the class size as numbering 2,700 inmates,[33] the court finds that the plaintiffs have clearly met Rule 23(a)(1)'s numerosity requirement. The second and third requirements of commonality and typicality are also clearly met. Here, the named plaintiffs have sought declaratory and injunctive relief in their challenge to the DOC's practice of shackling five inmates together. The named plaintiffs, like many other members in the putative class, have been assigned to the chain gang in the past and could potentially be reassigned to the chain gang in the future; moreover, the requested declaratory and injunctive relief would inure to the benefit of all members of the putative class.[34] Though there certainly may be some factual differences between the individual class members and the nature and severity of their treatment on the chain gang, such individual differences do not defeat certification because there is no requirement that every class member be affected by the institutional practice or condition in the same way. *See, e.g., Appleyard v. Wallace*, 754 F.2d 955, 958 (11th Cir.1985) (typicality not defeated by the varying fact patterns and varying degrees of injury underlying each class).

The fourth requirement, adequacy of representation, has also been met. In determining this issue, the court must inquire into "the adequacy of both the named representative and class counsel." 5 James Wm. Moore et al., Moore's Federal Practice § 23.25[3][a] at 23–113. "The determination that a party would adequately protect the interest of a class is factual and depends on the circumstances of each case." *Eastland v. Tennessee Valley Auth.*, 704 F.2d 613, 618 (11th Cir.1983). Here, the court finds, based on the record before it, that Austin, Hayes,

Elliot, and Guess, have not only demonstrated their commitment to this litigation, but have also demonstrated to the Magistrate Judge a "cooperative spirit" toward their attorneys.[35] The court is also satisfied with the adequacy of their counsel, which is an institutional public interest advocacy group that has experience in handling class-action suits.

Besides meeting the prerequisites of Rule 23(a), the putative class must also meet one of the types of actions described in Rule 23(b). Rule 23(b)(2) requires the court to be satisfied that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Class certification under Rule 23(b)(2) is particularly appropriate in the prison litigation context where only injunctive and declaratory relief are sought. *See, e.g., Pugh v. Locke*, 406 F.Supp. 318 (M.D.Ala.1976), *aff'd sub nom. Newman v. Alabama*, 559 F.2d 283 (5th Cir.1977), *cert. denied*, 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978). The court is therefore satisfied that the requirements of Rule 23 have been met and certifies the class of plaintiffs for the purposes of the chain-gang settlement agreement.

## III. SETTLEMENT OF TOILET–FACILITIES CLAIM

The plaintiffs first raised their allegations concerning the adequacy of toilet facilities for chain-gang inmates in their first amended complaint.[36] There, and in their subsequent amended complaints, the plaintiffs claimed that the only toilet facility provided to inmates assigned to chain-gang labor was a "portable chamber pot behind a make-shift screen next to the road."[37] The plaintiffs charged that the DOC did not pro-

---

**33.** *See* notes 30–31 and accompanying text.

**34.** Plaintiffs' memorandum in support of motion for class certification, filed July 7, 1996 (Doc. no. 28), exhibits 3–6 (affidavits of named plaintiffs Austin, Elliot, Hayes, and Guess).

**35.** Recommendation of the Magistrate Judge, at 52 n. 62.

**36.** *See* amended complaint, filed May 17, 1995 (Doc. no. 7), ¶ 31.

**37.** Second amended complaint, filed September 19, 1995 (Doc. no. 37), ¶ 32.

vide inmates with toilet paper or with facilities for them to wash their hands after using the chamber pot and before eating lunch. They also stated that because the chamber pot was not always available, inmates were often forced to squat on the ground and to defecate in public. Either with or without the chamber pot arrangement, the prisoners were forced to relieve themselves while chained to the other inmates, which severely compromised their privacy.[38] The plaintiffs contend that these practices created unsanitary conditions and deprived them of their basic human dignity; they also claim that the prison officials' deliberate indifference to these conditions resulted in the infliction of cruel and unusual punishment upon them in violation of the eighth and fourteenth amendments.[39] The class members challenging the adequacy of the toilet facilities are identical to the class certified for the chain-gang settlement, discussed *supra;*[40] thus, the court does not need to repeat the settlement class inquiry here.

After resolving the chain-gang claim through a settlement agreement, the parties were able to reach a second agreement on the toilet-facilities claim.[41] Recognizing that some of the plaintiffs' concerns had been remedied by the cessation of chaining inmates together, specifically the inmates' lack of privacy in the use of the toilet facilities, the parties agreed that the DOC would promulgate a standard operating procedure, which would apply to all outside work squads supervised by the DOC. This standard operating procedure would include the following provisions: soap, water, and toilet paper will be provided to all inmates; there will be one portable toilet for every squad of 40 inmates; the portable toilet will be equipped with a heavyweight canvas screen; for medium custody inmates who labor on prison grounds (as opposed to those inmates who labor on public highways), and for whom no toilet facilities are available, reasonable efforts will be made to allow privacy for those who need to relieve themselves; and a shovel or other instrument will be provided to such medium security inmates for the purpose of digging a hole when an inmate must defecate and no toilet facility is available.[42] The agreement also states that within four to eight months after the court approves the settlement, the Commissioner will conduct an unannounced inspection of these toilet facilities, and will take any corrective action necessary to ensure compliance with the standard operating procedure. The results of such inspections, as well as any corrective measures, will be reported to the plaintiffs' counsel. The plaintiffs also agreed to dismiss their claim against the Commissioner without prejudice, and to waive their right to seek fees and costs.

The parties filed a joint motion for preliminary approval of the settlement agreement and attached a proposed order that set out the procedures for giving notice to the class, as well as the form of the notice itself.[43] However, the Magistrate Judge did not sign this order, and a search of the record reveals no further instructions regarding the notice to the class or a fairness hearing. Although the court concludes that the settlement agreement is legal and is not against public policy, *see Piambino v. Bailey,* 757 F.2d 1112, 1119 (11th Cir.1985), the court is unable to evaluate the underlying fairness of the agreement without obtaining the views of the members of the class. The court will therefore enter an additional order instructing the parties to give the members of the class notice of the settlement agreement, and to review any objections members of the class

38. *Id.*

39. *Id.* ¶¶ 33, 45.

40. The definition of the class sought to be certified by the plaintiffs did not change after the plaintiffs amended their complaint to incorporate the adequacy of toilet-facilities claim on May 17, 1995. *See* motion for class certification, filed May 18, 1995 (Doc. no. 8). The plaintiffs only sought to certify a separate class with regard to their hitching-post claim. *See* amended motion for class certification, filed March 11, 1996 (Doc.

no. 74). Whether this putative class meets Rule 23(a)'s requirements for class certification will be discussed *infra.*

41. Stipulation, filed September 24, 1996 (Doc. no. 339).

42. *Id.* ¶¶ 1–4.

43. Joint motion for preliminary approval of proposed stipulation and notice to class members, filed September 27, 1996 (Doc. no. 344).

may have to the agreement. Following this process, the court will conduct a fairness hearing.

## IV. CLASS CERTIFICATION AS TO REMAINING CLAIMS

■ Before addressing the two remaining claims in the litigation—the visitation policy for those inmates assigned to the "Alternative Thinking Unit" (ATU) and the use of the hitching post—the court will address whether the putative class meets the class certification requirements set out in Rule 23, and if so, how many classes should be certified. The Magistrate Judge found that two classes of inmates should be ·certified: (1) present and future Alabama inmates who have been or may be assigned to work in chain gangs; and (2) present and future Alabama inmates who have been or may be placed on the hitching post.[44] The court agrees that two classes should be certified pursuant to Rule 23. However, for the reasons that follow, the court will redefine the first class to include only those present and future Alabama inmates who have been or may be assigned to the ATU, a shock incarceration program in Alabama's penal system.

As stated, the plaintiffs originally filed this lawsuit to challenge the DOC's use of chain gangs.[45] Two days later, the plaintiffs amended their complaint to include allegations that inmates "who refuse to go out on

the chain gang are tied to a post with their hands handcuffed above their heads and are forced to stand on an uneven surface in an open-air cell all day in the hot sun."[46] The plaintiffs later moved to amend their complaint to allege that the DOC's use of the "hitching post," the restraining bar to which the inmates who refuse to work are handcuffed, violates the eighth and fourteenth amendments.[47] The hitching post is a horizontal bar "made of sturdy, nonflexible material," located on the prison grounds, and positioned "no more than 50 feet from an officer."[48] According to the DOC's regulations, an inmate will be placed upon the hitching post either for refusing to work or otherwise disrupting a work squad.[49] Thus, the use of the hitching post applies to all inmates who are assigned work duties in prison, whether these duties include labor in chain gangs or other forms of work.[50]

■ By contrast, the plaintiffs' claim regarding visitation privileges affects a smaller group of inmates. The plaintiffs first raised their visitation-privileges claim in their revised second amended ·complaint.[51] There, they stated that "Chain gang inmates are denied any visitation for the entire length of their stay on the chain gang."[52] The plaintiffs claim that this practice "violates their right to freedom of association under the First and Fourteenth Amendments to the

---

44. Recommendation of the Magistrate Judge, at 48.

45. Complaint, filed May 15, 1995 (Doc. no. 1).

46. Amended complaint, filed May 17, 1995 (Doc. no. 7), ¶ 20.

47. Plaintiffs' motion for leave to amend, filed on September 9, 1995 (Doc. no. 37). This motion was granted in an order entered January 6, 1998 (Doc. no. 399).

48. Plaintiffs' exhibit 12 (Administrative Regulation 429, dated October 26, 1993). According to the regulations, each facility should actually have two bars: "one mounted 57 inches from the ground for taller inmates and one at 45 inches for the shorter inmates." *Id.*

49. *Id.* However, as discussed *infra*, testimony at the evidentiary hearing conducted by the Magistrate Judge indicated that inmates have been placed on the hitching post for reasons other than refusal to work.

50. The Magistrate Judge explained the application of the policy as follows:

> "Certification of a class of inmates assigned to the chain gang does not overlap completely with a class of inmates placed on the hitching post, however, because the two populations are not necessarily the same. [The evidence] reveals that the only restriction applicable to the hitching post is that its use is limited to inmates who refuse to work. An inmates's work assignment, location within the institution, and classification are not factors which affect his or her eligibility for placement on the hitching post once an officer determines that he or she has refused to work."

Recommendation of Magistrate Judge, at 47.

51. Plaintiffs' motion for leave to amend, filed February 23, 1996 (Doc. no. 59). The Magistrate Judge granted the plaintiffs' motion. *See* stamped order, entered on March 26, 1996.

52. Plaintiffs' motion for leave to amend, filed February 23, 1996 (Doc. no. 59), ¶ 42.

United States Constitution."[53] The plaintiffs' allegations imply that every inmate assigned to chain-gang labor is denied visitation. However, during oral argument before this court on the DOC Commissioner's objections to the Magistrate Judge's recommendation, the parties made clear that not all inmates assigned to chain-gang labor were placed in the ATU, and only ATU inmates were denied visitation for the entire period of their placement within the unit, or 90 days.[54] Thus, the issue is whether all present and future inmates who are assigned to the ATU and all present and future inmates who are denied visitation privileges for 90 days should be certified as two separate classes. Although the plaintiffs requested class certification in a slightly different form, this court is permitted under Rule 23(c)(4) of the Federal Rules of Civil Procedure to shape class definition so as to limit the class to the claims raised.[55] "Rule 23(c)(4) empowers courts to define an appropriate class, whether by accepting the proposed class, limiting the class to certain issues, or creating subclasses. Thus, a complaint's proposed class definition does not bind the court, and Rule 23(c)(4) provides [the court] with some latitude in redefining the class." 5 James Wm. Moore et al., Moore's Federal Practice § 23.05[3] (3d ed.1997).

Having established the parameters of these two classes, the court will next determine whether they satisfy the elements of Rule 23 of the Federal Civil Rules of Procedure. In order to represent a class of allegedly similarly-situated individuals, the proposed named plaintiffs must demonstrate that "(1) the class is so numerous that join-

der of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a).

Here, Rule 23(a)(1)'s requirement of numerosity has clearly been satisfied for both classes. The Magistrate Judge noted that neither the plaintiffs nor the DOC Commissioner presented evidence reflecting the number of inmates who have been placed on the hitching post since 1993, but that the Commissioner's trial exhibits, "which do not purport to reflect the totality of those inmates," indicate that over 200 inmates have been placed on the hitching post.[56] This evidence, combined with the fact that any inmate assigned to work duty is eligible for placement on the hitching post, and that the number of the inmates placed on the hitching post has increased constantly during this litigation,[57] renders the class so numerous so as to make joinder impracticable. With regard to the number of inmates assigned to the ATU, it is likewise difficult for the court to pinpoint an exact number based on the evidence before it. The Magistrate Judge stated that "well over 2,000 inmates have been assigned to the chain gang and have had their visitation rights suspended for the time that they served on it."[58] As discussed above, it appears that not all inmates assigned to chain-gang labor were in the ATU; some were placed on the chain gang for disciplinary violations. However, even as-

---

53. *Id.* ¶ 54.

54. Transcript of oral argument on objections to the Magistrate Judge's recommendation, held May 14, 1997, at 5–8. It appears that the terms "chain gang" and "ATU" were used interchangeably during the proceedings before the Magistrate Judge. *See* plaintiffs' pretrial brief, filed September 16, 1996 (Doc. no. 326), at 13 (challenging the denial of visitation privileges to inmates assigned to the ATU or "chain gang dorm."). In fact, the distinction is not even apparent in the DOC's policies. *See* plaintiffs' exhibits 14 and 15 (referring to "ATU 'Chain Gang' Orientation").

55. Rule 23(c)(4) of the Federal Rules of Civil Procedure provides:

"When appropriate (A) an action may be brought or maintained as a class action with respect to particular issues, or (B) a class may be divided into subclasses and each subclass treated as a class, and the provisions of this rule shall then be construed and applied accordingly."

56. Recommendation of the Magistrate Judge, at 50.

57. The court denied the plaintiffs' motion for a preliminary injunction to enjoin the Commissioner's use of the hitching post. *See* Order, entered March 6, 1997 (Doc. no. 379).

58. Recommendation of the Magistrate Judge, at 50.

suming that some percentage of inmates placed on the chain gang were not assigned to the ATU, it is clear that the number of inmates placed in the ATU, or who are eligible for placement in the ATU, or who have been placed in the ATU during the course of this litigation, is sufficient to meet Rule 23(a)'s numerosity requirement. *See Bradley v. Harrelson,* 151 F.R.D. 422, 426 (M.D.Ala.1993) (Albritton, J.) (The "common-sense approach" to class certification "has led courts to certify classes in cases ... which involve issues of common concern to inmates even when the potential class size is ... somewhat undefined.") (citations omitted).

Rule 23(a)(2) and (3)'s requirements of commonality and typicality "tend to merge." *Wyatt v. Poundstone,* 169 F.R.D. 155, 164 (M.D.Ala.1995) (Thompson, J.) (citing *General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 2370 n. 13, 72 L.Ed.2d 740 (1982)). "Both requirements serve to ensure that the 'maintenance of a class action is economical' and that the 'named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" *Id.* However, there is no requirement that the named plaintiffs' injuries be identical to those sustained by the class members; it is sufficient under Rule 23 that the harm complained of be common to the class. *Hassine v. Jeffes,* 846 F.2d 169, 177 (3d Cir.1988). Thus, although inmates in the two classes may have had different experiences on the hitching post or when assigned to the ATU, the members of each class are bringing the same constitutional challenge to the same set of policies and procedures implemented by the DOC. Moreover, the named plaintiffs' claims are identical to the class members' claims. The Magistrate Judge found that when the case was filed, the named plaintiffs were assigned to chain-gang labor and were being denied visitation.[59] When they amended their complaint to include the hitching-post claim, the plaintiffs added two named plaintiffs, Warren Leatherwood and Kervin Goodwin, both of whom had been placed on the

hitching post.[60] The court therefore finds the claims of the named plaintiffs are common and typical of the class.

The court has already examined the issue of adequacy of representation in its discussion of class certification for purposes of the settlement agreement. The court reaffirms its findings that the class representatives and their counsel will adequately and diligently represent the class members' interests. Thus, the plaintiffs have met all of Rule 23(a)'s requirements for class certification of the two classes.

In addition to the above four elements, the class must meet one of the three conditions stated in Rule 23(b) that make a class action the preferable mode of handling the lawsuit. The plaintiffs have sought certification under Rule 23(b)(2), which states "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Here, the plaintiffs have brought a constitutional challenge to published policies and procedures, as well as the Commissioner's means of implementing such policies and procedures. The plaintiffs seek only injunctive and declaratory relief regarding these policies and procedures. As stated in the court's discussion regarding class certification for purposes of the settlement agreement *supra,* class certification under Rule 23(b)(2) is particularly appropriate in the prison litigation context where only injunctive and declaratory relief are sought. *See, e.g., Pugh v. Locke,* 406 F.Supp. 318 (M.D.Ala.1976), *aff'd sub nom, Newman v. Alabama,* 559 F.2d 283 (5th Cir.1977), *cert. denied,* 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978).

The court finds that the requirements of Rule 23 have been met and will certify the following two classes of plaintiffs:

(1) A class defined as all present and future Alabama inmates who have been or may be assigned to the ATU.

---

59. *Id.* at 51.

60. *See* plaintiffs' motion for leave to amend, filed February 23, 1996 (Doc. no. 59). The Magistrate

Judge granted the plaintiffs' motion. *See* stamped order, entered on March 26, 1996.

(2) A class defined as all present and future Alabama inmates who have been or may be placed on the hitching post.

## V. VISITATION–PRIVILEGES CLAIM

The plaintiffs' first claim concerns the DOC's visitation policy for those inmates assigned to the ATU. The ATU, briefly described above as a shock incarceration program, is designed for repeat offenders or recidivists, and parole violators. Prisoners are placed in the ATU either by DOC classification, if they are a repeat offender or have violated a term of parole, or by an Alabama trial court judge during sentencing. According to the Commissioner, "The entire purpose of the ATU unit is oriented around creating a respect for authority, instilling self-discipline...."[61] Inmates assigned to the ATU are segregated from the general inmate population and are placed in a separate ATU dormitory, also referred to as the "chain gang dormitory."[62] The ATU inmates are assigned to at least eight hours of physical labor per day.[63] All visitation is denied to ATU inmates for 90 days, although at the time the visitation claim was filed, visitation to ATU inmates was generally denied for 180 days.[64] In contrast, inmates assigned to the general prison population at Alabama prisons receive visitation on weekends.[65] As alternatives to visitation, ATU inmates may make collect phone calls and exchange written correspondence with outsiders.[66] According to the Commissioner's expert witness, Alabama is the only state to implement a blanket, time-based denial of visitation policy.[67]

As explained in further detail below, the plaintiffs contend that these alternatives to visitation are inadequate substitutes for visitation, and also claim that the 90–day denial of visitation violates their right to freedom of association. The Magistrate Judge agreed, and concluded that the DOC's visitation policy for ATU inmates unreasonably impinged upon the plaintiffs' first-amendment rights. The Commissioner has objected to the Magistrate Judge's conclusion on the following grounds:

(1) Convicted felons retain no first-amendment right to freedom of association;[68]

(2) The Magistrate Judge incorrectly concluded that the DOC Commissioner had not stated a clear objective for the denial of visitation;[69]

(3) The Magistrate Judge erred in finding the visitation policy violated the plaintiffs' first-amendment right because of lack of alternative means of expression;[70]

(4) The Magistrate Judge erred in finding the DOC Commissioner's exhibits concerning alternatives to visitation "irrelevant";[71]

(5) The Magistrate Judge erred in finding that permitting ATU inmates to have visitors would not burden the DOC;[72] and

(6) The Magistrate Judge's conclusion that restrictions placed on ATU inmates, aside from the denial of visitation policy, were sufficient to accomplish the prison administrators' penological ob-

---

**61.** Transcript of the hearing before the Magistrate Judge, held October 7–11, 15, 1996 (hereinafter "transcript of the hearing before the Magistrate Judge"), at 867–68.

**62.** Transcript of pretrial conference before the Magistrate Judge, held June 19, 1996, at 26.

**63.** Although some inmates are placed on what was previously referred to as the "chain gang" for disciplinary reasons, other inmates are assigned to hard labor as part of their ATU sentence. *See* transcript of oral argument on objections to the Magistrate Judge's recommendation, held May 14, 1997, at 7.

**64.** Joint stipulation of facts, filed on September 23, 1996 (Doc. no. 337).

**65.** *Id.*

**66.** ATU inmates receive no stamps from the DOC for non-legal mail. *Id.*

**67.** Transcript of the hearing before the Magistrate Judge, at 1152 (testimony of Gary DeLand).

**68.** Objections to the Magistrate Judge's recommendation, filed February 27, 1997 (Doc. no. 376), at 46.

**69.** *Id.*

**70.** *Id.* at 51.

**71.** *Id.* at 2–3.

**72.** *Id.* at 56.

jectives was erroneous and violates the degree of deference required by the Supreme Court.[73]

As will be discussed further below, the court will sustain all but the DOC Commissioner's first and fifth objections to the Magistrate Judge's recommendation.

The court makes two preliminary remarks before addressing the plaintiffs' constitutional claims. First, although the parties have stipulated that visitation is "generally denied" to ATU inmates for 90 days, it is not clear from the record that visitation is automatically restored after 90 days. Rather, the information provided to the inmates, as well as the representations made by the DOC Commissioner's counsel and experts, indicates that the denial of visitation can be reinstated after the 90 days expires if an inmate has not "graduated" from the ATU program or is assigned to another term of the ATU.[74] The "orientation" to ATU inmates at Limestone Correctional Facility warns the inmates: "Behave, if you want another job and more privileges and the opportunity for programs. If you don't behave, you could stay here indefinitely."[75] According to Gary DeLand, the Commissioner's expert, the denial of visitation serves as an incentive for inmates to behave while assigned to the ATU so as to "earn back" the visitation privilege:

> "Certainly a prisoner who found ways to delay or manipulate the system and not make all of his work assignments would also know, perhaps, that the visiting might be if affected by that process to encourage a prisoner to get through that process and get off the chain gang at the appropriate time, and have his visiting restored to him, it would certainly seem a legitimate ap-

proach on the part of prison administrators."[76]

In addition, the Commissioner himself testified that he did not know whether visitation was automatically restored to inmates after 90 days, even though they had received a judicial sentence to the ATU for more than 90 days.[77] Although the record is somewhat unclear, the court will assume, for the sake of evaluating the plaintiffs' constitutional claim, that visitation is automatically restored after 90 days, and will limit its holding to this understanding of the DOC's policy.

Second, the court notes that the constitutional claim before it is very limited in nature: the plaintiffs have only brought a first-amendment claim; they have not challenged the DOC's visitation policies under the eighth or fourteenth amendments, or pursuant to any other enumerated or unenumerated constitutional right. Nor does any party in this litigation seek to advance the rights of non-incarcerated friends or family who may wish to visit those inmates placed in the ATU. *See Thornburgh v. Abbott,* 490 U.S. 401, 407, 109 S.Ct. 1874, 1878, 104 L.Ed.2d 459 (1989) ("nor do [prison walls] bar free citizens from exercising their own constitutional rights by reaching out to those on the 'inside.' ") (citations omitted). The court therefore does not address whether the ATU visitation policy is in violation of the eighth or fourteenth amendments, or other constitutional rights, or whether it violates the constitutional rights of those free individuals seeking visitation with ATU inmates.

### A. Standard of Review

"Inmates clearly retain protections afforded by the First Amendment," *O'Lone*

---

73. *Id.* at 57.

74. According to the Commissioner's counsel, the ATU program is for "90 days, and assuming that the inmates perform well on the chain gang for 90 days, then they graduate from the program, are reclassified and are—with every effort for them to go to minimum custody or work release." Transcript of pretrial conference before the Magistrate Judge, held June 19, 1996, at 24.

75. Plaintiffs' exhibit 16.

76. Transcript of the hearing before the Magistrate Judge, at 1123.

77. During the hearing before the Magistrate Judge, the following exchange took place between plaintiffs' counsel and the DOC Commissioner:

> "Q. And so those prisoners who are sentenced for more than ninety days do not receive visitation, do they, for the whole period of the amount they're sentenced by the judge?
> "A. I don't know."
> *Id.* at 880.

v. Estate of Shabazz, 482 U.S. 342, 348, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987) (citations omitted), because "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." Turner v. Safley, 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987). However, the fact of incarceration, as well as the existence of valid penological objectives such as deterrence of crime, rehabilitation of prisoners, and institutional security, necessarily results in infringements of the rights and privileges retained by prisoners. O'Lone, 482 U.S. at 348, 107 S.Ct. at 2404 (citing Pell v. Procunier, 417 U.S. 817, 822–23, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974); Procunier v. Martinez, 416 U.S. 396, 412, 94 S.Ct. 1800, 1810–11, 40 L.Ed.2d 224 (1974)). However, a restriction that interferes with an inmate's constitutional right must be "reasonably related to legitimate penological interests." Turner, 482 U.S. at 79, 107 S.Ct. at 2261. The Turner Court established a four-prong inquiry for determining the constitutionality of a prison regulation:

(1) Whether a valid, rational connection between the prison regulation and the legitimate governmental interest exists;

(2) Whether there are alternative ways for the prisoner to exercise the implicated constitutional right;

(3) What impact would accommodation of the implicated constitutional right have on the prison administration; and

(4) Whether the regulation is an exaggerated response to prison concerns.

482 U.S. at 89–90, 107 S.Ct. at 2261–62. The overarching principle in this test is a recognition that federal courts are "ill equipped to deal with the increasingly urgent problems of prison administration and reform," and, ac-

cordingly (and especially when reviewing state penal system policies), should defer to the expertise of prison authorities. Id. at 85, 107 S.Ct. at 2259 (quoting Procunier v. Martinez, 416 U.S. at 405, 94 S.Ct. at 1807.)

The Magistrate Judge applied the Turner test to the ATU visitation policy.[78] The Commissioner argues that Turner is inapplicable because prisoners retain no first-amendment right to visitation. Although the Supreme Court has not yet addressed this issue,[79] the Court has held that there is no due-process right to "unfettered visitation." Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 460, 109 S.Ct. 1904, 1908, 104 L.Ed.2d 506 (1989) ("it [cannot] seriously be contended, in light of our prior cases—that an inmate's interest in unfettered visitation is guaranteed directly by the Due Process Clause.").[80] There is split authority in the federal courts on whether a first-amendment right to visitation exists. Compare Bazzetta v. McGinnis, 902 F.Supp. 765, 770 (E.D.Mich.1995) (holding that no first-amendment right of association exists for prisoners), aff'd, 124 F.3d 774 (6th Cir.1997), opinion supplemented by, 133 F.3d 382 (6th Cir.) (clarifying that the issue before the court was only the constitutionality of restrictions on contact visits), cert. denied, — U.S. ——, 118 S.Ct. 2371, 141 L.Ed.2d 739 (1998); White v. Keller, 438 F.Supp. 110, 115 (D.Md. 1977) (no first-amendment right of association for prisoners), aff'd, 588 F.2d 913 (4th Cir.1978); Thorne v. Jones, 765 F.2d 1270, 1274 (5th Cir.1985) (no first-amendment right to "mere physical association"), with Robinson v. Palmer, 619 F.Supp. 344, 347 (D.D.C. 1985) (noting the "varying results" courts have reached in determining whether inmates have a first-amendment right to visitation and assuming that such a right does

---

**78.** Recommendation of the Magistrate Judge, at 75–76.

**79.** The Court has recognized, however, that prisoners retain first-amendment associational rights, which must, at times, "give way to the reasonable considerations of penal management." Jones v. N.C. Prisoners' Labor Union, Inc., 433 U.S. 119, 132, 97 S.Ct. 2532, 2541, 53 L.Ed.2d 629 (1977) (holding that prison's ban on union meetings was rationally related to legitimate penological objective of security in prison administration).

**80.** The regulation at issue in Thompson was the suspension of visitation privileges without a hearing for two visitors who had violated the institution's visitation policy regarding the importation of contraband into the institution. However, in his concurring opinion, Justice Kennedy noted that the Court's holding did not foreclose a claim that a "prison regulation permanently forbidding all visits to some or all prisoners implicates the protections of the Due Process Clause in a way that the precise and individualized restrictions at issue here do not." Id. at 465, 109 S.Ct. at 1911 (Kennedy, J., concurring).

exist), *aff'd in relevant part,* 841 F.2d 1151, 1156 (D.C.Cir.1988); *Laaman v. Helgemoe,* 437 F.Supp. 269, 322 (D.N.H.1977) (holding that a total denial of visitation would violate the three constitutional strictures of the inmates' first-amendment right to familial association and communication and the eighth-amendment right to be free of cruel and unusual punishment).

 The Eleventh Circuit Court of Appeals has recognized that there is no "absolute" right to visitation, but that the mechanics of visitation are subject to the discretion of prison authorities implementing legitimate penological objectives. *Caraballo–Sandoval v. Honsted,* 35 F.3d 521, 525 (11th Cir.1994) ("[A]s to the First Amendment [right to freedom-of-association] claim, inmates do not have an absolute right to visitation, such privileges being subject to the prison authorities' discretion provided that the visitation policies meet legitimate penological objectives."). The court will infer from the language used in *Caraballo–Sandoval* that the Eleventh Circuit has recognized that inmates retain some constitutional right to visitation, although that right may be curtailed by prison administrators, and that the *Turner* four-prong inquiry is the appropriate standard to review the limitation placed on the constitutional right.[81] The court therefore finds that the Magistrate Judge was correct in applying the *Turner* test to the visitation policy at issue here and overrules the Commissioner's first objection. The court will proceed to examine the Magistrate Judge's application of the *Turner* test to determine if the plaintiffs' constitutional rights have been violated.

### B. Valid, Rational Connection to Legitimate Governmental Interests

 "[A] regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Turner,* 482 U.S. at 89–90, 107 S.Ct. at 2262. In addition, the governmental objective must be "a legitimate and neutral one." *Id.* In discussing this first factor of the *Turner* analysis, the Magistrate Judge found that the Commissioner failed to articulate a legitimate penological interest served by denying visitation privileges to ATU inmates.[82] The Commissioner objects to the Magistrate Judge's conclusion, and argues that the DOC has advanced several reasons in support of the visitation policy.

Examining the record, the court finds that the Commissioner, his predecessor, and the expert testifying on behalf of the DOC offered two distinct justifications for the denial of visitation policy. The former Commissioner of the DOC testified during his deposition that the purpose of the policy was to send a message to inmates about the nature of prison life, specifically that prison would not be a place where they would receive benefits or privileges. He also stated that the DOC had not consulted with any health professionals regarding the effect of such a policy on inmates. The former Commissioner testified as follows:

"Q. What is the purpose in denying the visitation?

"A. The same purpose in denying all privileges....

"Q. What is the purpose of denying the visitation?

"A. Because it's a privilege.

"Q. But what is the purpose in taking away that privilege?

"A. All privileges for the same reason.

"Q. And what is the reason?

"A. To send a very clear message that as a repeat offender or a judicial entry, the prison system is not going to be, for you, an entitlement system, at least for a while."

"Q. What do you mean when you say it's not going to be an entitlement system?

"A. No benefits, no privileges.

---

**81.** *See also Pope v. Hightower,* 101 F.3d 1382, 1385 (11th Cir.1996) ("The right at issue in the present case may be defined expansively as the First Amendment right to communicate with family and friends.").

**82.** Recommendation of the Magistrate Judge, at 75.

"Q. Now, in taking away visitation, did you consult with any health professionals regarding the emotional and psychological effect that that can have on somebody?

"A. No." [83]

The Commissioner's correctional expert testified that the severity of the environment of the ATU would likely have a "useful purpose":

"Certainly the chain gang would be a less than pleasant assignment for most prisoners who would be on it, and if the State of Alabama would like to ensure that prisoners understand when they come back that the circumstances they will be in are such that it will require them some degree of discomfort, or some degree of loss of privilege that they will have to earn back, that that serves a useful purpose." [84]

Although the expert did not explicitly state what "useful purpose" the policy served, the court can infer from his remarks, as well as those of the former Commissioner, that the primary purpose of the policy is to make prison conditions as austere as possible so as to deter inmates from committing future crimes or to violate the conditions of their parole. The DOC Commissioner offered a second objective served by the policy: to remove distractions from the inmates while they were participating in a program designed to teach respect for authority and to instill self-discipline. The Commissioner stated, "the individual [needs] to concentrate solely on those things and does not need outside distractions while that period is going on." [85] Thus, the court finds that two sepa-

rate objectives are advanced by the visitation policy: one, to create an extremely austere environment, so as to increase deterrence; and, two, to remove distractions from inmates so as to increase rehabilitation. The only evidence the Commissioner provided in support of the policy was the testimony of the plaintiffs' witness, Gary Montgomery. According to the Commissioner, Montgomery "testified that being placed in the ATU will help him not return to prison." [86] However, Montgomery's testimony went to his experience with the ATU program as a whole, and not specifically to the visitation policy at issue here. When asked about this distinction, Montgomery stated, "Just the experience of prison itself will keep me from going back to prison." [87]

Thus, the plaintiffs contend that the DOC Commissioner did not produce any evidence showing that the denial of visitation furthers the stated penological interests. [88] At oral argument, they emphasized that the "reasonableness standard is not toothless," [89] *Thornburgh v. Abbott*, 490 U.S. 401, 414, 109 S.Ct. 1874, 1883, 104 L.Ed.2d 459 (1989), and cited the Ninth Circuit Court of Appeals for the following proposition:

"Prison authorities cannot rely on general or conclusory assertions to support their policies. Rather, they must first identify the specific penological interests involved and then demonstrate both that those specific interests are the actual bases for their policies and that the policies are reasonably related to the furtherance of the identified interests. An evidentiary showing is required as to each point."

---

**83.** Corrected exhibits in support of plaintiffs' opposition to defendants' motion for summary judgment, filed June 17, 1996 (Doc. no. 136), exhibit 2 (deposition of Ronald Eugene Jones), at 418–19. The Magistrate Judge quoted portions of the above deposition testimony in her discussion of the visitation claim. *See* recommendation of the Magistrate Judge, at 77–78. Neither the plaintiffs nor the Commissioner objected to the Magistrate Judge's use of this deposition testimony.

**84.** Transcript of the hearing before the Magistrate Judge, at 1123 (testimony of Gary DeLand).

**85.** Transcript of the hearing before the Magistrate Judge, at 867–68 (testimony of the DOC Commissioner).

**86.** Objections to the Magistrate Judge's recommendation, at 51. Montgomery was sentenced to a four-month term on the ATU by the circuit court for failing to report or pay fees while on a sentence of probation. Transcript of the hearing before the Magistrate Judge, at 584–85.

**87.** *Id.* at 590.

**88.** Transcript of oral argument on objections to Magistrate Judge's recommendation, held May 14, 1997, at 16.

**89.** *Id.* at 48.

*Walker v. Sumner,* 917 F.2d 382, 386 (9th Cir.1990). The plaintiffs bolstered their argument by citing a Seventh Circuit Court of Appeals decision in which the court recognized that prison officials " 'cannot avoid court scrutiny by reflexive, rote assertions.' " *Shimer v. Washington,* 100 F.3d 506, 509–510 (7th Cir.1996) (quoting *Williams v. Lane,* 851 F.2d 867, 886 (7th Cir.1988) (Flaum, J. concurring)). The plaintiffs argue that the Commissioner's failure to produce any evidence showing the relationship between his stated penological interests and the regulation denying visitation is critical because the court " 'must look to see whether the prison's visitation practices actually further [his stated] objectives.' " [90]

The Eleventh Circuit Court of Appeals has not identified whether prison officials, when defending challenges to regulations, are required to meet the same rigorous evidentiary burden required by the Ninth Circuit. However, an examination of the Eleventh Circuit's law pertaining to first-amendment freedom-of-expression challenges is instructive on this issue. In a first-amendment challenge to a restriction of speech in a public forum, the Eleventh Circuit recently held that when demonstrating the significance of a government interest, officials "are not required to present detailed evidence," rather officials are " 'entitled to advance [the governmental] interests by arguments based on appeals to *common sense and logic.*' " *International Caucus of Labor Committees v. City of Montgomery,* 111 F.3d 1548, 1551 (11th Cir.1997) (emphasis added) (quoting *Multimedia Pub. v. Greenville–Spartanburg Airport,* 991 F.2d 154, 161 (4th Cir.1993)). Because of the great deference that the Eleventh Circuit has granted the government when defending first-amendment challenges in public fora, this court believes that the rigorous evidentiary burden articulated by the Ninth Circuit would not be required by

the Eleventh Circuit when examining first-amendment challenges in a nonpublic forum such as a prison.[91]

Further, in addressing other first-amendment challenges to prison regulations, the Supreme Court has also applied a type of "common sense" analysis. The Court used this approach to strike down a regulation prohibiting inmates from marrying other inmates or civilians unless the superintendent of the prison found that there was a compelling reason for the marriage. *See Turner,* 482 U.S. at 98, 107 S.Ct. at 2266 ("*Common sense* likewise suggests that there is no logical connection between the ... restriction and [stated penological objectives].") (emphasis added). And, the Supreme Court has also held that prison officials do not have the burden of "show[ing] affirmatively" that the accommodation of an asserted constitutional right "would be 'detrimental to proper penological objectives.' " *Jones,* 433 U.S. at 128, 97 S.Ct. at 2539 (finding that the prison's ban on inmate union solicitation and group meetings was rationally related to reasonable prison administration objectives).

In light of the "common sense" approach adopted by the Eleventh Circuit in considering freedom-of-expression issues in public fora, as well as the Supreme Court's use of "common sense" to evaluate the penological objectives of regulations impinging on constitutional rights, this court rejects the plaintiffs' argument that the Commissioner's failure to produce evidence demonstrating a valid, rational connection between their stated objectives and the denial of visitation policy necessarily results in a holding for the plaintiffs. Rather, the court will examine the evidence presented by *both* the plaintiffs and the Commissioner to determine whether the DOC's policy is rationally related to its two objectives of rehabilitation and deterrence.

---

**90.** Plaintiffs' response to defendants' objections, filed April 8, 1997 (Doc. no. 384), at 88 (quoting *Lynott v. Henderson,* 610 F.2d 340, 343 (5th Cir.1980)).

**91.** The courts have traditionally held the government to stricter scrutiny when it defends restrictions on speech in public fora, than when it defends restrictions on speech in nonpublic fora. *United States v. Kokinda,* 497 U.S. 720, 726–27, 110 S.Ct. 3115, 3119, 111 L.Ed.2d 571 (1990)

(plurality opinion). Prisons and military bases, examples of nonpublic fora, have been held to less than the rigorous "reasonableness" standard scrutiny in first-amendment challenges to regulations. *See Jones v. N.C. Prisoners' Labor Union, Inc.,* 433 U.S. 119, 134, 136, 97 S.Ct. 2532, 2542, 2543, 53 L.Ed.2d 629 (1977) ("Since a prison is most emphatically not a 'public forum,' these reasonable beliefs of [prison officials] are sufficient.").

As stated above, the only evidence provided by the Commissioner in support of the policy was the testimony of Gary Montgomery, which the court has deemed inconclusive. In contrast, the plaintiffs presented evidence in the form of expert testimony and penological literature to support their argument that the policy is not rationally related to a legitimate penological objective. The plaintiffs' experts testified that visitation serves an important purpose in rehabilitating inmates and deterring future criminal conduct. One expert testified that "one of the most important factors in helping people stay out of prison is having supportive and positive relationships outside."[92] Another expert stated, "Visiting is probably without question the most important activity that takes place in a prisoner's life. . . . visiting is critically important and should not be curtailed except for specific violations of visiting regulations by the inmate."[93] This expert also testified to some of the deleterious effects of denying visitation: "[I]t would generally bring about bitterness, unhappiness, resentment, and very often, unfortunately, retaliation, because that's the only way that inmates sometimes feel that they can respond."[94] Further, the expert noted that because the suicide rate for inmates is highest at the initial period of confinement, close contact with family members is necessary to assist the inmate in surviving the initial adjustment period.[95] The third expert to testify for the plaintiffs on the issue of visitation stated that he found the DOC's policy to be "outrageous." He added that he found "absolutely no reason not to let inmates maintain their social life and social relationships. They should have visits with their parents, with their siblings, with their spouse and children."[96] In addition to the plaintiffs' experts, the Commissioner testified that it was a fair statement that it is "generally believed among correctional commissioners throughout the country that you should not take visitation away unless it's for a violation of prison rules."[97] Finally, none of the parties' experts could point to any research regarding the relationship between the denial of visitation and the Commissioner's stated objectives.[98]

The court is thus faced with conflicting policy rationales. On the one hand, there is a general consensus in the corrections field that visitation has a beneficial effect upon inmates. Common sense would dictate that because visitation is so important, it should not be denied but for compelling reasons, such as abuse of the privilege. On the other hand, the Commissioner's argument that a temporary denial of this privilege supports rehabilitation and deterrence is also grounded in common sense. Denial of visitation privileges reduces, if not eliminates, outside distractions to the inmates, thereby aiding the rehabilitation process. Similarly, the loss of visitation privileges deters rational judicial entries from becoming recidivists and violating the conditions of their parole. ATU inmates know that if they become repeat offenders or parole violators, they will reenter the prison system in the austere conditions of the ATU, rather than in the general prison population. Further, although the plaintiffs' experts may disagree with the Commissioner on the overall effect of the policy, none of the plaintiffs' experts testified that the Commissioner would be unable to effectuate his objectives by implementing the policy.

Moreover, it is most important to keep in mind that the issue is only the temporary, and not permanent, elimination of visitation privileges. Indeed, throughout his prison stay, an inmate may, off and on, lose his visitation privileges for reasons unconnected to assignment to the ATU unit. If the court were confronted with a permanent elimination, or an elimination that extended significantly throughout a prisoner's stay, the concerns raised by the plaintiffs' experts—that

---

**92.** Transcript of hearing before the Magistrate Judge, at 405 (testimony of Frank Rundle, M.D.).

**93.** *Id.* at 310–311 (testimony of Alan Breed).

**94.** *Id.* at 312.

**95.** *Id.* at 313.

**96.** *Id.* at 804 (testimony of George Sullivan).

**97.** *Id.* at 879 (testimony of the DOC Commissioner).

**98.** *Id.* at 343, 345 (Alan Breed testifying for the plaintiffs that no studies have been completed that clearly reflect whether the program works), 1151 (Gary DeLand testifying for the Commissioner).

visitation serves an important purpose in re-habilitating inmates and deterring future criminal conduct—could present a question of constitutional breach. However, an inmate who successfully completes the ATU program can still enjoy the benefits of visitation during the remainder of his prison life.

Thus, this court concludes that the DOC's denial of visitation privileges for ATU inmates passes the "common sense" test for its rational relationship to the legitimate penological objectives of deterrence and rehabilitation; furthermore, the court cannot conclude that the connection between the policy and the Commissioner's objectives is so remote to be considered "arbitrary or irrational." *Turner*, 482 U.S. at 89, 107 S.Ct. at 2262. The plaintiffs, and other specialists in the field of corrections, may disagree with the Commissioner's policy, but without evidence to support a finding that the policy lacks "common sense," the court must defer to the expertise of the State's prison administrators.

### C. Alternative Means to Exercise the Right

The second factor of the *Turner* analysis asks whether alternative means of expressing the constitutional right remain open to the prisoners. 482 U.S. at 89–90, 107 S.Ct. at 2262. The Magistrate Judge rejected the alternatives proffered by the Commissioner that included mail and telephone communication. The Magistrate Judge found that the "alternatives to visitation which are fueled by literacy and ability to pay are counterfeit means of maintaining ties to family and de-

terring recidivism." [99] The Commissioner objects to this finding.[100]

■ In considering the alternative means, the court must view the asserted right "sensibly and expansively." *Pope v. Hightower*, 101 F.3d 1382, 1385 (11th Cir. 1996). Here, the Commissioner contends that inmates are permitted to communicate with family and friends by sending and receiving mail, as well as by making telephone calls. In *Pope*, the Eleventh Circuit considered an inmate's challenge to a telephone-access policy that limited the number of persons an inmate could place on a calling list. Recognizing that visits and correspondence were alternatives to telephone calls, the court held that other avenues existed for exercising what the court defined as "the First Amendment right to communicate with family and friends." *Id.* Because the plaintiffs are able to make such calls and to send and receive mail, the court finds that other avenues exist for ATU inmates to exercise their first-amendment right to freedom of association.

As stated, the Magistrate Judge reached a different conclusion. Based on the high illiteracy rate in inmate populations,[101] as well as the costliness of telephone calls made from the penal institutions,[102] the Magistrate Judge found that the alternatives were "counterfeit" means of permitting the inmates to maintain ties to family and to deter recidivism.[103] The court agrees with the Magistrate Judge that low reading ability and cost can interfere with ability of some inmates to communicate with friends or family. However, this assumed interference [104]

**99.** Recommendation of the Magistrate Judge, at 83.

**100.** Defendant's objections to the Magistrate Judge's recommendation, at 51.

**101.** In a 1996 DOC ranking of the 21,320 inmates in Alabama's prison population, the average education level was the tenth grade, but the average reading level was below the sixth grade; more than 30% of the inmate population read at the third-grade level or below. Plaintiffs' exhibit number 70, at 6.

**102.** The DOC places a surcharge on collect calls made from the institutions and collects a considerable profit from such calls. Transcript of hearing before the Magistrate Judge, at 314 (testimony of Allen Breed).

**103.** Recommendation of the Magistrate Judge, at 83.

**104.** The plaintiffs did not present evidence of either problem interfering with inmate communication. The two inmates who testified before the Magistrate Judge stated that they sent and received mail, and neither made any mention of the cost of phone calls. *See* transcript of hearing before the Magistrate Judge, at 356–57 (testimony of Daniel Green that he sent and received mail and that his family could afford the collect phone calls), and at 577–79 (testimony of Gary Montgomery that he sent and received mail and that family accepted collect phone calls).

does not necessarily result in a finding that the alternatives are inadequate. In *Pell v. Procunier*, the Supreme Court upheld an institution's prohibition of face-to-face meetings between inmates and the press, and rejected the plaintiffs' argument that mail was an ineffective means of communication because some prisoners are illiterate or inarticulate. The Court stated: "Merely because such inmates may need assistance to utilize one of the alternative channels does not make it an ineffective alternative, unless, of course, the State prohibits the inmate from receiving such assistance." 417 U.S. at 828 n. 5, 94 S.Ct. at 2807 n. 5.

The court's conclusion should not be understood, however, to equate visitation with telephone calls or written communication. Certainly, there are some instances when mail and telephone communication will not be an adequate substitute for visitation, particularly when an inmate seeks to visit with friends or family who cannot read or speak, such as infants and small children. However, the court finds that this potential deprivation is slight due to the limited duration of the denial of visitation policy.

### D. Impact of Asserted Right on Allocation of Prison Resources

The third factor in assessing the reasonableness of a regulation that impinges on an inmate's constitutional rights asks what impact the accommodation of the asserted constitutional right will have upon guards and other inmates, and on the allocation of prison resources generally. *Turner*, 482 U.S. at 89–90, 107 S.Ct. at 2262. The Magistrate Judge found that "[t]he accommodation that the plaintiffs' seek . . . cannot be viewed as costly to the defendant or as an undue infringement upon the due deference to which prison officials are entitled in administering their institutions." [105] This court agrees with the Magistrate Judge's finding. The Department of Corrections has an established visitation policy, and the burden of allowing ATU inmates

to receive visitors would be negligible at best. This factor, however, is not dispositive on the issue of the constitutionality of the regulation.

### E. Ready Alternatives to Denial of Visitation

■ The fourth and final factor in assessing the reasonableness of a regulation is whether there are ready alternatives to the regulation. *Turner*, 482 U.S. at 89–90, 107 S.Ct. at 2262. "[I]f an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at de minimus cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.* "[T]he existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Id.*

■ In her recommendation, the Magistrate Judge listed several restrictions that proscribe the conduct of ATU inmates.[106] The Magistrate Judge found that these restrictions advance the state's penological interests without burdening the inmates' first amendment rights.[107] However, the final prong of *Turner* is not a "least restrictive alternative" test. "[P]rison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Turner*, 482 U.S. at 90–91, 107 S.Ct. at 2262. Accordingly, the court disagrees with Magistrate Judge and finds that the other restrictions, while arguably less restrictive than the denial of visitation privileges, do not fully accommodate the stated penological objectives. Thus, the visitation policy is not an exaggerated response to the goals of deterrence and rehabilitation. Accordingly, this court also finds that the denial of visitation privileges to ATU inmates for a period of 90 days is constitutionally permissi-

---

105. Recommendation of the Magistrate Judge, at 83.

106. *Id.* at 85 (alternative restrictions which do not burden an inmate's first-amendment right include (1) wearing shackles for up to ten hours a day; (2) working on sites several miles from the prison; (3) exposure to inclement weather

and to snake and insect infested working conditions; (4) submitting to daily strip searches; (5) loss of commissary privileges; (6) loss of television privileges, and (7) additional incarceration in the ATU for rules violations).

107. *Id.*

ble, and therefore sustains the Commissioner's objections to the Magistrate Judge's recommendation.

## VI. HITCHING–POST CLAIM

The plaintiffs' second claim concerns the DOC's use of a device referred to as a "hitching post." [108] In a two-pronged attack, the plaintiffs allege that use of the hitching post violates their fourteenth-amendment right to procedural due process, as well as their eighth-amendment right to be free from cruel and unusual punishment. After conducting an evidentiary hearing, [109] the Magistrate Judge concluded that the Commissioner's use of the hitching post violated both the eighth and fourteenth amendments. [110]

The DOC Commissioner has raised a considerable number of objections to the Magistrate Judge's findings of facts and conclusions of law. The court will address these objections in the following manner. First, the court will examine the evidence, admitted at the hearing before the Magistrate Judge, concerning the ways in which the hitching post has been and is being used. The court will pay special attention to the following aspects of the hitching post: the events that trigger an inmate's placement on the post; the length of time an inmate remains on the post; the manner in which an inmate is shackled to the post; the conditions under which an inmate remains on the post (i.e.,

access to water, food, and restroom facilities, as well as climate conditions); the means by which an inmate can secure his release from the post; and, finally, the disciplinary sanctions that result from being placed on the hitching post. Second, the court will analyze the plaintiffs' constitutional contentions. Beginning with the plaintiffs' eighth-amendment claim, the court will discuss whether the plaintiffs have satisfied their burden of showing both the objective and subjective components of the eighth-amendment framework. Next, the court will address the plaintiffs' procedural-due-process claim, including whether the plaintiffs have demonstrated that use of the hitching post violates their constitutionally-created or state-created liberty interests. Although somewhat complicated by the fact that, as discussed below, the Commissioner has not utilized the hitching post in a consistent manner in the DOC's penal institutions in Alabama, the court will undertake its analysis of the plaintiffs' constitutional claims as they relate to both the DOC's policy governing use of the hitching post and its manifested use.

### A. The Hitching Post

On October 26, 1993, the DOC adopted Administrative Regulation Number 429, entitled "Refusal to Work" (hereinafter "Regulation 429"). [111] This regulation states that any inmate who "refuses to work or is otherwise

---

**108.** As the Magistrate Judge noted, witnesses throughout the evidentiary hearing used different terms to describe the restraining bar to which inmates were handcuffed, including "hitching post," "restraining bar," "bar," "hitching rail," and "rail." Recommendation of the Magistrate Judge, at 12. For the sake of consistency, the court will refer to this device as a "hitching post."

**109.** The Magistrate Judge heard the testimony of ten inmates who had been placed on the hitching post in different institutions. In addition, nine present and former DOC officers, as well as six expert witnesses (five for the plaintiffs and one for the Commissioner), testified on the use of the hitching post in Alabama's prisons. Further, the Magistrate Judge herself called one witness to testify as to his interaction with an inmate who had been placed on the hitching post.

**110.** Although the plaintiffs did not raise it as an issue, the Magistrate Judge also found that the use of the hitching post violated the plaintiffs' substantive-due-process right under the four-

teenth amendment. Recommendation of the Magistrate Judge, at 92–93. The plaintiffs state that a substantive-due-process claim is analogous to an eighth-amendment claim and ask that this court not address the issue of substantive due process. Plaintiffs' response to defendant's objections, filed April 8, 1997 (Doc. no. 384), at 73 n. 18. For the reasons set *infra*, the court will not adopt that portion of the Magistrate Judge's recommendation dealing with the plaintiffs' substantive-due-process right, but will analyze such contention within the eighth-amendment framework.

**111.** Plaintiffs' exhibit 12, at 1; *see also* transcript of hearing before the Magistrate Judge, at 864 (testimony of the DOC Commissioner). However, at oral argument on the Commissioner's objections to the Magistrate Judge's recommendation, counsel for the Commissioner stated that the hitching post was used by the DOC "for quite some time" before the 1993 policy was written. Transcript of oral argument on objections to Magistrate Judge's recommendation, held May 14, 1997, at 81.

disruptive to the work squad" shall be placed upon a "restraining bar," or as others have termed the device, the hitching post.[112] Although the Magistrate Judge devoted considerable space in her recommendation outlining the manner in which the DOC has utilized this device, the court, after conducting an independent review of the record, finds it necessary to summarize briefly its findings of fact as to how the hitching post has been implemented in Alabama's prisons. Such a review is necessary because, as will be shown below, although the DOC has attempted to regulate the use of the hitching post in its institutions, numerous and particularly egregious violations of its policy have resulted in substantial harm to those inmates who have been placed upon the device.

### 1. Purpose

Each correctional facility regulated by the DOC has a hitching post on its property. Although Regulation 429 is the only statewide administrative regulation promulgated by the DOC to govern the use of the hitching post, the DOC has issued some institution-specific regulations regarding the device.[113] As stated above, Regulation 429 provides that inmates who refuse to work or are otherwise "disruptive" should be placed on the post. The term "disruptive" is not defined in the text of Regulation 429. However, the regulation states that an "activity log" should be completed for each day an inmate is on the hitching post.[114] The activity log form issued by the DOC lists, under the section entitled "Reason for Restraint," the following:

"Refusing to Work

Disruptive to Work Squad (Be Specific)

a. Refusal to Walk in Prescribed Manner

b. Refusal to Carry a Tool to Job Site

c. Other (Be Specific)" [115]

In addition to refusing to walk in the prescribed manner and refusing to carry a tool, a corrections officer testified that an inmate would be considered "disruptive" and placed on the hitching post for fighting while on work assignment, or attempting to prevent other inmates from working.[116] However, during the evidentiary hearing before the Magistrate Judge, the DOC Commissioner testified that he believed two of the "disruptive" reasons listed on the activity log form, refusal to walk in the prescribed manner and refusal to carry a tool to the work site, should not result in an inmate's placement on the hitching post, but rather should be dealt with by a disciplinary proceeding with due process.[117] He agreed that the reason neither violation should result in placement on the hitching post was because they were not "emergency situations." [118] The Commissioner also stated that for an inmate to refuse to go out with his work squad in the morning would also not be considered an "emergency situation" to justify the use of the hitching post. The Commissioner attempted to clarify the meaning of "emergency situation" as follows:

"If just refusing to go out in the morning, you know, not going to work, that would not be an emergency situation. But should an individual just quit work immediately out on the work detail, that could involve an emergency situation." [119]

Notwithstanding the Commissioner's testimony, the Magistrate Judge heard testimony from some inmates that they were placed on the hitching post for these three non-emer-

---

**112.** Plaintiffs' exhibit 12, at 1.

**113.** See, e.g., defendant's exhibits 2536 (Standard Operating Procedure 6–019, Hitching Rail Procedure, Holman Prison), and 2552 (Standard Operating Procedure 9–8, Work Related Uncooperative Inmates, Fountain Correctional Facility).

**114.** Plaintiffs' exhibit 12, at 2.

**115.** Id. (Annex A to Regulation 429) ("Activity Log: Inmates Placed on Restraining Bar").

**116.** Transcript of hearing before the Magistrate Judge, at 1042 (testimony of Officer Mark Pelzer).

**117.** Id. at 870 (testimony of the DOC Commissioner). Hopper, who was appointed as Commissioner of the DOC in April of 1996, testified that he had no knowledge prior to the eve of his appearance in court, that inmates could be placed on the hitching post for refusing to walk in the prescribed manner or to carry a tool to the work site. Hopper further testified that he intended to change this regulation. Id.

**118.** Id. at 872, 886.

**119.** Id. at 886. The Commissioner also stated that "I can't fathom removing an individual from a secure segregation cell to take them outside and put them on a restraining bar." Id. at 887.

gency reasons.[120] Further, the deputy warden of Limestone Correctional Facility testified that inmates who were late for checkout with their work squad and detained in holding cells would be transferred to the hitching post.[121]

Although Regulation 429 attempts to limit the reasons for which inmates are placed upon the hitching post to refusal to work or disrupting a work squad, some institutions used the hitching post for other disciplinary purposes. For example, inmates at the Holman Correctional Facility were, at one time, subject to placement on the hitching post if they committed indecent exposure. Holman's "Hitching Rail Procedure" plainly states, "Any inmate identified as a violator of Rule 38 Indecent Exposure/Exhibitionism may be secured to the hitching rail to prevent the continued negative behavior."[122] For such a violation, the inmate is kept on the hitching post "until the end of the shift the violation occurred or dusk dark which ever is longer."[123] The Commissioner has conceded that the Holman policy violated Regulation 429.[124]

### 2. Physical Description

Regulation 429 describes the hitching post or restraining bar as a horizontal bar, "made of sturdy, nonflexible material," placed at 57 inches and 45 inches from the ground so as to accommodate inmates of varying heights.[125] Inmates are handcuffed to the hitching post in a standing position and remain standing the entire time they are placed on the post. Although corrections officers are instructed to handcuff the inmates to the post at "mid-chest level," [126] the plaintiffs presented evidence that some inmates were handcuffed such that they were forced to stand with their arms above their heads, while others were handcuffed such that they could not stand upright while handcuffed to the post.[127] Most inmates are shackled to the hitching post with their two hands relatively close together, however

120. *Id.* at 366–376 (testimony of inmate Michael Askew), and 421–439 (testimony of inmate Jerry Johnston). Michael Askew had been given a "stop-up," or medical excuse to not perform work, from the prison doctor. However, he was placed on the hitching post at Draper Correctional Facility for approximately five hours when, pursuant to the doctor's instructions, he refused to pick up a hoe for his work duty. At a subsequent disciplinary hearing on his alleged refusal to work, Askew was found not guilty. *Id.*

The Commissioner maintains that Askew did not have a "stop-up," but rather a "limited duty slip," which did not entitle him to stop working. Defendant's objections to Magistrate Judge's recommendation, at 16. This assertion is belied by the ultimate finding at the disciplinary hearing. Moreover, the Commissioner concedes that "if the officer failed to check for a medical stop up it was a violation of Regulation 429." *Id.*

Additional instances are found in the appendix attached to the Magistrate Judge's recommendation. There, the Magistrate Judge summarized and categorized the Commissioner's exhibits, including incident reports for those inmates placed on the hitching post. Many of the triggering events for placement on the hitching post included refusal to carry a tool or to walk in the prescribed manner. *See* appendix to the recommendation of the Magistrate Judge.

121. Transcript of hearing before the Magistrate Judge, at 1006 (testimony of Ralph Hooks).

122. Defendant's exhibit 2536 (Standard Operating Procedure 6–019, Hitching Rail Procedure, Holman Prison).

123. *Id.*

124. Transcript of hearing before the Magistrate Judge, at 864–66 (testimony of the DOC Commissioner) (referring to the placement of inmates on the hitching post for masturbating in public as "summary punishment by correctional officers").

125. Plaintiffs' exhibit 12.

126. Transcript of hearing before the Magistrate Judge, at 1041–42 (testimony of Officer Mark Pelzer).

127. Recommendation of the Magistrate Judge, at 20, 23, 26, and 32 (discussing testimony of inmates John Spellman, Tony Fountain, Warren Leatherwood, and Jerry Johnston). The Magistrate Judge admitted into evidence three photographs, two offered by the plaintiffs, and one offered by the Commissioner, purporting to show the actual height of the hitching post. Plaintiffs' exhibits 20 and 22, defendant's exhibit 2596. The plaintiffs' exhibits depict two inmates shackled to the hitching post: one inmate's hands appear to be shackled at chin level, the other's appear to be at or above his head. The Commissioner's exhibit does not depict an inmate shackled to a hitching post; rather, it shows a man standing next to the lower of the two hitching posts, with what appears to be a meter stick by his side. The court finds that none of these three exhibits are particularly useful in determining the height at which inmates are shackled to the hitching post. For example, the inmate shackled to the hitching post in exhibit 20 testified at the hearing that at the time the picture was taken he was not standing upright, but was "swinging" from the post. *See* transcript of hearing before the Magistrate Judge, at 691 (testimony of Larry Hope). Rather, the court will rely on the testi-

some inmates were handcuffed so that their arms were spread apart and their hands shackled independently.[128] Some facilities also shackle the inmates' ankles together when the inmates are on the post.[129]

Inmates eat their lunches while standing and with both hands shackled to the post. At one point in time, officers at the Limestone Correctional Facility permitted inmates to eat with one hand unshackled. However, this practice was discontinued because it was said to require too much time in order to secure additional officers to back up the officer who was unshackling the inmate.[130] Inmates are not permitted breaks to flex or stretch their muscles while they are on the post. As further explained below, many inmates reported being in mild to severe pain during and after their placement on the hitching post because of the strain on their muscles.

### 3. The Policy: Placement Procedures as Outlined in Regulation 429

Once an officer has determined that an inmate has refused to work or is disruptive to a work squad, the officer may place the inmate on the hitching post, using force if necessary.[131] No disciplinary hearing or other type of due process procedure is provided to the inmate.[132] According to Regulation 429, if force is used, the corrections officer should contact a nurse to "check the inmate's condition." Regardless of whether force is used, Regulation 429 specifies that the corrections officer must contact the health care unit "to ensure that [the inmate] does not have a medical stop-up restricting him from work." Regulation 429 states that if no medical attention is warranted, then, at "the end of the day the inmate will be carried to the health care unit for a body chart." The

regulation does not specify whether "end of the day" means the completion of the inmate's time on the hitching post if the inmate returns to work and serves less than a full day on the post, or it only applies if the inmate does not return to work and remains on the post until the conclusion of the work day. In either case, as discussed *infra*, the DOC Commissioner and his officers failed to observe this portion of the regulation.

Regulation 429 also provides that "[f]resh water will be available to the inmate" and that the inmate "will be given the opportunity to go to the bathroom once each hour." The activity log form, attached to Regulation 429 as Annex A, instructs the corrections officer to record whether the inmate has accepted or rejected water and bathroom breaks in 15–minute increments.[133] Most importantly, the regulation states: "At any time during the day the inmate can tell an officer that he is ready to go to work. He will be allowed to join his assigned squad for that day and begin work." However, if the inmate remains on the hitching post the entire day, "he will be checked back into the institution after the last squad is checked in." Regulation 429 also states that "The inmate will be written a disciplinary for refusal to work," but does not specify whether the inmate receives such a citation in all cases or only in those cases where the inmate, after being placed on the hitching post, maintains his refusal to work.[134] Further, Regulation 429 does not specify the number of days an inmate is to be placed on the hitching post for refusal to work; nor does the regulation set a maximum number of hours or days for which an inmate can be placed on the post.

The result of the "disciplinary," referred to in Regulation 429 as being issued to an inmate who is placed on the hitching post,

mony of the inmates placed on the post, as well as the testimony of the corrections officers who were responsible for placing the inmates on the post, to determine where and how inmates are shackled to the post.

128. *Id.* at 526 (inmate Calvin Nix, testifying that he was shackled to the hitching post in this manner, as were other inmates at Holman Prison).

129. *Id.* at 431 (testimony of Jerry Johnston).

130. *Id.* at 1066–67 (testimony of Keith Gates).

131. Plaintiffs' exhibit 12.

132. *Id.;* Joint Stipulation of Facts, filed September 23, 1996 (Doc. no. 337), ¶ 2.

133. To clarify, the form does not instruct the officer to ask the inmate whether he needs water or restroom breaks every fifteen minutes, but rather provides entry lines for the officer to record the responses or observations in fifteen minute increments. Plaintiffs' exhibit 12.

134. *Id.*

depends on what type of rule or regulation the corrections officer contends the inmate violated. There are two types of disciplinary proceedings in Alabama's prison system. Administrative Regulation Number 403 "Disciplinary Hearing Procedures for Major Rule Violations" (hereinafter "Regulation 403") governs the procedure for "major rule violations." [135] Among the major rule violations is Rule 54: "Refusing to work/failing to check out for work/encouraging or causing others to stop work." [136] The sanctions for a violation of a major rule violation such as Rule 54 include "segregation, forfeiture of earned good time, and placement on the chain gang." [137] Thus, the majority of inmates who are placed on the hitching post will be charged with a major rule violation and, after a due process hearing as set out in Regulation 403, can suffer the consequences listed above. The alternative procedure is found in Administrative Regulation Number 414: "Behavior Citation Procedures for Informal Disciplinary Actions." [138] The result of receiving a behavior citation can include "removal from good time earning status" and/or "assignment to institutional chain gang for up to 15 days," but does not result in a forfeiture of good time. Some examples of the minor rules violations include Rule 81: feigning illness; Rule 55: unsatisfactory work; Rule 87: malingering. A due process hearing is not required for the imposition of a punishment for a minor rules violation. [139]

Thus, because the inmate who refuses to work receives a formal sanction as a result of his violating a major and minor rule, the Commissioner argues that placing the inmate on the hitching post is not a punishment, as such, but merely a means by which prison guards can coerce the inmate to return to work. [140] This argument will be discussed in greater length below.

### 4. The Practice: Actual Placement Procedures

The testimony given at the evidentiary hearing before the Magistrate Judge revealed that the procedures set out in Regulation 429 for determining whether to place an inmate on the hitching post were not followed, or were followed and resulted in substantial physical harm to inmates. The most compelling examples of this deficiency were in cases in which the corrections officers ignored inmates' protestations that they were not physically capable of working. The corrections officers, whose medical background and training are disputed by the parties, often interpreted inmates' complaints as indicia that they were malingering or refusing to work, and placed them on the hitching post. Placement on the hitching post oftentimes exacerbated the inmates' poor physical condition.

For example, on May 2, 1994, inmate Tony Fountain was placed on the hitching post at Staton Correctional Facility because he could not keep up with the rest of the inmates in his squad on their route to the work site. Fountain had previously received a "stop-up" order from the prison physician for his back and leg conditions, which, on the date he was placed on the hitching post, were causing him severe pain and discomfort. [141] Although Fountain did not refuse to work, he was taken back to the institution and placed on the hitching post at about 7:00 a.m. He was shackled to the lower of two bars, which forced him to bend over the entire time he was placed on the post. Fountain spent nine hours on the post in this bent position. [142] During this time, he was not given food, water, or access to toilet facilities, although he made such requests repeatedly. [143] Although Regulation 429 mandates that an in-

135. Plaintiffs' exhibit 84.

136. *Id.* (Annex A).

137. *Id.* at 1.

138. Plaintiffs' exhibit 85.

139. However, the Warden or his designee has final approval of these sanctions. *Id.*

140. *See* defendant's objections to the Magistrate Judge's recommendation, at 61.

141. Transcript of hearing before the Magistrate Judge, at 114–117 (testimony of inmate Tony Fountain).

142. *Id.* at 122–23.

143. *Id.* at 125–30. The Commissioner contends that Fountain was given access to food, water, and toilet facilities. The Commissioner bases this assertion on the testimony of Officer Leroy Yelder, who reviewed a back gate entry log for the date Tony Fountain was placed on the hitching post. *Id.* at 1085–87, 1095. This entry log

mate receive a "body chart" examination following his placement on the hitching post, Fountain had to request such an examination from the prison's health care unit. Fountain was unable to walk in an upright position for two weeks after his placement on the hitching post; he received a work stop-up order from the health care unit for 30 days due to the fact that he was dehydrated after his placement on the post and could not stand upright.[144]

Another example can be found in the case of inmate Gerald Ware, who in the summer of 1995 was assigned to the Draper Correctional Facility segregation unit and chain gang. After injuring his shoulder while working, Ware was scheduled to receive an x-ray examination at the Kilby institution on July 6, 1995. On July 5, 1995, before his squad was checking out for work duties, Ware informed the back-gate officer that he needed to see the nurse because he was scheduled to have the x-rays performed. The officer refused to permit Ware to see the nurse and told him that he had to report for work duties. When Ware resisted, the officer summoned his supervisor, who placed Ware on the hitching post for refusing to work. Neither officer contacted the health care unit to verify Ware's claims. Ware remained on the hitching post from 8:30 a.m. to 1:00 p.m., when an officer asked him if he could "just stand up" and "fake it for awhile" at the work site. The officer was concerned that, if Ware remained on the hitching post,

he "could have a heat stroke."[145] Ware described the experience of being placed on the hitching post as "very painful ... humiliating ... [and] real frustrating, dehumanizing."[146] Following a formal charge of violating Rule 54 (Refusing to Work) and a disciplinary hearing, Ware was found not guilty. The hearing officer determined that "Inmate Ware was scheduled for X–Rays [sic] and did in fact go to Kilby on July 6, 1995. Inmate Ware should have been stopped up until the x-rays were done."[147]

### 5. Duration of an Inmate's Placement on the Hitching Post

The length of time an inmate remains on the hitching post varies.[148] In fact, corrections officers from the same facility could not reach consensus on the average amount of time inmates at that facility spent on the hitching post. One Limestone corrections officer testified that the "majority" of inmates he placed on the hitching post wanted to go back to work after 30 minutes to an hour.[149] The Deputy Warden of Limestone stated that "in ninety percent of the cases [inmates] don't stay on the bar over two hours."[150] However, the back-gate officer at Limestone, who actually supervises the inmates on the hitching post, credibly testified that, on the average, inmates at Limestone spend about six or seven hours handcuffed to the post.[151]

Gauging the average amount of time an inmate spends on the hitching post is further

---

was neither provided to the plaintiffs in discovery, although it clearly came within the ambit of the plaintiffs' discovery requests, nor was the log admitted into evidence by the Magistrate Judge. *Id.* Unfortunately, this entry log appears to be the only documentation the DOC maintained for Fountain's placement on the hitching post; although they have always been required by Regulation 429, the use of activity logs to document water, food, and bathroom breaks did not begin at Staton Correctional Facility until after Fountain was placed on the hitching post. *Id.* at 1097 (representations made by Commissioner's counsel).

**144.** *Id.* at 122–23. The Commissioner did not refute Fountain's testimony as to the consequences of the hitching post.

**145.** *Id.* at 230–40 (testimony of inmate Gerald Ware).

**146.** *Id.* at 237–38.

**147.** Plaintiffs' exhibit 61.

**148.** The incident reports submitted by the Commissioner indicates that the duration of an inmate's placement on the hitching post can range from thirty minutes to 12 hours. *See* appendix to recommendation of the Magistrate Judge. In their joint stipulation of facts, however, the parties stated that "Some inmates remain on the post for up to ten hours during the day." Joint stipulation of facts, filed September 23, 1996 (Doc. no. 337), ¶ 6.

**149.** Transcript of hearing before the Magistrate Judge, at 1048 (testimony of Officer Mark Pelzer). Pelzer testified that he had placed a dozen inmates on the hitching post.

**150.** *Id.* at 1011 (testimony of Deputy Warden Ralph Hooks).

**151.** Transcript of hearing before the Magistrate Judge, at 1069 (testimony of Officer Keith Gates).

complicated by the contradictory evidence in the record concerning compliance with Regulation 429's provision that "At any time during the day the inmate can tell an officer that he is ready to go to work." [152] However, inmates were not permitted to leave the hitching post after they had informed the officers that they were willing to work, but rather were forced to stay on the hitching post until their squad had returned from the work site. [153] One of the plaintiffs' expert witnesses testified that it was his belief, after interviewing inmates and prison guards, that contrary to the rule set out in Regulation 429, inmates were not permitted to rejoin work squads after being placed on the hitching post:

> "[T]here are sharp disputes between the guards I spoke to and the prisoners on that matter. And I'm inclined to agree with the prisoners, because of the difficulty of arranging for a person to go out to a distant gang on any day and the limited number of guards that are observing people on the—or the guard that is observing the prisoner on the restraining bar, the same guard who is also on the front gate of Limestone. So I find it very hard to believe the sincerity of implementation of that regulation." [154]

There was some indirect evidence offered at trial to support the plaintiffs' contentions that inmates were not permitted to return to work as soon as they informed the officers of their willingness to do so. For example, three sets of incident reports, involving a total of 10 inmates, reveal that corrections officers at the Easterling Correctional Facility placed inmates on the hitching post in the morning after the inmates had failed to report for work duty, but were not removed from the hitching post until their work squad returned at lunchtime, some four to five hours later. [155] During his testimony at the evidentiary hearing, the corrections officer responsible for supervising these particular inmates stated that none of the inmates had refused to work, rather they only failed to appear for their roll call. He also stated that it was his practice to ask the inmates once every hour if they desired to join their work squads, but that "it just so happened" all of the inmates in question decided to rejoin their work squads after their squad's lunch break. [156] While the incident reports and the corrections officer's testimony do not provide direct evidence that Regulation 429's directives were violated, the court finds the coinciding times raise an inference that the policy was not followed. The court also notes that Regulation 429 does not regulate the frequency with which the corrections officer guarding the inmates must inquire as to whether they would like to return to their work squads; nor is there a demarcation on the annex form to Regulation 429 for the corrections officer to record the number of times he or she has asked the inmates on the hitching post if they would like to return to their work squad.

It also appears from the record that some institutions have adopted the practice of leaving inmates on the hitching post until their squad returns from the work site, regardless of whether the inmate has indicated that he is ready and willing to work. Another one of the plaintiffs' expert witnesses testified, based on his observation of a training videotape produced by the DOC, that correctional officers are instructed to leave inmates on the hitching post until their work squad returns. [157] It is apparent that the DOC gains

---

**152.** *Id.*

**153.** "From once you get sent to the hitching rail, you can't get off the hitching rail and go back to work. You got to be on that hitching rail until the squad come in." *Id.* at 690 (testimony of inmate Larry Hope).

**154.** Transcript of hearing before the Magistrate Judge, at 755 (testimony of Norville Morris).

**155.** Defendant's exhibits 623 (incident report for inmates Larry Powe, Alonzo Robinson, Timmie Minniefield, dated November 20, 1995); 594 (incident report for inmates Jeremy Logel, Harold Kizziah, dated September 27, 1995); and 583 (incident report for Allen Brazzie, Morris Welch, Herbert Lane, Bobby Monogan, Bruce Wilson, dated September 18, 1995).

**156.** Transcript of hearing before the Magistrate Judge, at 922–26.

**157.** *Id.* at 317 (testimony of Allen Breed); plaintiffs' exhibit number 86 ("Chain Gang" videotape). The court has viewed that portion of the videotape admitted into evidence by the Magistrate Judge for the purposes of Breed's expert testimony. *The videotape depicts an inmate*

a substantial derivative benefit from this practice, in that the inmate on the hitching post is in plain view of other inmates returning from the work sites who then taunt and ridicule him as they pass by. One corrections officer credited this type of humiliation with motivating the inmates to adhere to their work duties:

> "They're on that restraining bar when the rest of their squad who did work comes in, or by them to go into the gate and go back in. And the amount of harassment, verbal I mean, from the other inmates does a lot, you know. It really affects them. When they start, well, making fun of them, you know, talking about how stupid they look standing there and all this, that it really affects them." [158]

Indeed, one inmate testified about his experience being on the hitching post when their squad returns from the work site. Tony Fountain was placed on the hitching post for nine hours at Staton Correctional Facility, and was forced to defecate in his pants when his requests for a bathroom break were ignored. Fountain was not permitted to use the restroom or to change his clothing for four and one-half hours after he had defecated on himself. About 100 inmates returning to the institution from the work site saw him in this condition; they laughed at him and made jokes about him, and continued to refer to him in derogatory terms after the incident.[159] Thus, in addition to whatever physi-

cal effects the inmate experiences while placed on the post, the hitching post serves a type of public shaming function as well.

To further compound the problem of non-compliance with Regulation 429, some individual institutions developed their own policies regarding returning inmates to work after they have been placed on the hitching post. The hitching-post policy for the Holman Correctional Facility reads: "The inmate will be escorted to the hitching rail and secured for the duration of his work shift or four hours which ever is greater. The exception to this rule is inclement weather and darkness both of which result in the inmate being removed from the hitching rail." However, an inmate may return to work after the shift commander determines the "legitimacy of the inmate's request to return to work," and finds the inmate "is ready to work." [160] Thus, although Regulation 429 mandates that any inmate who states he is willing to work be returned to his work squad, at institutions such as Holman, the corrections officer can decide that an inmate's proffered willingness to work is illegitimate and decline to remove him from the hitching post.

### 6. Conditions of Confinement on the Hitching Post

The hitching post is located outside the institution and, according to the testimony of the inmates who have been placed on it, the hitching post is not shaded from the sun.[161]

---

shackled to the hitching post; the inmate's wrists are clearly affixed to the post above his head level. The narrator of the videotape states the following:

> "If it is determined by the medical staff that the inmate is malingering, the officer will issue the inmate a negative report, which will extend the inmate's work time on the chain gang. The inmate will be on the security rail *until all work squads have been checked in to the check-in point at the end of the day.*"

*Id.* (emphasis added).

**158.** Transcript of hearing before the Magistrate Judge, at 1061.

**159.** *Id.* at 124–129 (testimony of inmate Tony Fountain). The Commissioner has objected to the Magistrate Judge's statement that Fountain's testimony was not refuted by the testimony of a Staton Correctional Facility back gate officer, Leroy Yelder. The court overrules the Commissioner's objections. Yelder testified that he had

never seen an inmate defecate in his pants while placed on the restraining bar. He also stated, based on his review of the documentation of Fountain's placement on the hitching post, *but not based upon his own personal knowledge,* that Fountain was given sufficient bathroom and water breaks. *Id.* at 1095 (testimony of Leroy Yelder) ("Well, basically I was testifying what was on the back gate log, because back in '94, you know, after I read the log it refreshed my memory a little bit of what happened.").

**160.** Defendant's exhibit 2536.

**161.** Calvin Nix testified:

> "I couldn't get out of the sun, I was out there all day in it. Because of the way the rail is set up and all, there is no shade, and the way the angle of the rails are, the sun comes up and it follows the rail from sunrise to sunset, and you're exposed to it the whole time. There is no way of getting out of it."

Although they can be placed on the hitching post at any time of the year, including the summer, inmates do not receive sun block protection, nor are they always permitted to wear a hat to shield their faces from the sun.[162] Several of the inmates were placed on the hitching post during the summer months when the temperatures were upwards of 95 degrees Fahrenheit. These inmates experienced dehydration, as well as sunburn and blistering from their unprotected exposure to the sun.[163] As stated above, Regulation 429 requires that inmates be provided with fresh water and given the opportunity to use the bathroom once every hour while on the post.[164] The Magistrate Judge correctly concluded that this policy was not adhered to by the DOC Commissioner and his officers. Inmates were not given water while shackled to the hitching post, and were denied access to toilet facilities while shackled to the hitching post. Moreover, certain corrections officers not only ignored or denied inmates' requests for water or access to toilet facilities, but taunted them while they were clearly suffering from dehydration or

had been forced to defecate or urinate in their clothes and needed to access facilities so they could wash themselves.[165] The Magistrate Judge correctly concluded that these actions presented serious health hazards, not only for the inmates, but also for anyone in their immediate vicinity.[166]

One of the most egregious examples of this type of abuse occurred during Larry Hope's placement on the hitching post. Hope was placed on the hitching post on June 7, 1995, for seven hours during very hot weather.[167] The reason for his placement on the hitching post was his altercation with six corrections officers.[168] Hope had not received water for at least two hours while placed on the hitching post and repeatedly requested water. He made such requests to two corrections officers in charge of the dog truck; one of these officers filled a cooler with ice and water and "watered the dogs" on the dog truck. The officer then placed the cooler on the ground at about three feet from Hope, "took the top off" and "kicked it over" so that the water ran to the ground directly in front

Transcript of hearing before the Magistrate Judge, at 548–49.

162. One inmate brought a towel with him to cover his face while being placed on the hitching post. A corrections officer ordered that it be taken away from him stating, "You damn red niggers don't need nothing like that." Transcript of hearing before the Magistrate Judge, at 547–48 (testimony of inmate Calvin Nix).

163. Leonard Goltry, who was called by the court as a witness in conjunction with inmate Calvin Nix's testimony, stated that he saw Calvin Nix on the hitching post and that Nix appeared sunburned and to have fever blisters on his bottom lip, although Goltry could not confirm whether such blisters were the result of sun exposure. Transcript of hearing before the Magistrate Judge, at 723; see also id. at 56–57 (testimony of inmate John Spellman) (stating he received "the worse sunburn I've ever had" while on the hitching post).

164. However, the standard operating procedure for the Holman Correctional Facility states that water and access to toilet facilities are to be provided once every two hours. Defendant's exhibit 2536.

165. In addition to the testimony of Tony Fountain, discussed *supra*, the Magistrate Judge heard testimony from inmate Hadji Hicks, who was similarly forced to defecate on himself when his requests to use the bathroom were ignored. *Id.*

at 645 (testimony of inmate Hadji Hicks). Hicks stated that the other inmates and officers taunted him about this incident. *Id.* Officer Leroy Yelder confirmed this incident when he testified that he had "heard" that Hicks had defecated in his pants. *Id.* at 1101 (testimony of Officer Leroy Yelder).

166. Recommendation of the Magistrate Judge, at 108.

167. Transcript of hearing before the Magistrate Judge, at 691 (testimony of inmate Larry Hope). Hope was placed on the hitching post about one month prior to this incident for fighting with another inmate. *Id.* at 681–82. Hope did not receive a disciplinary citation for the incident and the captain eventually concluded that Hope should not have been placed on the hitching post for the fight. Plaintiffs' exhibit 50 (remarks of Captain Wise).

168. The Commissioner has objected to the Magistrate Judge's use of the term "fight" to describe the interaction between Hope and the corrections officers. *See* recommendation of the Magistrate Judge, at 42; defendant's objections to recommendation of the Magistrate Judge, at 20–21. The plaintiffs contend that based on Hope's testimony, the term "fight" is generous to the Commissioner. Plaintiffs' response to defendant's objections, at 110. The court need not resolve this factual dispute, but notes that an altercation

of Hope.[169] The Commissioner has conceded that these allegations, if true, would constitute violations of Regulation 429, but contends that there is insufficient evidence to support the allegations.[170] However, the Commissioner did not present any evidence to refute Hope's allegations. Further, the Commissioner's claims that evidence in the record contradicts Hope's testimony are unfounded. The Commissioner points to plaintiffs' exhibit 50 to show that Hope received water while placed on the hitching post.[171] However, plaintiffs' exhibit 50 documents Hope's May 11, 1995, placement on the hitching post. The only evidence in the record that relates to Hope's June 7, 1995, placement on the hitching post, the date that he contends he was deprived of water, is plaintiffs' exhibit 51, a treatment record for Hope following his altercation with the corrections officers and prior to his placement on the hitching post, as well as plaintiffs' exhibit 20, which is a photograph of Hope receiving a cup of water from an officer. While the photograph demonstrates that Hope received at least one cup of water during his seven-hour placement on the hitching post, the Commissioner has provided no documentation concerning Hope's June 7, 1995, placement on the hitching post to demonstrate that he received water in regular intervals throughout the day as required by Regulation 429.

The most repeated complaint of the hitching post, however, was the strain it produced on inmates' muscles by forcing them to remain in a standing position with their arms raised in a stationary position for a long period of time.[172] In addition to their exposure to sunburn, dehydration, and muscle aches, the inmates are also placed in substantial pain when the sun heats the handcuffs that shackle them to the hitching post, or heats the hitching post itself. Several of the inmates described the way in which the handcuffs burned and chafed their skin during their placement on the post.[173] One of the plaintiffs' experts recreated the conditions of the hitching post and shackled himself to it for about two hours. He stated:

> "[I]n the 93 degree weather . . . that pipe, the sunlight on the metal bar began to generate a heat that went well beyond the 93 degrees and became hotter and hotter so that my wrists touching that bar became inflamed, and the only way I could avoid the bar would be to hold the chain between the handcuffs above the bar, which meant I had to even get in a higher position. When I did bring the handcuffed arms on the bar itself, then the handcuffs began to get a transmission of heat from the bar, and the handcuffs themselves heated up. At the end of two hours, Your Honor, I decided that this experience I had was not going to go on any longer . . . no one can honestly say that this is not a painful experience. And I'm sure it varies from one inmate to another. I do not know how an inmate would stay on that for eight or ten hours." [174]

The Commissioner attempted to introduce similar evidence regarding their expert's experience on the hitching post. However, the Magistrate Judge sustained the plaintiffs' objections to the admission of this evidence.[175]

---

between corrections officers and an inmate no doubt presents a security risk.

**169.** Transcript of hearing before the Magistrate Judge, at 694–703.

**170.** Defendant's objections to the recommendation of the Magistrate Judge, at 21; *see also* transcript of hearing before the Magistrate Judge, at 865–66 (testimony of the DOC Commissioner).

**171.** Defendant's objections to the recommendation of the Magistrate Judge, at 71.

**172.** *See, e.g.,* transcript of hearing before the Magistrate Judge, at 32 (testimony of inmate John Spellman), 130 (testimony of inmate Tony Fountain), 187–88 (testimony of inmate Warren Leatherwood).

**173.** *Id.* at 549 (testimony of inmate Calvin Nix) (stating that the steel handcuffs and hitching post became hot to touch in the sun and were extremely painful).

**174.** Transcript of hearing before the Magistrate Judge, at 298–99 (testimony of Allen Breed).

**175.** *Id.* at 1113. The Magistrate Judge excluded the evidence based on a motion in limine to limit the expert's testimony to information the expert received up until the time the plaintiffs deposed the expert. Plaintiffs' motion in limine to limit the testimony of defendant's experts, filed September 20, 1996 (Doc. no. 332). This motion was granted by the Magistrate Judge on October 17, 1996 (Doc. no. 359). By contrast, the Commissioner did not object to the plaintiffs' expert's testimony as to his experiences on a mock hitch-

### 7. The Department of Justice's Investigation

In June and July of 1994, the Civil Rights Division of the United States Department of Justice conducted an investigation of Alabama's Easterling Correctional Facility. This investigation included an evaluation of Easterling's use of the hitching post.[176] The Department of Justice concluded that the hitching post [177] required an improper use of restraints and corporal punishment, that corrections officers did not comply with the minimal safeguards required by state policies, and that inmates with medical conditions were placed on the hitching post without medical clearances, which rendered the use of the hitching post "potentially dangerous from a medical standpoint." [178] The Department of Justice found the DOC's officers had failed to comply with the policy of immediately releasing any inmate from the hitching post who agrees to return to work.[179] The Department of Justice recommended that in order to meet minimum constitutional standards at Easterling, the DOC should cease its use of the hitching post.[180]

The DOC responded to the Department of Justice's report by way of a letter, dated May 15, 1995.[181] In the letter, the DOC stated that it had "determined to maintain the existence of the security bar, noting that its use is not unconstitutional and is necessary to preserve prison security and discipline." [182] The letter continued to explain the DOC's reasons for using the security bar, or hitching post:

> "DOC assures DOJ that the security bar is not used with malice or cruelty but with the intent of maintaining prison security....

> "While DOJ raises valid concerns regarding the potential health problems that could develop from use of the security bar, DOC maintains that these have been adequately addressed in the past.... [T]he use of the security bar at Easterling is closely monitored. Inmates are offered water every fifteen minutes and are allowed to use a toilet whenever necessary. Any inmates taking medication with side-effects that could be worsened by exposure to the sun or any medically compromised inmates are given a medical stop-up. DOJ, while raising "potential" concerns, has not cited any actual case where an inmate's medical condition has been caused or exacerbated while being restrained on the security bar. In fact, no such case of an inmate restrained on the security bar requiring medical attention has ever existed at Easterling. As long as the use of the security bar is closely monitored, actual related medical problems should be continued to be avoided." [183]

The DOC supported its argument that the hitching post was a valid means of maintaining security by citing *Whitley v. Albers*, 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986).[184] However, the Department of Justice disagreed with the DOC's interpretation of *Whitley*. In a letter dated June 27, 1995, the Department of Justice responded to the DOC's letter as follows:

> "We remain deeply concerned about your unwillingness to take any corrective action regarding the 'rail' or 'hitching post.' We have reviewed your legal analysis and must differ with your reading of *Whitley*. Although an emergency situation may war-

---

ing post. *See* transcript of hearing before the Magistrate Judge, at 296–310.

**176.** The Commissioner did not object to the plaintiffs' proffer of the Department of Justice's report and recommendation, and the Magistrate Judge admitted them into evidence. *See* plaintiffs' exhibit 25 (letter from Deval Patrick to Governor James, dated March 27, 1995); exhibit 78 (report of James E. Murphy on Easterling Correctional Facility, dated November 28, 1994).

**177.** The Department of Justice used the term "hitching pole" in their report. Plaintiffs' exhibit 25, at 3.

**178.** *Id.*

**179.** *Id.*

**180.** *Id.* at 4.

**181.** Plaintiffs' exhibit 72, exhibit D (excerpt from letter from Charles A. Graddick, counsel for DOC, to Deval L. Patrick, Department of Justice, dated May 15, 1995). The DOC Commissioner did not object to the plaintiffs' proffer of this correspondence.

**182.** *Id.* at 9.

**183.** *Id.* at 7, 12.

**184.** *Id.* at 7.

rant drastic action by corrections staff, our experts found that the 'rail' is being used systematically as an improper punishment for relatively trivial offenses. Therefore, we have concluded that the use of the 'rail' is without penological justification." [185]

The Department of Justice report was raised in a wardens and directors' meeting held on November 15, 1995. According to the minutes of the meeting, the wardens and general counsel for the DOC concluded: "[W]e feel the Admin.Reg. we have in place right now covers [the need for protocol]. Just emphasize to your employees that they follow our regulation specifically, and make sure they keep any and all logs they are supposed to and that it is properly applied." [186]

### 8. Use of the Hitching Post in Other Prison Systems

According to the plaintiffs' and the DOC Commissioner's experts, no other prison system, state or federal, uses a device similar to Alabama's hitching post. One of the plaintiffs' experts testified that he believed that Texas had utilized a similar device, but that its use was abolished in the 1970's.[187] Another one of the plaintiffs' experts stated that in his opinion the only analogous device would be one used in South African prisons in the 1950s on black prisoners.[188] The DOC Commissioner did not dispute the representations made by the plaintiffs' experts concerning the use of the hitching post or devices similar to it in other jurisdictions, and the DOC Commissioner's expert witness testified that he was not aware of any other prison system that used a hitching post on inmates who refused to work.[189]

### B. Constitutional Arguments

The plaintiffs assert two constitutional arguments in support of their challenge to the DOC Commissioner's use of the hitching post. The plaintiffs maintain, first, that the use of the hitching post violates the eighth-amendment right of the inmates placed upon the post to be free from cruel and unusual punishment, and, second, that the use of the hitching post violates their fourteenth-amendment procedural—due-process right. The court will address each argument in turn.

#### 1. Eighth–Amendment

■ The Supreme Court has interpreted the eighth amendment's cruel-and-unusual-punishment clause to prohibit "punishments which are incompatible with 'the evolving standards of decency that mark the progress of a maturing society' ... or which 'involve the unnecessary and wanton infliction of pain.'" *Estelle v. Gamble*, 429 U.S. 97, 102–03, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976) (citations omitted).[190] Unless the inmate alleges an eighth-amendment violation stemming from the official or formal punishment itself, an evaluation of the inmate's claims necessarily requires an objective component ("Was the deprivation sufficiently serious?"), and subjective component ("Did the officials act with a sufficiently culpable state of mind?"). *Wilson v. Seiter*, 501 U.S. 294, 298–300, 111 S.Ct. 2321, 2324–25, 115 L.Ed.2d 271 (1991). "If the pain inflicted is not formally meted out *as punishment* by the statute or the sentencing judge, some mental element must be attributed to the inflicting officer before it can qualify." *Id.* (emphasis in original); *see also Sims v. Mashburn*, 25 F.3d 980, 983 (11th Cir.1994).

■ The state of mind required to sustain an eighth-amendment challenge is one of wantonness. *Wilson*, 501 U.S. at 302, 111 S.Ct. at 2326 ("[O]ur cases say that the offending conduct must be *wanton*.") (emphasis in original). That is to say, mere negligence is insufficient to support a claim of cruel and unusual punishment. *See Es-*

---

**185.** Plaintiffs' exhibit 72, exhibit B (letter from Christopher N. Cheng, Department of Justice, to Charles A. Graddick, counsel for DOC, dated June 27, 1995).

**186.** Defendant's exhibit 2453 (minutes of wardens'/directors' meeting, dated November 15, 1995).

**187.** Transcript of hearing before the Magistrate Judge, at 307, 309 (testimony of Allen Breed).

**188.** *Id.* at 748 (testimony of Norville Morris).

**189.** *Id.* at 1150 (testimony of Gary DeLand).

**190.** The eighth amendment provides, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const., Amdt. 8.

*telle,* 429 U.S. at 106–07, 97 S.Ct. at 292–93. The Supreme Court has created two standards for determining whether such wantonness has been established; these standards vary according to the nature of the alleged constitutional violation. *Hudson v. McMillian,* 503 U.S. 1, 5, 112 S.Ct. 995, 998, 117 L.Ed.2d 156 (1992). An inmate's challenge to the conditions of his confinement requires a court to consider whether prison officials were "deliberately indifferent" to his health or safety. *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994); *Wilson,* 501 U.S. at 304, 111 S.Ct. at 2327. However, when the court is considering actions taken by prison officials in the course of responding to a prison disturbance, where such actions are taken "in haste, under pressure, and frequently without the luxury of a second chance," the proper inquiry in determining the subjective component is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley v. Albers,* 475 U.S. 312, 320–21, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986). Therefore, there are two standards that are used to determine whether the prison officials have acted with a sufficiently culpable mind: the *Farmer* standard of deliberate indifference, which is applied in challenges to prison conditions; and the *Whitley* standard of malicious and sadistic use of force, which is applied in challenges to the use of force under exigent circumstances.

■ The first observation the court makes in determining the appropriate standard to evaluate the plaintiffs' claim is that the use of the hitching post cannot be viewed as a "punishment" imposed by statute or sentencing judge; therefore, the plaintiffs must show that the prison officials acted wantonly, or with a sufficiently culpable state of mind, in order to prevail on their eighth-amendment argument.[191] The Commissioner has steadfastly maintained that the *Whitley* subjective test, the higher standard of culpability, should govern this case because the hitching post is used as a "measured response" to the "conduct of inmates that disrupts the orderly administration of the prison facility."[192] That is, the Commissioner contends, because the hitching post is designed to be used, as the Commissioner stated, in "emergency situations," *Whitley* should govern the disposition of the claim. The plaintiffs admit that the use of the hitching post "does not fit neatly into either category" of cases, but argue that they can prevail under either standard.[193]

The Eleventh Circuit has consistently used the heightened *Whitley* standard to evaluate prisoner claims regarding disciplinary actions taken to restore official control or in response to a security threat. *See, e.g., Sims v. Mashburn,* 25 F.3d 980, 984 (11th Cir.1994); *Williams v. Burton,* 943 F.2d 1572, 1575 (11th Cir.1991), *cert. denied,* 505 U.S. 1208, 112 S.Ct. 3002, 120 L.Ed.2d 877 (1992); *Ort v. White,* 813 F.2d 318, 325 (11th Cir.1987). However, in such cases, the court was confronted with the efforts of corrections offi-

**191.** The court literally interprets the Supreme Court's use of the terms "statute" and "sentencing judge" in *Wilson.* Although Regulation 429 arguably creates a "punishment" for those inmates who refuse to work by mandating their placement on the hitching post, an avoidance of the subjective component cannot be justified; the punishment is not imposed by statute or sentencing judge, nor is it imposed by prison officials to supplement the inmate's sentence as a punishment for the convicted crime. *See Ingraham v. Wright,* 430 U.S. 651, 664–68, 97 S.Ct. 1401, 1408–11, 51 L.Ed.2d 711 (1977) (discussing history of the eighth amendment and noting "The primary purpose of the [Cruel and Unusual Punishments Clause] has always been considered, and properly so, to be directed at the method or kind of punishment imposed for the violation of criminal statutes....") (citations omitted); *cf. Duckworth v. Franzen,* 780 F.2d 645, 652 (7th

Cir.1985) ("If a guard decided to supplement a prisoner's official punishment by beating him, this would be punishment and 'cruel and unusual' because the Supreme Court has interpreted the term to forbid unauthorized and disproportionate, as well as barbarous, punishments.... But if the guard accidently stepped on the prisoner's toe and broke it, this would not be punishment in anything remotely like the accepted meaning of the word, whether we consult the usage of 1791, 1868, or 1985.") (citing *Ingraham, supra* ), *cert. denied,* 479 U.S. 816, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986).

**192.** Defendant's objections to the Magistrate Judge's recommendation, at 61.

**193.** Plaintiffs' response to defendant's objections, at 48.

cers to subdue or control an individual prisoner who was clearly creating a security disturbance. In *Sims,* in response to an inmate's repeated obstruction of the guards' view to his cell and the inmate's belligerent behavior, which included threats to kill the prison guards, the prison guards "stripped" the inmate's cell for about 29 hours. Likewise, in *Williams,* prison guards responded to an inmate's belligerent behavior, which included cursing, threatening to kill the prison guards, throwing bodily fluids at the guards, and causing other inmates to join in a general disturbance, by placing him in four-point restraints in his cell and gagging him for over 28 hours.[194] And again, in *Ort,* the prison guard denied an inmate water while on work detail when the inmate had refused to carry the water to the work site or work with the other inmates, and the other inmates at the work site threatened to refuse to work or to assault the inmate if the guard permitted him to drink the water. In all three situations, the court was faced with prison guards dealing with an immediate security risk, and potentially volatile situation.

Here, based on the evidence presented at the evidentiary hearing before the Magistrate Judge, the court cannot conclude that a security risk, disturbance, or other type of situation requiring an immediately necessarily coercive measure, was present in every instance, or even in most instances, in which the hitching post was used on inmates. For example, on August 23, 1995, inmate John Spellman was taken from his administrative segregation cell to the hitching post, where he remained for over six hours. He did not refuse to work, but rather told the guards that he did not have the proper work boots to work.[195] There is no evidence that Spellman was behaving in a belligerent manner, threatening the prison guards or other inmates, or otherwise disturbing or threatening to disturb prison security.[196] Nor did Spellman's "refusal" to work cause other inmates nearby him to rebel or to disobey orders. Similarly, the testimony of inmate Gerald Ware supports the conclusion that inmates were not always placed on the hitching post during emergency or threatening situations. As described above, Ware was placed on the hitching post after a corrections officer interpreted his statement that he was scheduled for an x-ray examination as a refusal to work.[197] This incident occurred at the back gate of the Draper Correctional Facility, on the institution's grounds and not at the work site. Again, the Commissioner neither alleged nor presented evidence that Ware's protestations created or threatened to create a prison disturbance. Inmate Michael Askew also "refused to work" while at the back gate and was placed on the hitching post, because the prison doctor had instructed him not to lift objects weighing more than 10 pounds.[198] And, like John Spellman, inmate Calvin Nix was physically removed from his segregation cell and placed on the hitching post.[199] The Commissioner offered no evidence that either Askew's or Nix's behavior created or threatened to create a disturbance in the prison.[200]

194. The inmate-plaintiffs in both *Sims* and *Williams* were confined to segregation units reserved for "the most difficult, unruly, and unmanageable members of the prison population." *Sims,* 25 F.3d at 984 n. 10.

195. Transcript of hearing before the Magistrate Judge, at 28–33.

196. The Commissioner objects to the Magistrate Judge's finding that his counsel "did not call any witnesses to refute Spellman's testimony as reported in [her] findings," and argues that the testimony of Officer Federal Blakely refuted Spellman's testimony concerning whether he could be removed from the hitching post if he stated his willingness to work. Defendant's objections to the Magistrate Judge's recommendation, at 11. The court does not need to resolve this objection because it is irrelevant to the court's critical finding that Spellman was removed from his cell to be placed on the hitching post. The Commissioner's contention that "[m]any other defense witnesses refuted Spellman's testimony generally," *id.,* is too vague to be addressed by the court.

197. Transcript of hearing before the Magistrate Judge, at 229–30.

198. *Id.* at 366–68.

199. *Id.* at 533–38.

200. Reviewing the evidence submitted by the Commissioner, the Magistrate Judge concluded that "There is a paucity of evidence in the record that placement of inmates on the hitching post routinely or even frequently occurs in an atmosphere of violence or under circumstances that can be characterized as emergency situations." Recommendation of the Magistrate Judge, at 110. The Commissioner did not directly object

The absence of evidence, or even allegations, that these inmates' refusal to work created a disturbance or threat of disturbance in the prison precludes the court's sole reliance on the heightened *Whitley* standard to analyze the plaintiffs' eighth-amendment argument. The court will therefore adopt the lower-level *Farmer* standard to evaluate the inmate's eighth-amendment argument. In reaching this conclusion, the court has not substituted its own judgment for the experience and expertise of DOC officials, nor has the court second-guessed the DOC by relying on the testimony of the plaintiffs' expert witnesses, who stated that the removal of an inmate from his cell to place him on the hitching post is counterintuitive to prison security.[201] Rather, the court has reached this conclusion by deferring to the policies and practices articulated by the Commissioner himself. In his testimony, the Commissioner stated that inmates who refuse to work while at the institution should not be placed on the hitching post because such a situation would not be considered an emergency:

> "[J]ust refusing to go out in the morning, you know, not going to work, that would not be an emergency situation ... I can't fathom removing an individual from a secure segregation cell to take them outside and out them on a restraining bar. I can't fathom that happening, and I don't see the reason for it." [202]

The court gives considerable credit to this testimony, despite the fact that the Commissioner's expert witness testified to the contrary.[203]

Moreover, the court's decision to use the deliberate-indifference standard to evaluate the plaintiffs' claim is reaffirmed by the fact that the corrections officers' actions in the above instances of use of the hitching post were dictated by Regulation 429, a policy adopted by the DOC with consideration and forethought, rather than an individual offi-

---

to this finding by the Magistrate Judge. The only evidence provided by the Commissioner to the contrary is the testimony of his expert witness, Gary DeLand. *See infra* note 203.

**201.** One of the plaintiffs' expert witnesses testified as follows:

> "It almost violates the very basic principles to begin with of good custody. If an inmate is on the inside of the institution, and he says I'm not going to work today, you don't take him outside the security fence to lock him up on the restraining bar or anything else, you keep him inside the institution. If he's inside the institution, you have him under control."

Transcript of hearing before the Magistrate Judge, at 301–02 (testimony of Allen Breed).

**202.** *Id.* at 886–87.

**203.** The Commissioner's expert witness stated that he believed a refusal to work could be considered an emergency because it was insubordination and might encourage other inmates to do the same thing. Transcript of hearing before the Magistrate Judge, at 1140–41 (testimony of Gary DeLand). The expert also stated that he would consider it an emergency situation that justified use of the hitching post if an inmate refused to work while still in his cell. The expert provided the following explanation to the court:

> "In Alabama you have an unpopular work program, and there needs to be some means by which you can coerce prisoners to accept that work program if the program is going to be deemed to be constitutional, is going to be allowed. To allow prisoners to simply say no, they're willing to accept the limited range of things that may occur in an inmate disciplinary action, it is not unreasonable, in my judgment, to have some means which is somewhat more coercive, time limited, something that the inmate has the key to. Something that the prisoner can walk away from within a reasonable period of time after changing his mind. That's why I would deem it as an exigent circumstance. It's something that needs to be resolved in the short-term. Discipline of prisoners is more long-term. They have the twenty-four hour wait before they have to have a hearing, they have to be scheduled for a hearing, and the punishments are not intended to be punishments you can walk away from, they're intended to be sanction for misconduct where[as] this is an opportunity for a prisoner to rethink, I'm not going to go out today. And that's why I believe it's reasonable, because it's something that gives an opportunity for a prisoner to change his mind then to walk away from it."

*Id.* at 1160–61. Notwithstanding the Commissioner's contradictory testimony, the court does not find the testimony of this expert to be persuasive. First, the expert later clarified that he did not believe there was a "security justification" for using the hitching post. *Id.* at 1165. Second, the expert's reasoning as to the effect of the hitching post as an immediate coercive device that would enable the inmate to escape sanctions by rethinking his refusal to work is flawed. Regulation 429 plainly states that the prison guard will issue a "written disciplinary" to those inmates placed on the hitching post. Plaintiffs' exhibit 12.

cer's reaction to an emergency situation. Support for this reasoning is found in *Jordan v. Gardner*, 986 F.2d 1521 (9th Cir.1993), in which the Ninth Circuit considered an eighth-amendment challenge to a prison's policy of permitting cross-gender clothed body searches. The court conducted its review of the policy under the deliberate-indifference standard for similar reasons:

"Unlike judgment in the excessive force context, our task is not to critique in hindsight the exercise of judgment of a particular officer on a specific occasion. The cross-gender clothed body search policy was developed over time, with ample opportunity for reflection. Moreover, unlike incidents of excessive force, the cross-gender clothed body search policy does not inflict pain on a one-time basis; instead, as with substandard conditions of confinement, the policy will continue to inflict pain upon the inmates indefinitely."

*Id.* at 1528.[204] The distinction drawn by the Ninth Circuit between the systematic infliction of pain on inmates pursuant to a premeditated policy and a single occurrence of force has been amplified in the Supreme Court's recent pronouncement on the fourteenth-amendment right to substantive due process. Drawing an analogy to its eighth-amendment jurisprudence, the Court stated the following:

"To recognize a substantive due process violation in these circumstances when only mid-level fault has been shown would be to forget that liability for deliberate indifference to inmate welfare rests upon the luxury enjoyed by prison officials of *having time to make unhurried judgments, upon the chance for repeated reflection,* largely uncomplicated by the pulls of competing obligations. When such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking. But when *unforeseen circumstances demand an officer's instant*

*judgment,* even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock that implicates 'the large concerns of the governors and the governed.'"

*County of Sacramento v. Lewis,* —— U.S. ——, ——, 118 S.Ct. 1708, 1720, 140 L.Ed.2d 1043 (1998) (citation omitted) (emphasis added). Because numerous incidents leading to placement on the hitching post were not, by the Commissioner's own admission, unpredictable, unforeseen, or volatile situations, and because the actions of the corrections officers were taken pursuant to the hitching-post policy, Regulation 429, which was designed to address these specific non-emergency situations, the court declines to rely solely on the heightened *Whitley* standard to determine the wantonness of the prison officials' actions. *See also Hickey v. Reeder,* 12 F.3d 754, 758 (8th Cir.1993) (concluding that prison guards violated the eighth amendment by applying stun gun to force him to comply with housekeeping regulations: "We have not found, and hope never to find, a case upholding the use of this type of force on a non-violent inmate to enforce a housekeeping order.").

Although the court has chosen to adopt the deliberate-indifference standard for the purpose of evaluating the plaintiffs' eighth-amendment argument in circumstances, such as the ones described above, where there is no disturbance or threat of disturbance to prison security, it acknowledges that the hitching post has been used on at least one occasion in a potentially volatile prison disturbance. Inmate Larry Hope was placed on the hitching post on June 7, 1995, following an altercation that he himself admitted involved six corrections officers.[205] The court does not dispute the Magistrate Judge's conclusion that Hope "did not refuse to work nor disrupt the work of other inmates,"[206] but notes and agrees with the Commissioner's

---

**204.** *See also Madrid v. Gomez,* 889 F.Supp. 1146, 1251 (N.D.Cal.1995) ("Thus, *Jordan* teaches that where the prison practice at issue (a) lacks a legitimate security justification, (b) will inflict pain on a routine basis, and (c) was not developed under time constraints, plaintiffs need not show that prison policy makers acted with the very purpose of causing harm. Rather a showing of deliberate indifference will suffice."), *man-*

*damus denied,* 103 F.3d 828 (1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1823, 137 L.Ed.2d 1031 (1997).

**205.** *Id.* at 688 (testimony of inmate Larry Hope).

**206.** Recommendation of the Magistrate Judge, at 43.

argument that such an incident "is a major security concern." [207] The court will therefore use the heightened *Whitley* standard to evaluate the DOC's use of the hitching post under such exigent circumstances. *See Ort,* 813 F.2d at 323 (granting great deference to actions of prison officials in applying preventative measures to reduce the threat of dangerous misconduct and to restore order and discipline). The court's use of *both* standards, however, is especially appropriate because the plaintiffs' claim regarding the use of the hitching post presents overlapping challenges both to their conditions of confinement, which necessitates use of the *Farmer* standard, as well as the use of excessive force during exigent circumstances, which necessitates use of the *Whitley* standard.[208]

In applying the two standards to the plaintiffs' claim, the court remains mindful of the considerable deference owed to prison officials, both in formulating their disciplinary policies, as well as in their implementation: "[p]rison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979). As Judge Friendly remarked: "The management by a few guards of large numbers of prisoners, not usually the most gentle or tractable of men and women, may require and justify the occasional use of a degree of intentional force. Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied sub nom. John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973). However, this deference "does not insulate from review actions taken in bad faith or for no legitimate purpose." *Whitley,* 475 U.S. at 322, 106 S.Ct. at 1085.

The court notes that, in applying the above standards, it is expressly rejecting the Magistrate Judge's decision to use *Turner v. Safley's* reasonableness standard, employed *supra* in the context of the visitation claim, to analyze the plaintiffs' eighth-amendment argument. In so holding, the court again adopts the reasoning of the Ninth Circuit in *Jordan v. Gardner,* which similarly rejected an application of *Turner* to an inmate's eighth-amendment argument. The Ninth Circuit reasoned as follows:

> "*Turner* has been applied only where the constitutional right is one which is enjoyed by all persons, but the exercise of which may necessarily be limited due to the unique circumstances of imprisonment....
> Eighth Amendment rights do not conflict with incarceration; rather, they limit the hardships which may be inflicted upon the incarcerated as 'punishment'.... Perhaps for this reason, the Supreme Court has never applied *Turner* to an Eighth Amendment case."

986 F.2d at 1530. The court also notes that although the expansive language used in *Turner* would appear to apply to an eighth-amendment challenge—"when a prison regulation impinges on inmates' *constitutional rights,* the regulation is valid if it is reasonably related to legitimate penological interests," 482 U.S. at 89, 107 S.Ct. at 2261 (emphasis added)—the Supreme Court's numerous opinions in the development of a specific eighth-amendment jurisprudence perforce compel the court to adopt the above standards.

*a. Objective Component: Evolving Standards of Decency*

▇▇▇▇▇ The objective component "embodies 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency...,'" "but must be balanced against competing penological goals." *Gamble,* 429 U.S. at 102, 97 S.Ct. at 290 (quoting *Jackson*

---

**207.** Defendant's objection to the recommendation of the Magistrate Judge, at 21. Indeed, the Commissioner's and Magistrate Judge's characterizations of the event are not antithetical.

**208.** The court has had some difficulty in characterizing the plaintiffs' challenge. Courts have generally treated challenges to the use of re-

straints as claims regarding the appropriate level of force applied by the prison guards. *See, e.g., Williams v. Burton,* 943 F.2d 1572 (11th Cir. 1991). However, many of the plaintiffs' complaints about the hitching post concern their conditions of confinement, such as their access to food, water, and toilet facilities, and not only the use of restraints.

*v. Bishop*, 404 F.2d 571, 579 (8th Cir.1968)). In determining whether a punishment is incompatible with "the evolving standards of decency that mark the progress of a maturing society," or involves "the unnecessary or wanton infliction of pain," *Estelle*, 429 U.S. at 102–03, 97 S.Ct. at 290, in violation of the eighth amendment, the deprivation asserted by the inmate must be "sufficiently serious" in a challenge to prison conditions, *Wilson*, 501 U.S. at 298, 111 S.Ct. at 2324, but need not rise to the level of "serious injury" in claims involving excessive use of force. *Hudson v. McMillian*, 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). Further, while the eighth amendment "does not mandate comfortable prisons," *id.*, it does require prison officials to provide "the minimal civilized measure of life's necessities" to the inmates in their custody. *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981). As the Third Circuit Court of Appeals explained, "The touchstone is the health of the inmate. While the prison administration may punish, it may not do so in a manner that threatens the physical and mental health of prisoners." *Young v. Quinlan*, 960 F.2d 351, 364 (3d Cir.1992). The court may consider the cumulative effect of the adverse conditions of confinement when such conditions have a "mutually enforcing effect that produces the deprivation of a single identifiable human need such as food, warmth, or exercise." *Wilson*, 501 U.S. at 304, 111 S.Ct. at 2321. Applying these standards to the plaintiffs' mixed prison conditions-excessive force claim, the court agrees with the Magistrate Judge's conclusion that inmates placed upon the hitching post suffered "extreme pain, anguish, humiliation, mental suffering, and resulting physical soreness and depression," and overrules the Commissioner's objection to this finding.[209]

The court first considers the plaintiffs' allegations that the hitching post places inmates in considerable physical pain. Although the Commissioner states that one of the purposes of the hitching post is to subject "the recalcitrant inmates to the same conditions as those inmates who are in the field working," [210] the Commissioner's expert witness admitted that use of the hitching post results in some discomfort.[211] In fact, based on the testimony offered at the evidentiary hearing, the court readily concludes that the experience of being placed on the hitching post for an extended period of time results in pain that far exceeds the "discomfort" imagined by the Commissioner's expert.[212] As the record reflects, inmates were forced to stand for several hours at a time in an uncomfortable, stationary position: some inmates had their arms shackled spread-eagled to the hitching post, while others were forced to stand with their arms up above their heads, and still others were placed on the lowest post, forcing them to spend their time on the hitching post in a doubled-over position. The prisoners who had been placed upon the hitching post, as well as one of the plaintiffs' experts who placed himself on the post for two hours, all described the pain they experienced by being forced to stand in the same position, without the ability to stretch, for an extended period of time: they complained of back aches, of muscle spasms, and of leg pain. The duration of this pain after being removed from the hitching post ranged from several days to two weeks. Further, any attempts made by the inmates secured to the post to stretch or to move so as to ease the pain of their back or legs resulted in considerable chafing and pain on their wrists because the inmate would be forced to pull on his wrist shackles: "if one gives into the gravity then the cuffs are going to be pulled

---

**209.** Recommendation of the Magistrate Judge, at 106; defendant's objections to the recommendation of the Magistrate Judge, at 66.

**210.** Defendant's objections to the recommendation of the Magistrate Judge, at 61.

**211.** Transcript of hearing before the Magistrate Judge, at 1125.

**212.** The Commissioner's expert's knowledge of the physical effects of the hitching post was extremely limited and appeared to be based solely

on his review of Regulation 429 and his examination of a hitching post at one of the DOC's correctional facilities. The expert admitted that he did not review incident reports or activity logs regarding inmate placement on the post, nor did he review the Department of Justice's reports, nor did he speak to any inmates who had been shackled to the hitching post. *Id.* at 1127, 1131–33.

more tightly and that's going to cause more pain."[213] This chafing was exacerbated by the heat of the shackles, which intensified in the direct sunlight in which the hitching post is placed. As a result of the pressure of the shackles on the inmates' wrists, many inmates complained of pain and swelling in their wrists, as well as bleeding, inflammation, and burning. Further, inmates who were placed on the hitching post with existing injuries suffered from aggravation of those injuries.

In addition to wrist, back, and leg pain, inmates also suffered physical pain as a result of exposure on the hitching post. With no sun protection, in the form of either sun block, a hat, or shade, inmates suffered sunburn and blistering, which made them vulnerable to risk of infection. The combination of the heat, the sun, and limited access to water, caused many inmates to become dehydrated or to suffer from heat exhaustion. Medical records documenting these physical effects demonstrate that in more than a few cases the hitching post not only failed to serve its stated purpose—to coerce inmates to return to work—but ultimately rendered inmates unfit for work, as their conditions resulted in a medical "stop-up."

The Commissioner maintains that none of the inmates alleged a "serious injury," and thus the plaintiffs have failed to prove the subjective component of the eighth amendment analysis. In support of this argument, the Commissioner points to the testimony of a nurse at the Easterling and Ventress Correctional Facilities who stated that she had never seen an inmate suffer a "serious injury" as a result of being on the hitching post.[214] The Commissioner's argument lacks merit: the plaintiffs are not required to show that the inmates suffered serious injury. *Hudson v. McMillian*, 503 U.S. at 5–6, 112 S.Ct. at 998. The court, however, is satisfied that the plaintiffs have shown for the purpose of satisfying the objective component for a *Whitley*–claim of excessive use of force that inmates placed on the hitching post have suffered "actual injuries." *Williams v. Burton*, 943 F.2d 1572, 1575 (11th Cir.1991) (concluding that an inmate's placement in four-point restraints and gag did not rise to the level of an eighth amendment violation because "while [the inmate] experienced some discomfort because of his restraint, no actual injury was inflicted.").[215] Moreover, although the plaintiffs are not required to show that the pain inflicted upon them by the prison officials through use of the hitching post resulted in serious harm, the court finds that the cumulative effects of sunburn, dehydration, and lasting muscular pain, are sufficient to create significant injuries.

The Commissioner also contends that the majority of the inmates placed on the hitching post do not suffer adverse physical effects. In support of this argument, the Commissioner points to approximately 70 exhibits entered into evidence purporting to be medical records that demonstrate the lack of injury sustained by inmates placed upon the hitching post. With the exception of the above-mentioned nurse, the Commissioner did not call any witnesses to refute the plaintiffs' allegations concerning physical injury; nor did the Commissioner call any witnesses to explain, clarify, or even to summarize the 70 medical reports. The Commissioner objects to the Magistrate Judge's finding that these records "are difficult if not impossible to decipher." The nurses and physicians' handwriting is often illegible, and the lan-

---

**213.** Transcript of hearing before the Magistrate Judge, at 402 (testimony of Dr. Frank Rundle).

**214.** *Id.* at 946 (testimony of Linda Shipman). The nurse did admit that prisoners at one of her facilities suffered potential heat exhaustion in the form of nausea, headaches, and dizziness after being removed from the hitching post. *Id.* at 953–54.

**215.** There can be no doubt that the plaintiffs must assert actual injuries resulting from the DOC's use of the hitching post in order to sustain their eighth amendment challenge. *See Lewis v. Casey*, 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (holding that inmates claiming denial of access to courts failed to show actual injuries stemming from inadequate library facilities). However, the court reiterates that the requirement of actual injury is not equivalent to a showing of serious harm or injury. As a concurring Justice in *Hudson* explained, "Indeed, were we to hold to the contrary, we might place various kinds of state-sponsored torture and abuse—of the kind ingeniously designed to cause pain but without a telltale 'significant injury'—entirely beyond the pale of the Constitution." *Hudson*, 503 U.S. at 13–13, 112 S.Ct. at 1002 (Blackmun, J., concurring in the judgment).

guage is replete with medical jargon, symbols, and abbreviations that no witnessed explained."[216] Upon examining these exhibits, the court is inclined to agree with the Magistrate Judge. The DOC Commissioner's proffer of these exhibits without a witness to summarize or explain serves little evidentiary purpose. More importantly, the Commissioner offered nothing to actually refute the testimony of the plaintiffs' witnesses regarding the physical effects of the hitching post.

The court also finds that corrections officers denied prisoners access to basic human needs when they placed them on the hitching post. Specifically, inmates were denied water, were not given sufficient protection from the sun, and most importantly, were in some cases denied access to toilet facilities. Although Regulation 429 provides that the corrections officer in charge of supervising the inmates verify in 15–minute increments an inmate's need for access to toilet facilities, the court finds that this policy was not followed in all cases and the failure to comply with the policy caused the inmates considerable pain, embarrassment, and humiliation.[217] The victims of this non-compliance, those inmates who could not control their bodily functions for the duration of their placement on the hitching post, were not only placed in a degrading and unsanitary situation, but were also subject to public humiliation and ridicule due to the prominent placement of the hitching post at the back gate—where all inmates traverse upon returning from the work sites. The deprivation of these basic human necessities plainly violates the eighth amendment. *See, e.g., Young v. Quinlan,* 960 F.2d at 365 (reversing the district court's award of summary judgment to prison officials where an inmate alleged that he was not permitted to leave his cell more than once to urinate or defecate over the period of several days, and was forced to do so in his cell, was not provided with toilet paper, was not provided with water, and was not permitted to bathe for several days; the Third Circuit found that if proven true, such conditions

would "demonstrate a violation of the basic concepts of humanity and decency that are at the core of the protections afforded by the Eighth Amendment."). Further, the corrections officers' refusal to provide inmates who had urinated or defecated upon themselves with means to clean their bodies constituted a further violation of the inmates' eighth amendment rights. *See Chandler v. Baird,* 926 F.2d 1057, 1065 (11th Cir.1991) (denial of personal hygiene items can give rise to eighth amendment violation). The adverse conditions of the hitching post, including its placement in the direct sunlight, causing inmates to suffer symptoms of heat exhaustion and sunburn, also violated the minimum standards required by the eighth amendment. The Eleventh Circuit has recognized that extreme temperatures in inmate's place of confinement can give rise to an eighth-amendment claim if it is sufficient to cause the inmate "severe discomfort." *Chandler,* 926 F.2d at 1065–66. This court concludes that inmates placed upon the hitching post are subject to conditions—to wit, intense heat and sunlight—that cause them "severe discomfort" in violation of the eighth amendment. *See Gordon v. Faber,* 973 F.2d 686, 687–88 (8th Cir.1992) (affirming district court's conclusion that prison officials violated the eighth amendment by sending inmates outside in sub-freezing weather without hats and gloves for a period of one hour to one hour and forty-five minutes).

Finally, because there is no "static 'test' " for determining whether the conditions of confinement are cruel and unusual, the court must consider all of the above conditions in the context of the "evolving standards of decency that mark the progress of a maturing society." *Rhodes,* 452 U.S. at 346, 101 S.Ct. at 2399. In order to determine whether the use of the hitching post, both in compliance with and in deviation from the DOC's own guidelines, violates contemporary standards of decency, the court relies upon the following sources: precedent, statutory provisions regarding corporal punishment, comparable practices in other prison systems,

---

**216.** Recommendation of the Magistrate Judge, at 20 n. 30; defendant's objections to the recommendation of the Magistrate Judge, at 11–12.

**217.** As the court noted above, the form does not instruct the officer to ask the inmate whether he

needs water or restroom breaks every fifteen minutes, but rather provides entry lines for the officer to record the responses or observations in fifteen minute increments.

and the opinions of both the defendant's and plaintiffs' experts.

In *Gates v. Collier*, the former Fifth Circuit held that "handcuffing inmates to the fence and to cells for long periods of time . . . and forcing inmates to stand, sit or lie on crates, stumps, or otherwise maintain awkward positions for prolonged periods," constituted methods of corporal punishment that ran afoul of the eighth amendment. 501 F.2d 1291, 1306 (1974). Thus, for over 20 years, institutional practices that impose pain on inmates in ways similar to the hitching post have been deemed to "offend contemporary concepts of decency, human dignity, and precepts of civilization which we profess to possess." *Id. See also Jackson v. Bishop*, 404 F.2d 571 (8th Cir.1968) (finding the use of the strap for whipping in penal institutions to violate the eighth amendment). Given the evidence that the hitching post inflicts significant pain on inmates placed upon it for an extensive period of time, the court agrees with the opinion of one of the plaintiffs' experts that the hitching post is a form of corporal punishment whose history can be traced to the pillory and the stocks:

> "[T]he pillory is almost identical to the stocks, which is identical to the restraining bar. If anything, the pillory, as it was designed, was probably more comfortable because in most cases the prisoner sat on the ground and had his feet and his hands put through a stock. In this case we're perhaps more barbarous because what we're doing is stretching an inmate out in the hot sun so he's uncomfortable and can't move." [218]

As a form of corporal punishment, use of the hitching post violates contemporary standards of decency as enunciated in *Gates*. The court declines to find that society's standards have so devolved since the holding in *Gates* over two decades ago that use of an instrument like the hitching post would be deemed permissible. The court finds evidence in support of its conclusion in the actions of Alabama's legislature, which has placed severe limits on the use of corporal punishment in Alabama prisons: "No cruel or excessive punishment shall be inflicted on any convict, *no corporal punishment of any kind shall be inflicted except as it shall have been previously prescribed by the rules of the Board of Corrections and of which the convict shall have been notified and such punishment shall be inflicted only by the party authorized by the board to inflict it.*" 1975 Ala.Code § 14-3-52 (emphasis added).[219] The statute reflects the Alabama legislature's appreciation for the severity of such punishment; the court has no doubt that the ad-hoc use of a corporal-punishment instrument such as the hitching post is in violation of this statute, as well as the contemporary standards of decency.

The fact that no other state or federal prison uses a device similar to the hitching post also weighs in favor of a finding that use of the hitching post should be condemned. Moreover, the standards promulgated by organizations such as the American Correctional Association [220] and the American Bar Association [221] urge against the use of restraints in the prolonged, non-emergency manner as

**218.** Transcript of hearing before the Magistrate Judge, at 303.

**219.** The statute also creates record-keeping requirements for such punishments, as well as mandatory monthly inspections for such punishments.

**220.** *See* plaintiffs' exhibit 1, American Correctional Association, *Standards for Adult Correctional Institutions* (3rd ed.), at 60 ("Written policy, procedure, and practice provide that instruments of restraint, such as handcuffs, irons, and straight jackets, are never applied as punishment and are applied only with the approval of the warden/superintendent or designee."). *The comment to this standard, which is not mandatory*, states that "Instruments of restraint should be used only as a precaution against escape during transfer, for medical reasons, by

direction of the medical officer, or to prevent self-injury to others, or property damage. Restraints should not be applied for more time than is absolutely necessary." *Id. See also* plaintiffs' exhibit 3: American Correctional Association, *Manual of Correctional Standards* (3rd ed.), at 417 ("Corporal punishment should never be used under any circumstances. This includes such practices as . . . exposure to extremes of heat or cold . . . confinement in the stocks or in cramped sweatboxes, handcuffing to cell doors or posts, shackling so as to enforce cramped position or to cut off circulation, standing for excessive periods 'on the line' or barrel-heads, painted circles, etc . . .").

**221.** *See* Plaintiffs' exhibit 2, American Bar Association, *Standards for Criminal Justice* (2d ed.), at 23-121 ("Personal restraints like handcuffs, ir-

the hitching post is used in Alabama's prisons.[222] While these standards are by no means binding on the court,[223] they do serve as powerful indicia of society's understanding of those practices that serve no penological value and result in harm to inmates.

Weighing all of the above factors, the court concludes that the common and routine, and not just isolated, use of the hitching post has involved "the unnecessary or wanton infliction of pain," *and* violated "the evolving standards of decency that mark the progress of a maturing society." The court finds that the plaintiffs have thus satisfied the objective component of the eighth amendment analysis by showing that the hitching post inflicts actual, significant pain on inmates, that prison officials have denied inmates access to basic human needs while shackled to the hitching post, such as access to shelter, water, and toilet facilities, and that the hitching post as an instrument of corporal punishment violates contemporary standards of decency.

ons, and straitjackets are to be used only if necessary to prevent individual prisoners from escaping during transfers or injuring themselves or others.").

**222.** The standards promulgated by the United Nations also urge against the use of restraints in the prolonged, non-emergency manner as the hitching post is used in Alabama's prisons. *See* Plaintiffs' exhibit 5, United Nations, *Standard Minimum Rules for the Treatment of Prisoners* (1984), at 6–7 ("Instruments of restraint, such as handcuffs, chains, irons and strait-jackets, shall never be applied as a punishment.... [Handcuffs and strait-jackets] shall not be used except in the following circumstances: (a) As a precaution against escape during a transfer ... (b) On medical grounds by direction of the medical officer, (c) By order of the director, if other methods of control fail, in order to prevent a prisoner from injuring himself or others or from damaging property; in such instances the director shall at once consult the medical officer and report to the higher administrative authority.").

Although these *Rules* are considered "the most important international document in the area of prisons," Kurt Neudek, *The United Nations, in* Imprisonment Today and Tomorrow: International Perspectives on Prisoners' Rights and Prison Conditions 704, 705 (Dirk van Zyl Smith and Frieder Dünkel eds., 1991), this court is wary of relying upon them as indicia of *American* evolving standards of decency. The Supreme Court has cautioned that federal courts should not rely on international standards in determining evolving standards of decency:

"In determining what standards have 'evolved,' however, we have looked not to our own conceptions of decency, but to those of modern American society as a whole....

"We emphasize that it is American conceptions of decency that are dispositive, rejecting the contention ... that the sentencing practices of other countries are relevant. While '[t]he practices of other nations, particularly other democracies, can be relevant to determining whether a practice uniform among our people is not merely a historical accident, but rather so "implicit in the concept of ordered liberty" that it occupies a place not merely in our mores, but, text permitting, in our Constitution as well' ... they cannot serve to establish the first Eighth Amendment prerequisite, that the practice is accepted among our people."
*Stanford v. Kentucky,* 492 U.S. 361, 369–370 & n. 1, 109 S.Ct. 2969, 2975 & n. 1, 106 L.Ed.2d 306 (1989) (citations omitted) (holding that the imposition of capital punishment for individual who committed crime at 16 or 17 years of age does not violate eighth amendment).

Further, although the United States has ratified certain international agreements whose terms would appear to apply to the treatment of prisoners, the United States has attached reservations that limit the enforcement of higher international standards. *See, e.g.,* International Covenant on Civil and Political Rights (ICCPR), opened for signature Dec. 9, 1966, 999 U.N.T.S. 171 (entered into force Mar. 23, 1976; adopted by the United States Sept. 8, 1992). Article 7 of the ICCPR states in part: "No one shall be subjected to torture, or to cruel, inhuman or degrading treatment or punishment." However, the United States ratified the ICCPR with the reservation that "Art. 7 protections shall not extend beyond protections of the 5th, 8th and 14th Amendments of the U.S. Constitution." Senate Committee on Foreign Relations Report on the International Covenant on Civil and Political Rights, S. Exec. Rep. No. 23, 102nd Cong., 2d Sess. (1992), *reprinted in* 31 I.L.M. 645, 646 (1992). Thus, although international jurisprudence interpreting and applying the ICCPR would appear to assist this court, two sources preclude reliance on such precedent: the Supreme Court's directive in *Stanford v. Kentucky;* and the reservations attached to the ICCPR. The court will therefore rest its analysis entirely on American sources to determine whether the hitching post violates evolving standards of decency.

**223.** In *Bell v. Wolfish,* the Supreme Court stated that the standards promulgated by such organizations "do not establish the constitutional minima." 441 U.S. 520, 543–44 n. 27, 99 S.Ct. 1861, 1876 n. 27, 60 L.Ed.2d 447 (1979). The court notes that it has only found these standards and the testimony of the parties' experts to be informative; as explained more fully above, it has not relied exclusively on these sources for its determination that the hitching post violates contemporary standards of decency.

### b. Subjective Component: the "Deliberate Indifference" Standard

The court begins its analysis of the subjective component of the plaintiffs' eighth-amendment argument by relying on the "deliberate indifference" standard for determining wantonness. In *Farmer v. Brennan,* the Supreme Court defined the deliberate indifference test in the following manner: "a prison official may be liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." 511 U.S. 825, 847, 114 S.Ct. 1970, 1984, 128 L.Ed.2d 811 (1994). It is important to emphasize that the required knowledge is of the "risk," not necessarily of an injury itself. *Id.* at 842, 114 S.Ct. at 1981 ("Under the test we adopt today, an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm."). Nevertheless, prison officials will not be held liable if "they prove they were unaware of even an obvious risk" or if "they responded reasonably to a known risk, even if the harm ultimately was not averted." *Id.* at 844, 114 S.Ct. at 1982.

According to the *Farmer* Court, a court may determine that the prison official had knowledge of the risk of harm from inferences from circumstantial evidence. *Id.* at 842, 114 S.Ct. at 1981. The Commissioner has not disputed the plaintiffs' contention that he had knowledge of the risk of serious harm. Indeed, the Commissioner could not sustain such an argument when there is evidence to support a finding that the Commissioner had actual knowledge of the risk of serious harm to inmates. The 1994–1995 correspondence between the DOC and the Department of Justice demonstrates that the DOC had knowledge of the allegations of serious harm being inflicted by prison offi-

cers upon inmates by means of the hitching post. One of the findings made by the Department of Justice was that corrections officers were not complying with the DOC's policies, and that use of the hitching post was "potentially dangerous from a medical standpoint." Moreover, given the obvious physical effects of the hitching post, as well as the DOC's own documentation of these physical effects, the court finds it difficult if not impossible to conclude that the Commissioner did not know of these risks. As the *Farmer* court stated, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that it was obvious." *Id.* at 842, 114 S.Ct. at 1981. *See also id.* at 842–43, 114 S.Ct. at 1981–82 ("For example, if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was 'longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus "must have known" about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.' ") (citation omitted).[224]

Nor can the court conclude that the DOC's response was "reasonable" to the serious risk of harm presented by the inmate complaints and the Department of Justice investigation. The Commissioner asserts that Regulation 429 itself constitutes a reasonable response because, if administered correctly, the regulation would prevent the serious risks alleged by the plaintiffs. However, this regulation was not administered properly and the DOC had knowledge of such abuses by means of the Department of Justice investigation. The DOC's response to these allegations cannot be considered reasonable given the severity of the harm alleged. The DOC did not conduct an independent investigation of these allegations. Rather, it merely reiterated its commitment to use of the hitching post by

---

**224.** In *Farmer,* the Court also wrote that a prison official "would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist." 511 U.S. at 843 n.

8, 114 S.Ct. at 1982 n. 8. Here, the DOC Commissioner also declined to confirm inferences of the risk posed by how the hitching post was being used—in particular, from those established by the report from the Department of Justice.

means of a letter to the Department of Justice. The only steps the DOC took to ensure that the constitutional rights of inmates placed upon the post were not being violated was to instruct its wardens to follow Regulation 429. There is no evidence in the record to show that after its receipt of the Department of Justice's letters the DOC interviewed or monitored officers at individual institutions to determine whether violations of Regulation 429 were taking place. Further, even when the DOC had knowledge that its employees were abusing its policy, such as the Holman institution's use of the hitching post to punish those inmates who had committed indecent exposure, it did not take steps to correct the situation. The DOC Commissioner testified at the evidentiary hearing that he did not discipline the warden at Holman for violating Regulation 429, nor could he identify *any* correction officers who had been disciplined for violating Regulation 429.[225] Any investigation of a prisoner's complaint regarding placement on the hitching post was conducted in a disciplinary hearing that occurred after the fact. Although these proceedings resolved pending charges against the inmate usually in the inmate's favor, such proceedings did little, if anything, to rectify abuses at the hitching post. The court concludes that the Commissioner was deliberately indifferent to the risk of serious harm facing inmates on the hitching post. The DOC was not merely negligent by failing to investigate adequately the charges made by the Department of Justice, by failing to protect the inmates placed in its care from the unnecessarily painful, and oftentimes humiliating, conditions of the hitching post; rather, the DOC recklessly, even willfully, ignored the substantial risk that inmates were suffering serious harm and being denied the humane conditions required by the eighth amendment.

The court is therefore firmly convinced that the DOC Commissioner and his predecessors had actual knowledge of the substantial risk of harm created by common and routine use of the hitching post and recklessly and consciously ignored this risk to the grave detriment of the inmates in their care.

In any event, even in the absence of this compelling evidence of prior knowledge, any assertion by the DOC Commissioner that he himself was unaware of the risk of substantial harm would not necessarily foreclose the court's finding that the plaintiffs met both the subjective and objective requirements of their eighth-amendment challenge to the extent the plaintiffs seek injunctive relief. In *Farmer*, the Supreme Court stated that "If ... the evidence before a district court establishes that an inmate faces an objectively intolerable risk of serious injury, the defendants could not plausibly *persist* in claiming lack of awareness, any more than prison officials who state during the litigation that they will not take reasonable measures to abate an intolerable risk of which they are aware could claim to be subjectively blameless for purposes of the Eighth Amendment, and in deciding whether an inmate has established a continuing constitutional violation a district court may take such developments into account." 511 U.S. at 846 n. 9, 114 S.Ct. at 1983 n. 9 (emphasis added). " 'It would,' indeed," the Court explained, " 'be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them,' " *id.* at 845, 114 S.Ct. at 1983 (citation omitted)—or, more to the point here, nothing yet had not happened again and thus had not been brought to the attention of the DOC Commissioner. In other words, "a subjective approach to deliberate indifference does not require a prisoner seeking 'a remedy for unsafe conditions [to] await a tragic event ... before obtaining relief.' " *Id.* (citation omitted).

Indeed, as will be explained in more detail *infra*, because "to establish eligibility for an injunction, the inmate must demonstrate the continuance of that disregard during the remainder of the litigation and into the future," *id.* at 846, 114 S.Ct. at 1983, the court will set this case for a supplemental hearing to determine whether the DOC Commissioner has continued, and seemingly will continue in the future, to disregard the risk to inmate safety

---

**225.** Transcript of hearing before the Magistrate Judge, at 865 (testimony of the DOC Commissioner).

and health posed by the manner in which the hitching post is used in Alabama prisons.

### c. Subjective Component: the Whitley Standard

As stated above, the court finds it necessary to analyze the plaintiffs' claim under the heightened *Whitley* standard for those instances in which the hitching post is used on inmates in emergency or exigent situations. The *Whitley* standard requires the plaintiffs to show that the prison officials' actions were taken "maliciously and sadistically for the very purpose of causing harm." 475 U.S. 312, 320–21, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251. In the Eleventh Circuit, an inmate bears a heavy burden in proving that a prison guard acted maliciously and sadistically under exigent circumstances. In *Ort v. White*, 813 F.2d 318 (11th Cir.1987), the court found that an inmate had not met this burden where he alleged that he was denied water on four or five occasions while assigned to farm squad work duty. The salient facts of *Ort* are as follows: the inmate, Anthony Ort, was frequently assigned to a "late squad" because he " 'refused to do any work and [ ] was basically insubordinate against all authority.' " *Id.* at 320 (quoting the Magistrate Judge's findings of fact). One of the responsibilities of the work squad members was to carry a five-gallon water keg with them to the work site. Ort not only refused to work, but he also refused to assist his fellow squad members in carrying the water keg; often, Ort refused to carry his own work tools, and his fellow squad members were forced to carry his tools for him. *Id.* Ort's behavior angered the other squad members who "displayed an attitude of open hostility toward Ort." *Id.* While on the work site, and away from the prison, they informed the prison guard supervising them that if Ort could refuse to work and still drink the water from the keg, that they would do the same. One member of the squad "threatened to knock Ort in the head with a shovel if the guard allowed Ort to drink from the water keg, which he had not helped to carry." *Id.* at 321. Under these circumstances, the guard denied Ort the water until he began to work. The guard testified that he believed this action was "the minimal amount of force necessary to protect

Ort and himself from possible retaliation by the other inmates." *Id.* at 320. There is no mention in the Eleventh Circuit's opinion of any ill effect suffered by Ort as a result of being denied water during his time on the work squad. In determining the appropriate standard to be applied, the Eleventh Circuit distinguished between "punishment after the fact and immediate coercive measures necessary to restore order or security." The *Ort* court continued as follows:

"Prison officials step over the line of constitutionally permissible conduct if they use more force than is reasonably necessary in an existing situation or if they summarily and maliciously inflict harm in retaliation for past conduct. Prison officers must, however, have the authority to use that amount of force or those coercive measures reasonably necessary to enforce an inmate's compliance with valid prison rules and to protect themselves and the other inmates. Thus, where such immediate coercive action is necessary, the conduct of a prison official does not constitute cruel and unusual punishment within the meaning of the eighth amendment if it was undertaken not maliciously or sadistically, but in a good faith effort to restore order or prevent a disturbance, *and if the force used was reasonable in relation to the threat of harm or disorder apparent at the time.*"

*Id.* at 324–25 (emphasis added). Applying this standard, the court first determined that the prison guard's actions constituted "necessary, coercive measures undertaken to obtain compliance with a reasonable prison rule," and could not be considered punishment in the strict sense. *Id.* at 325. The court next examined whether the prison guard's actions were necessary and taken in good faith; in light of the potentially dangerous situation, including the fact that the guard was in the field and away from other guards and the prison, the court answered these questions in the affirmative. *Id.* Finally, the court determined that the guard's actions were reasonable in relation to the threat apparent to him at the time. In concluding that the guard's actions did not constitute cruel and unusual punishment, the *Ort* court stated, "We acknowledge that we might have reached a

different decision if later, once back at the prison, officials had decided to deny [Ort] water as punishment for his refusal to work." *Id.* at 326.

In *Williams v. Burton,* 943 F.2d 1572 (11th Cir.1991), the court concluded that an inmate had failed to show that prison officials acted maliciously and sadistically when, after the inmate, Michael D. Williams, had yelled, screamed, spit, threw his bodily fluid at officers, threatened to kill prison officers, and threatened to incite a riot, the officers placed him in four-point restraints and a gag for a little over 28 hours. At the time, Williams was placed in a segregation unit at the St. Clair facility, which is reserved for "the most difficult, unruly, and unmanageable members of the prison population." *Id.* at 1575. According to the Eleventh Circuit's opinion, Williams was placed in "some discomfort" because of the restraints, but "no actual injury was inflicted." During his period of restraint, Williams was given the opportunity to eat, exercise, and go to the bathroom. *Id.* at 1574. The court concluded that the prison guards' actions did not violate the eighth amendment because they were faced with a volatile situation, and needed to take action to prevent further spreading of the disturbance. The court also found that the guards had taken adequate precautions to monitor Williams's physical condition while placed in the restraints.

The *Williams* court devoted a large portion of its discussion to the length of time Williams was placed in restraints, and whether the restraints were used beyond the need for such measures. The court noted that problem in reviewing the prison guards' decision:

"Once restraints are initially justified, it becomes somewhat problematic as to how long they are necessary to meet the particular exigent circumstances which precipitated their use. The basic legal principle is that once the necessity for the application of force ceases, any continued use of harmful force can be a violation of the Eighth and Fourteenth Amendments, and any abuse directed at the prisoner after he terminates his resistance to authority is an Eighth Amendment violation.... [T]he courts give great deference to the actions of prison officials in applying prophylactic or preventative measures intended to reduce the incidents of riots and other breaches of prison discipline."

*Id.* at 1576 (citations omitted). Finding that the prison officials had performed continuous observation of Williams and, being familiar with his history of disobedience, the court concluded that the officials were justified in keeping Williams in restraints for the entire 28–hour period.

Following its precedent, particularly *Williams,* the Eleventh Circuit held in *Sims v. Mashburn,* 25 F.3d 980 (11th Cir.1994), that the inmate, Hardie Vertrain Sims, who like Williams was housed in St. Clair's segregation cell, had not shown that prison officials acted sadistically or maliciously when they stripped his cell of everything except the undershorts he was wearing and turned off the water to his toilet. Sims was left in this condition for about 29 hours. According to prison officials, these actions were taken after Sims obstructed the view to his cell, attempted to flood his cell, and yelled at the prison guards. *Id.* at 981–82. Determining that the case "boil[ed] down to a subjective judgment relative to when Sims had demonstrated such a period of stable behavior and a subjective judgment relative to the intervals at which that question should be reevaluated," the court deferred to the evaluations made by the prison officials and upheld their actions. *Id.* at 985. The court stated, "we accept [their] judgment unless there is evidence justifying its rejection." *Id.* The court found that the evidence in the record supported the prison officials' actions in that the officials had complied with their internal policies regarding stripping inmate cells. *Id.*

As explained above, the court has rejected the Commissioner's argument that every instance in which an inmate refuses to work creates exigent circumstances requiring use of the hitching post. Rather, the court finds only one instance in the record in which an inmate's behavior created an emergency situation justifying the use of force. Inmate Larry Hope and a corrections officer became involved in a physical altercation that required at least six corrections officers to subdue him. For this assault, Hope was placed on the hitching post for seven hours in

very hot weather.[226] During this time he was only given water twice, and his efforts to obtain more water were denied in a cruel manner described above.[227] This situation differs from the above-cited line of Eleventh Circuit precedent in the following manner: first, unlike the prison officials in *Sims*, by refusing to provide Hope with water the Commissioner's employees failed to follow the DOC's own procedures for supervising inmates placed on the hitching post (*i.e.*, offering them water in fifteen-minute intervals); second, clear evidence exists in the record that the Commissioner's employees were malicious and sadistic by giving water to the dogs instead of Hope; third, there is simply no evidence in the record that the Commissioner needed to keep Hope in restraints once they had returned to the prison because of exigent circumstances. Thus, the court finds that the plaintiffs have met their burden in meeting the *Whitley* subjective prong to show an eighth amendment violation.

### d. Conclusion

The court concludes that the plaintiffs have satisfied both the objective and subjective components of their eighth-amendment argument. Although it has found that significant shortcomings both in the policy and practice of the hitching post has led to constitutional violations, the court notes that its holding is limited to the DOC's current policy and evidence of its application, and does not reach the issue of whether the hitching post can be used in a way that does not constitute cruel and unusual punishment. For example, it may well be that placing an inmate on the hitching post for 20 minutes to a half-hour would make the inmate uncomfortable and would coerce this inmate to return to work without depriving the inmate of his right to be free from cruel and unusual punishment. However, the court is concerned as to whether such a policy can ever be implemented in a manner that would safeguard prisoners' rights. In *Jackson v. Bishop*, then–Judge Blackmun presented several compelling rea-

sons as to why forms of corporal punishment, specifically the use of the strap, would always be fraught with constitutional violations. His reasoning may have application to the DOC's use of the hitching post in Alabama:

"(1) We are not convinced that any rule or regulation as to the use of the strap, however seriously or sincerely conceived and drawn, will successfully prevent abuse. The present record discloses misinterpretation and obvious overnarrow interpretation even of the newly adopted January 1966 rules.

"(2) Rules in this area seem often to go unobserved. Despite the January 1966 requirement that no inmate was to inflict punishment on another, the record is replete with instances where this very thing took place.

"(3) Regulations are easily circumvented. Although it was a long-standing requirement that a whipping was to be administered only when the prisoner was fully clothed, this record discloses instances of whippings upon the bare buttocks, and with consequent injury.

"(4) Corporal punishment is easily subject to abuse in the hands of the sadistic and the unscrupulous.

"(5) Where power to punish is granted to persons in lower levels of administrative authority, there is an inherent and natural difficulty in enforcing the limitations of that power.

"(6) There can be no argument that excessive whipping or an inappropriate manner of whipping or too great frequency of whipping or the use of studded or overlong straps all constitute cruel and unusual punishment. But if whipping were to be authorized, how does one, or any court, ascertain the point which would distinguish the permissible from that which is cruel and unusual?

"(7) Corporal punishment generates hate toward the keepers who punish and toward

**226.** The court notes that although Hope's actions clearly justified the use of force, placing Hope upon the hitching post for fighting was a clear violation of Regulation 429, as interpreted by the Commissioner, which compels placement on the post only for refusal to work. According to the

Commissioner, other disciplinary violations, such as exposure or masturbation, should not result in placement on the hitching post.

**227.** *See* notes 167–71 and accompanying text.

the system which permits it. It is degrading to the punisher and to the punished alike. It frustrates correctional and rehabilitative goals. This record cries out with testimony to this effect from the expert penologists, from the inmates and from their keepers.

"(8) Whipping creates other penological problems and makes adjustment to society more difficult.

"(9) Public opinion is obviously adverse. Counsel concede that only two states still permit the use of the strap. Thus almost uniformly has it been abolished. It has been expressly outlawed by statute in a number of states."

*Jackson*, 404 F.2d at 579–80. This court is not an expert on penological matters and accords the Commissioner great deference in conceiving and implementing policies to control inmate behavior in his institutions. However, it is also the duty of this court to protect prisoners within such institutions from practices that violate their constitutional rights. The manner in which the DOC has used the hitching post does just this.

### 2. Due–Process Clause

The plaintiffs contend that placing inmates upon the hitching post is a form of punishment and that, by punishing inmates with the hitching post without a hearing, the DOC Commissioner has violated their fourteenth-amendment right to procedural due process.

The fourteenth amendment provides that a state shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Supreme Court has understood the "core" of the concept of due process to be the protection of the individual against arbitrary action of government. *County of Sacramento v. Lewis*, —— U.S. ——, ——, 118 S.Ct. 1708, 1716, 140 L.Ed.2d

1043 (1998). Like other constitutional rights, the right to procedural due process extends to inmates, subject to limitations "justified by the considerations underlying our penal system." *Jones v. N.C. Prisoners Labor Union*, 433 U.S. 119, 125, 97 S.Ct. 2532, 2537–38, 53 L.Ed.2d 629 (1977) (citations omitted). Further, in considering the constitutional claims of inmates, federal courts must "afford appropriate deference and flexibility to state officials trying to manage a volatile environment." *Sandin v. Conner*, 515 U.S. 472, 482, 115 S.Ct. 2293, 2299, 132 L.Ed.2d 418 (1995) (citations omitted).

With these precepts in mind, the Supreme Court recently stated in *Sandin v. Conner* that "liberty interests" in the prison setting are "generally limited" to freedom from two types of "restraints," 515 U.S. at 483–84, 115 S.Ct. at 2300: first, those restraints that "exceed[ ] the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force," *id.;* and, second, those that "impose[ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.*[228] However, and unfortunately, it is not apparent from the Court's descriptive wording of these two types of restraints just how they differ. That is, how does a restraint that "exceed[s] the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force" differ from one that "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life"?

Turning to the rest of the *Sandin* Court's opinion, this court can envision two ways in which the two types of restraints can be distinguished. Prior to the *Sandin* decision, the Supreme Court had held that state administrative regulations could create federal-

---

**228.** The Supreme Court stated:

"Following Wolff, we recognize that States may under certain circumstances create liberty interests which are protected by the Due Process Clause. *See also Board of Pardons v. Allen*, 482 U.S. 369, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987). But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its

own force, *see, e.g., Vitek [v. Jones]*, 445 U.S. [480,] at 493, 100 S.Ct. [1254] at 1263–1264 [(1980)] (transfer to mental hospital), and *Washington [v. Harper]*, 494 U.S. [210] at 221–222, 110 S.Ct. [1028] at 1036–1037[, 108 L.Ed.2d 178] [(1990)] (involuntary administration of psychotropic drugs), nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."

515 U.S. at 483–84, 115 S.Ct. at 2300–01.

ly enforceable liberty interests by establishing " 'substantial predicates' to govern official decision-making" and "by mandating the outcome to be reached upon a finding that the relevant criteria have been met." *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 462, 109 S.Ct. 1904, 1909, 104 L.Ed.2d 506 (1989); *see also Hewitt v. Helms,* 459 U.S. 460, 472, 103 S.Ct. 864, 871–72, 74 L.Ed.2d 675 (1983). The *Sandin* Court rejected this approach because it "encouraged prisoners to comb regulations in search of mandatory language on which to base entitlements to various state-conferred privileges," thereby creating "disincentives for states to codify prison management procedures in the interest of uniform treatment" and leading "to the involvement of federal courts in the day-to-day management of prisons, often squandering judicial resources with little offsetting benefit to anyone." *Sandin,* 515 U.S. at 482, 115 S.Ct. at 2299. By adopting the new standard, the Court endeavored to focus the liberty interest inquiry on the nature of the deprivation, that is, the restraint, experienced by the inmate, rather than upon the language of the institution's regulation. *See Beverati v. Smith,* 120 F.3d 500, 503, n. 3 (4th Cir.1997).

As examples of restraints that "exceed[ ] the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force," the Supreme Court gave two. First, the Court cited *Vitek v. Jones,* which held that an inmate's transfer to a mental hospital implicated a liberty interest protected by the due process clause itself. 445 U.S. 480, 494, 100 S.Ct. 1254, 1264, 63 L.Ed.2d 552 (1980).[229] The *Vitek* Court reasoned that involuntary commitment and treatment in a mental hospital were "qualitatively different from the punishment characteristically suffered by a person convicted of a crime," as well as resulted in "stigmatizing consequences" for the inmate. *Id.* at 493, 100 S.Ct. at 1264. Second, the Court cited *Washington v. Harper,* 494 U.S. 210, 221–22, 110 S.Ct. 1028, 1036–37, 108 L.Ed.2d 178 (1990), which held that an inmate had retained a liberty interest, which was constitutionally protected, from the involuntary administration of psychotropic

drugs.[230] It can be inferred from these examples that the type of restraint at issue is one that is essentially outside what would be expected in a prison setting.

It could be further inferred that the second type of restraint—one that "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life"—is one that is expected in the ordinary prison setting but is still atypical and, of course, also imposes a significant hardship. Thus, with this reading of *Sandin,* the plaintiffs here could argue that use of the hitching post violated either, or both, of these types of restraints—that is, it is totally outside what would be expected in a prison setting or it is expected in the ordinary prison setting but is still atypical and, of course, also imposes a significant hardship.

Within the confines of the language in *Sandin,* the two types of restraints can be distinguished in another way as well. As stated, the first type of restraint is described as one that "exceed[s] the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause *of its own force.*" (Emphasis added.) Thus, such a restraint would encroach upon a liberty interest and violate the due process clause even in the absence of a state law or regulation. The second type on restraint is described as one that "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." The words, "give rise to protection by the Due Process Clause *of its own force,*" are conspicuously absent. Thus, it could be concluded that, for the second type of restraint to give rise to a liberty interest, the restraint must be based on some state law or regulation that is mandatory, or otherwise restricts the authority of prison officials to impose the restraint, so as to give rise to a liberty interest (the traditional manner in which the Court has discerned a liberty or property interest, *see Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)) *and* that "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."

---

**229.** *See supra* note 228.

**230.** *See supra* note 228.

The *Sandin* Court's rejection of the inmate's assertion "that any state action taken for a punitive reason encroaches upon a liberty interest under the Due Process Clause even in the absence of any state regulation" supports this latter distinction between the two types of the restraints. 515 U.S. at 484, 115 S.Ct. at 2300. Moreover, in his dissent, Justice Breyer appears to read the majority opinion as essentially "clarifying," *Id.* at 496, 115 S.Ct. at 2306, or modifying, the traditional approach of determining whether a state law or regulation gives rise to a liberty interest by *adding* the requirement that the law or regulation must also "impose atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 496–504, 115 S.Ct. at 2304–2310. Justice Breyer explains that this additional requirement helps assure that "minor prison matters" are removed from "federal-court scrutiny." *Id.* at 497, 115 S.Ct. at 2306. Nevertheless, it cannot be overlooked that, in applying the second type of restraint, the *Sandin* Court majority looked principally to whether the restraint (the placement in segregation) was atypical; the Court did not look to whether the state regulation was mandatory. *Id.* at 485–86, 115 S.Ct. at 2301. The Court explained that the inmate's placement in disciplinary segregation "did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest" because the record reflected that "disciplinary segregation, with insignificant exceptions, mirrored those conditions imposed upon inmates in administrative segregation and protective custody." *Id.* at 486, 115 S.Ct. at 2293.[231]

Lower court decisions interpreting *Sandin* offer little insight to this issue. Some courts have specifically held that an inmate bringing a procedural-due-process claim must point to a state regulation that provides the liberty interest as a basis for the inmate's claim. *See, e.g., Frazier v. Coughlin*, 81 F.3d 313, 317 (2d Cir.1996) ("To prevail, [the inmate] must establish both that the confinement or restraint creates an 'atypical and significant hardship' under *Sandin*, and that the state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint."). Other courts reach the same result by implication. *See, e.g., Dominique v. Weld*, 73 F.3d 1156, 1161 (1st Cir.1996) (examining community release agreement and atypicality of removal from work-release program); *Whitford v. Boglino*, 63 F.3d 527, 531 (7th Cir.1995) (finding that Illinois' adoption of prison regulation did not create liberty interest where inmate did not suffer "significant hardship."). Still others refer only to the type of deprivation alleged by the inmate to determine whether a liberty interest entitled to due-process protection exists. *See, e.g., Pifer v. Marshall*, 139 F.3d 907, 1998 WL 81335, at *1 (9th Cir. Feb.24, 1998) (table) ("After *Sandin*, only those restraints, *whether regulated by mandatory language in prison codes or not,* that 'impose [ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life' are subject to due process review.") (emphasis added); *Beverati v. Smith*, 120 F.3d 500, 502–04 (4th Cir.1997); *Knecht v. Collins*, 903 F.Supp. 1193 (S.D.Ohio 1995) ("The new

**231.** It is unclear, but it appears that the *Sandin* Court applied the test for both types of restraints. The Court wrote:

"This case, though concededly punitive, does not present a dramatic departure from the basic conditions of Conner's indeterminate sentence. Although Conner points to dicta in cases implying that solitary confinement automatically triggers due process protection, *Wolff, supra*, at 571, n. 19, 94 S.Ct., at 2982, n. 19; *Baxter v. Palmigiano*, 425 U.S. 308, 323, 96 S.Ct. 1551, 1560, 47 L.Ed.2d 810 (1976) (assuming without deciding that freedom from punitive segregation for " 'serious misconduct' " implicates a liberty interest, holding only that the prisoner has no right to counsel) (citation omitted), this Court has not had the opportunity to address in an argued case the

question whether disciplinary confinement of inmates itself implicates constitutional liberty interests. We hold that Conner's discipline in segregated confinement did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest. The record shows that, at the time of Conner's punishment, disciplinary segregation, with insignificant exceptions, mirrored those conditions imposed upon inmates in administrative segregation and protective custody."

*Sandin*, 515 U.S. at 485–86, 115 S.Ct. at 2301. The paragraph could be understood to address the first type of restraint with the "dramatic departure" language and the second type of restraint with "atypical" language.

framework focuses solely upon the liberty interest lost, rather than upon the regulatory language.").

The Eleventh Circuit has not directly addressed this issue. In *Williams v. Fountain*, 77 F.3d 372 (11th Cir.), *cert. denied*, ―― U.S. ――, 117 S.Ct. 367, 136 L.Ed.2d 257 (1996), the court "assume[d]" without looking to specific prison regulations that the prisoner had "suffered a liberty deprivation and was entitled to due process," because his sanction of a full year in solitary confinement was "substantially more 'atypical and [of a] significant hardship' " than that of the inmate in *Sandin*. *Id.* at 374 n. 3. The Eleventh Circuit ultimately concluded that Williams had received the procedural due process protection to which he was entitled. *Id.* at 375–76.

More recently, in *Rodgers v. Singletary*, 142 F.3d 1252 (11th Cir.1998), the court summarized the holding in *Sandin* as follows:

> "[An] inmate can only claim a due process violation if he can show deprivation of a protected liberty interest, and that such interests are generally limited to (a) those actions that unexpectedly alter the inmate's term of imprisonment; and (b) those actions that impose an atypical and significant hardship in relation to the ordinary incidents of prison life."

*Id.* at 1253 n. 1. Thus, unlike the Second Circuit, it does not appear that the Eleventh Circuit has interpreted *Sandin* to require an inmate to point to a specific regulation for the creation of the protected liberty interest.

Here, the court need not resolve—at least not yet—how the types of restraints discussed in *Sandin* should be distinguished. A procedural-due-process violation would merely necessitate the imposition of some measure of process (*e.g.*, a hearing) before the restraint could be imposed. The plaintiffs maintain, and the evidence supports the conclusion, that the restraint at issue, that is, the hitching post, as it has been used through trial, may not be imposed at all. However, if the hitching post can be imposed in a manner that does not violate the eighth amendment, the court would then have to reach the ques-

tion of whether, under *Sandin*, some measure of process is required before it may be imposed. The plaintiffs' procedural-due-process argument is therefore premature.

The court notes, however, that the current record is void of much evidence as to whether the hitching post presents an "atypical and significant hardship" upon the inmates when compared to their normal conditions. Although the DOC Commissioner argued that placement on the hitching post was "normally expected" by the prisoners, this expectancy sheds no light on the type of conditions in the Alabama penal system absent the use of the hitching post. Should the court have to reach the plaintiffs' procedural-due-process argument, the plaintiffs may then have to offer proof of the existence of other prison regulations or statutes to support their claim. In her recommendation, the Magistrate Judge concluded that the DOC's Administrative Regulation 403 provides the plaintiffs with a state-created liberty interest in the type of punishment that may be imposed for refusal to work, as well as the process needed to impose such a punishment.[232] As the court has already noted, Administrative Regulation 414 permits the DOC to punish inmates, without a hearing, for "minor rules violations," such as "malingering, feigning illness, unsatisfactory work, disorderly conduct, and intentionally creating a security, safety or health hazard." [233] Thus, on the record before it, it is not clear to the court whether Administrative Regulation 403 provides the plaintiffs with such a state-created liberty interest.

Finally, the court considers the Commissioner's objection to the Magistrate Judge's determination that the hitching post violated the *substantive*-due-process right of the plaintiffs.[234] The Supreme Court has indicated that a substantive-due-process claim asserted in conjunction with an eighth-amendment claim for the unnecessary and wanton infliction of pain in a penal institution is duplicative:

---

**232.** Recommendation of the Magistrate Judge, at 88–89.

**233.** *See supra* notes 138–39 and accompanying text.

**234.** *See* recommendation of the Magistrate Judge, at 92–93.

"It would indeed be surprising if, in the context of forceful prison security measures, 'conduct that shocks the conscience' or 'afford[s] brutality the cloak of law,' and so violates the Fourteenth Amendment ... were not also punishment 'inconsistent with contemporary standards of decency' and repugnant to the conscience of mankind ... in violation of the Eighth."

*Whitley v. Albers*, 475 U.S. 312, 327, 106 S.Ct. 1078, 1088, 89 L.Ed.2d 251 (1986). The Court concluded that in cases challenging deliberate use of force as excessive and unjustified, "the Due Process Clause affords [an inmate] no greater protection than does the Cruel and Unusual Punishment Clause." *Id.*[235] Moreover, the Court reaffirmed its prior holding that were "a particular amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *County of Sacramento v. Lewis*, — U.S. —, —, 118 S.Ct. 1708, 1714, 140 L.Ed.2d 1043 (1998) (citing *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989)).[236] The court concludes that given the eighth-amendment analysis conducted above, it would be redundant to examine the plaintiffs' hitching-post claim under a substantive-due-process analysis. The court will therefore not adopt that portion of the Magistrate Judge's recommendation dealing with the plaintiffs' substantive-due-process right.[237]

## VII. RES JUDICATA AND COLLATERAL ESTOPPEL

The DOC Commissioner argues that the doctrine of res judicata bars the plaintiffs from asserting their hitching-post claim. In support of this argument, the Commissioner has submitted six unpublished recommendations from various magistrate judges in the Northern and Middle Districts of Alabama.[238] As explained more fully below, the court concludes that the plaintiffs' claim is not barred.

Although neither the Commissioner nor the plaintiffs have raised it as an issue, the court must first determine whether federal law or Alabama law applies. Unfortunately, as the Eleventh Circuit Court of Appeals recently noted, there is conflicting precedent in the Eleventh Circuit on this issue. *See Pleming v. Universal–Rundle Corp.*, 142 F.3d 1354, 1356 n. 1 (11th Cir. 1998) ("Our precedents on this question appear to lead in two different directions. *Compare Precision Air Parts, Inc. v. Avco Corp.*, 736 F.2d 1499, 1503 (11th Cir.1984) (a federal court reviewing the preclusive effect of a prior federal judgment applies federal common law) *with NAACP v. Hunt*, 891 F.2d 1555, 1560 (11th Cir.1990) ("Federal courts apply the law of the state in which they sit with respect to the doctrine of res judicata."))." Because the applicable state and federal principles were identical in *Pleming*, the Eleventh Circuit did not resolve the problem. *Id.* Examining the conflicting precedent, this court has concluded that "the better reading of Eleventh Circuit precedent is that a federal court applies federal preclusion principles when considering the effect of a prior federal court judgment." *Kachler v. Taylor*, 849 F.Supp. 1503, 1516 (M.D.Ala.1994) (Thompson, J.). Here, the DOC Commissioner has offered six unpublished recommendations authored by United States Magistrate Judges as support for his res judicata argument. Accordingly, the court will apply federal law to this issue.

**235.** *See also Williams v. Benjamin*, 77 F.3d 756, 768 (4th Cir.1996) ("[I]t is now well established that the Eighth Amendment 'serves as the primary source of substantive protection to convicted prisoners,' and the Due Process Clause affords a prisoner no greater *substantive* protection 'than does the Cruel and Unusual Punishments Clause.'" (quoting *Whitley*, 475 U.S. at 327, 106 S.Ct. at 1088)).

**236.** Further, in *United States v. Lanier*, 520 U.S. 259, — n. 7, 117 S.Ct. 1219, 1228 n. 7, 137 L.Ed.2d 432 (1997), the Court held that "*Graham* simply requires that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process."

**237.** *See supra* note 110.

**238.** *See* defendant's objection to the recommendation of the Magistrate Judge, exhibits 1–6.

The doctrine of res judicata, or claim preclusion, forecloses relitigation of matters actually or potentially litigated in an earlier lawsuit. *See S.E.L. Maduro, Inc. v. M/V Antonio de Gastaneta,* 833 F.2d 1477, 1481 (11th Cir.1987). "The application of res judicata requires that: (1) the issue contested in both proceedings be identical; (2) the parties to the subsequent proceeding are the same as, or are in privity with, the parties to the earlier proceeding; and (3) the earlier proceeding resulted in a final judgment on the merits." *Baptiste v. Commissioner of Internal Revenue,* 29 F.3d 1533, 1539 (11th Cir.1994). There are, however, limits on the application of the doctrine. "A judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings." *Martin v. Wilks,* 490 U.S. 755, 762, 109 S.Ct. 2180, 2184, 104 L.Ed.2d 835 (1989). This principle stems from the "'deep-rooted historic tradition that everyone should have his own day in court.' 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4449, p. 417 (1981)." *Id.* at 761–62, 109 S.Ct. at 2184. In *Richards v. Jefferson County, Ala.,* 517 U.S. 793, 116 S.Ct. 1761, 135 L.Ed.2d 76 (1996), the Supreme Court explained that in order for a prior litigation to have binding effect on future litigants, the prior litigation "would at least have to be 'so devised and applied as to insure that those present are of the same

class as those absent and that the litigation is so conducted as to insure the full and fair consideration of the common issue.'" *Id.* at 801, 116 S.Ct. at 1767 (quoting *Hansberry v. Lee,* 311 U.S. 32, 43, 61 S.Ct. 115, 119, 85 L.Ed. 22 (1940)). In *Richards,* the Court found that the parties seeking to litigate claims that had previously been litigated in the Alabama courts were not precluded by res judicata where the first set of litigants "did not sue on behalf of a class; their pleadings did not purport to assert any claim against or on behalf of any non-parties; and the judgment they received did not purport to bind any county taxpayers who were non-parties." *Id.* The Court therefore concluded that "there is no reason to suppose that the [prior] court took care to protect the interests of petitioners in the manner suggested by *Hansberry.*" *Id.* at 802, 116 S.Ct. at 1768.

The court finds that the Supreme Court's reasoning applies with equal force to the present situation. Even a cursory examination of the opinions submitted by the Commissioner reveals that the cases were litigated by pro se prisoner-plaintiffs, some of whom did not even present evidence to the court in support of their claims, and who were seeking damages for alleged injuries, rather than class-wide, injunctive relief. Furthermore, the facts presented by the cases vary dramatically from the factual record before the court in the present litigation.[239] Under these circumstances, the

---

**239.** In *Williamson v. Anderson,* 92–H–675–N (M.D.Ala. Aug. 18, 1993), Magistrate Judge Carroll granted the defendant's motion for summary judgment and dismissed the inmate's claim that handcuffing him to the fence for refusing to work violated his constitutional rights. The Magistrate Judge noted that the inmate was given "unlimited water and access to restroom facilities." *Id.* at 2. In *Vinson v. Thompson,* 94–A–268–N (M.D.Ala. Dec. 9, 1994), Magistrate Judge McPherson granted the defendants' motion for summary judgment on the inmate's claim that his constitutional rights were violated when he was placed on a restraining bar. In so holding, the Magistrate Judge stated that the inmate had "offered no evidence to support his claims other than his allegations that he was subjected to cruel and unusual punishment." *Id.* at 5. Similarly, in *Hollis v. Folsom,* 94–T–0052–N (M.D.Ala. Nov. 4, 1994), Magistrate Judge McPherson concluded that the plaintiff provided no evidence to support his claim that being handcuffed to a fence for two hours violated his

eighth amendment rights. *Id.* at 9–10. In *Kimble v. Hightower,* 95–B–1328–S (N.D. Ala. April 5, 1996), Magistrate Judge Greene found that the inmate's placement upon the restraining bar did not violate the inmate's eighth amendment rights. However, the court specifically stated, "It is important to note that plaintiff was given food, water, and the opportunity to use toilet facilities while he was on the restraining bar and that he was examined by a nurse after each restraint." *Id.* at 6. In *Ashby v. Dees,* 94–U–0605–NE (N.D.Ala. Dec. 27, 1994), Magistrate Judge Putnam granted summary judgment in favor of the defendants and found that they did not act sadistically or maliciously when they chained the inmate to a fence for 45 minutes and kept him in the sally port for an additional 45 minutes. The Magistrate Judge stated "Handcuffing lasted only as long as he refused to work and then for only 45 minutes." *Id.* at 8. Finally in *Lane v. Findley,* 93–C–1741–S (N.D.Ala. Aug. 24, 1994), Magistrate Judge Greene found that an inmate's placement on the hitching post for

court concludes that the plaintiffs' hitching-post claim is not barred by the cases cited by the Commissioner. Moreover, the Commissioner has made no representation to this court as to whether the recommendations were adopted by the district court judges to whom the cases were assigned. Thus, the court finds that the opinions have no preclusive effect.

## VIII. RELIEF

As stated earlier, any relief ordered by this court to remedy the constitutional violations created by the hitching post must comply with the PLRA. With respect to prospective relief regarding prison conditions, the PLRA provides:

> "Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." [240]

§ 3626(a)(1)(A). Thus in the case before it, the court must consider whether the relief it imposes: (1) extends no further than necessary to correct the Commissioner's violations of the plaintiffs' eighth and fourteenth amendment rights; (2) is narrowly drawn; (3) is the least intrusive means to remedy the above violations; and (4) does not create an adverse impact on the DOC's resources. The PLRA states that prospective relief regarding prison conditions is terminable two years after the date the court granted or

approved such relief. 18 U.S.C.A. § 3626(b)(1)(A)(i). However, the statute also states that prospective relief "shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and is the least intrusive means to correct the violation." § 3626(b)(3).

However, the question precedent to the issue of *how* the court should frame any prospective injunctive relief is *whether* the court should issue such relief. In *Farmer v. Brennan*, the Supreme Court set out the method by which a court should determine the appropriate relief when plaintiff-prisoners seek an injunction to prevent a substantial risk of serious injury from ripening into actual harm. 511 U.S. at 845, 114 S.Ct. at 1983. As explained earlier, the court is to examine the prison authorities' "current attitudes and conduct" at the time the lawsuit is brought, as well as throughout the litigation. *Id.* That is, prison authorities may prevent the issuance of an injunction by proving that, "during the litigation, ... they were no longer unreasonably disregarding an objectively intolerable risk of harm and that they would not revert to their obduracy upon cessation of the litigation." *Id.* at 846 n. 9, 114 S.Ct. at 1983 n. 9. If the court is satisfied that the objective and subjective components of the eighth-amendment analysis are met, the court may grant appropriate injunctive relief.

Here, the DOC Commissioner has received explicit notice from two sources that his use of the hitching post resulted in sufficiently substantial danger to its inmates: first, from its correspondence with the Department of Justice in 1994 and 1995; and

---

five hours did not violate the inmate's eighth amendment rights. Again, the Magistrate Judge noted that the inmate "was given food, water, and the opportunity to use toilet facilities while he was held in the sally port and that he was examined by a nurse during and after the restraint." *Id.* at 9.

**240.** The statute further provides:

"(B) The court shall not order any prospective relief that requires or permits a government official to exceed his or her authority under State or local law or otherwise violates State or local law, unless—

(i) Federal law requires such relief to be ordered in violation of State or local law;

(ii) the relief is necessary to correct the violation of a Federal right; and

(iii) no other relief will correct the violation of the Federal right."

more recently, from the Magistrate Judge's recommendation in 1997. And, of course, with this memorandum opinion, the Commissioner has received additional notice. Pursuant to *Farmer*, the court will conduct a hearing to determine the following, among other things: first, whether the hitching post can be used in a constitutionally permissible manner; second, if so, what progress, if any, the Commissioner has made in addressing the unconstitutional manner in which the post has been used; and, third, the likelihood that the Commissioner will cease using the post altogether, or in an unconstitutional manner, in the future. If the post can be used in a constitutional manner and if the Commissioner is willing to commit to its use in this manner, the court will also address whether, under *Sandin v. Conner*, certain due-process measures must precede its use.

The more difficult question for the court is whether it should order temporary, provisional relief pending the outcome of the supplemental hearing. To be sure, the Commissioner's use of the hitching post in Alabama prisons has resulted in serious harm to inmates. Nevertheless, if the Commissioner will assure the court that he will suspend the use of the post, at least until the parties have had an opportunity to update the court on whether the post is still being used in an unconstitutional manner and whether the post can be used in a constitutional manner, the court will not issue any prospective injunctive relief and will, instead, limit the relief to a declaration of unconstitutionality.

An appropriate judgment will be entered.

## JUDGMENT

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court that the recommendation of United States Magistrate Judge Vanzetta Penn McPherson, entered January 28, 1997 (Doc. no. 372), is adopted in part and rejected in part.

It is further ORDERED as follows:

(1) The parties' joint motion, filed June 28, 1996 (Doc. no. 155), for approval of the settlement agreement on the chain-gang claim is granted with the modification that the plaintiffs' claim is dismissed *without* prejudice.

(2) Pursuant to said settlement agreement, and on the court's independent evaluation of the certification requirements, the following plaintiff class is certified: all present and future Alabama inmates who have been or may be assigned to work in chain gangs, with the class represented by named plaintiffs Michael A. Austin, Richard Elliot, Ogie Lee Hayes, Charles Orlander Guess, Warren Leatherwood, and Kervin Goodwin.

(3) The plaintiffs' chain-gang claim is dismissed without prejudice.

It is further ORDERED as follows:

(1) The parties' joint motion, filed September 27, 1996 (Doc. no. 344), for preliminary approval of the settlement agreement of the toilet-facilities claim is granted.

(2) A fairness hearing is set for November 17, 1998, at 10:00 a.m. in the second floor courtroom of the federal courthouse in Montgomery, Alabama.

(3) By no later than September 8, 1998, the parties shall file with the court the following:

(a) A joint proposed notice to the members of the putative plaintiff class regarding the settlement;

(b) A joint proposed means of distributing notice to the putative class; and

(c) A joint proposed form for putative class members to use to file their objections.

(4) A status conference on the issue of notice to the putative class is set for September 21, 1998, at 8:00 a.m. in chambers at the federal courthouse in Montgomery, Alabama.

It is further ORDERED that the plaintiffs' motion for class certification, filed May 18, 1995 (Doc. no. 8) and amended motion for class certification, filed March 11, 1996 (Doc. no. 74), are granted, and two classes of plaintiffs are certified in this action as follows:

(1) All present and future Alabama inmates who have been or may be assigned to the ATU, with the class represented by named plaintiffs Michael A. Austin, Richard Elliot, Ogie Lee Hayes, Charles Orlander Guess, Warren Leatherwood, and Kervin Goodwin.

(2) All present and future Alabama inmates who have been or may be placed on the hitching post, with the class represented by named plaintiffs Michael A. Austin, Richard Elliot, Ogie Lee Hayes, Charles Orlander Guess, Warren Leatherwood, and Kervin Goodwin.

It is further ORDERED that judgment is entered in favor of defendant Commissioner of the Department of Corrections and against the plaintiffs on the plaintiffs' visitation-privileges claim.

It is further ORDERED as follows:

(1) Judgment is entered in favor of plaintiffs and against defendant Commissioner of the Department of Corrections on the plaintiffs' hitching-post claim.

(2) It is DECLARED that the manner in which defendant Commissioner of the Department of Corrections has used the hitching post violates the eighth amendment to the United States Constitution.

(3) A supplemental hearing is set for September 22, 1998, at 10:00 a.m. in the second floor courtroom of the federal courthouse in Montgomery, Alabama. The parties are to submit prehearing briefs by September 17, 1998.

(4) Defendant Commissioner of the Department of Corrections is allowed until August 24, 1998, to submit to the court a written assurance that he will suspend the use of the hitching post until the parties have had an opportunity to update the court on whether the post is still being used in an unconstitutional manner and whether the post can be used in a constitutional manner. If the court does not receive such an assurance, it will then consider whether to issue interim prospective injunctive relief.

It is further ORDERED that costs are taxed against the defendant Commissioner of the Department of Corrections, for which execution may issue.